**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

---

DROR ADAM; ADAM BERES LLC a/k/a ADAM BERES
ONE LLC; BERES ADAM ONE LLC; D. MODY
PROPERTIES, LTD.; RSN FINANCE, LLC; SHNIZEL OH
LLC; ZUK DOMESTIC HOLDINGS, INC., and ZUK
MARBLE PRODUCTS, LTD.;

       Plaintiffs,

     -v-

GEORGE NAKHLE; SAMIR NAKHLE; RICHARD
RUSSELL GUTZKY; CAF BORROWER GS LLC;
COREVEST AMERICAN FINANCE LENDER LLC; GS &
M LLC; LIEBERMAN, DVORIN & DOWD, LLC;
NADAM LLC; RG HOLDINGS DELAWARE LLC; RG
HOLDINGS PERM, LLC; RG HOLDINGS PERM II, LLC;
RSN HOLDINGS I LLC;  RSN HOLDINGS II, LLC; RSN
HOLDINGS 4, LLC; RSN HOLDINGS DELAWARE, LLC;
R.S.N. PROPERTIES LLC; UNITED SYNERGY GROUP,
LLC; WILMINGTON TRUST, NATIONAL
ASSOCIATION; and 6395 PEARL ROAD LLC;

       Defendants,

---

**COMPLAINT**

**JURY DEMAND ENDORSED
HEREON**

## PRELIMINARY STATEMENT

Plaintiffs Dror Adam, an individual acting personally (with respects to Counts I, XXIII,

XXIV, XXV, XXVI, XXVII, XXVIII, XXIX, XXX, XXXI, XXXII and XL) and as assignee of

the interest of Bavaria MF LLC, a Florida limited liability company (with respect to Counts I,

XXXIII, XXXIV, XXXV, XXXVI, XXXVII, XXXVII,I XXXIX and XL) (**Adam**),  Adam Beres

LLC a/k/a Adam Beres One LLC, a Florida limited liability company (bringing claims in Counts

I, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII, XXIII, XXIV, XXV, XXVI, XXVII

and XL) (**ABO**), Beres Adam One LLC, a Florida limited liability company (bringing claims in

Counts I, XXVIII, XXIX, XXX, XXXI, XXXII and XL) (*BAO*), D. Mody Properties, Ltd., an Israeli limited liability company (bringing claims in Counts I, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII and XL) (*D. Mody*), RSN Finance, LLC, an Ohio limited liability company (bringing claims in Counts I, XIII, XIV, XV, XVI, XIX, XX, XXI, XXII and XL) (*Finance*), Shnizel OH LLC, an Ohio limited liability company (bringing claims in Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XII and XL) (*Shnizel*), and Zuk Domestic Holdings, Inc., a Florida corporation (bringing claims in Counts I, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII and XL) (*Zuk*), and Zuk Marble Products, Ltd., an Israeli corporation (bringing claims in Counts I, XIII, XIV, XVIII, XIX, XX and XL) (*Zuk Marble*, and together with Adam, ABO, BAO, DMP, Finance, Shnizel and Zuk, the *Plaintiffs*), by their undersigned counsel, allege in this complaint against defendants George Nakhle (in Counts I, II, III, V, VI, VII, VIII, X, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XXI, XXII, XXIII, XXIV, XXV, XXVI, XXVII, XXVIII, XXIX, XXX, XXXI, XXXII, XXXIII, XXXIV, XXXV, XXXVI, XXXVIII, and XXXIX) (*George Nakhle*), Samir Nakhle (in Counts I, II, III, V, VI, VII, VIII, X, XI, XII, XIII, XIV, XVI, XVII, XVIII, XIX, XXI, XXII, XXIII, XXVI, XXVII, XXVIII, XXIX, XXX, XXXI, XXXII, XXXIII, XXXIV, XXXV, XXXVI, XXXVIII and XXXIX) (*Samir Nakhle* and, together with George Nakhle, the *Nakhles*), Richard Russell Gutzky (in Counts I, II, III, V, VI, VII, VIII, X, XI, XII, XIII, XIV, XVI, XVII, XVIII, XIX, XXI, XXII, XXIII, XXVI, XXVII, XXVIII, XXIX, XXX, XXXI, XXXII, XXXIII, XXXIV, XXXV, XXXVI, XXXVIII and XXXIX) (*Gutzky*), CAF Borrower GS LLC, a Delaware limited liability company (in Counts X, XII, XXI and XXVII) (*CAF*), Corevest American Finance Lender LLC (in Counts X, XII, XXI, XXII, XXVII, XXXVIII and XXXIX) (*Corevest*), GS & M LLC, an Ohio limited liability company (in Counts I, II, III, IV, V, VI, VII, VIII, X, XI, XII and XL) (*GS&M*), Lieberman, Dvorin & Dowd, LLC, an Ohio limited

liability company (in Counts IX, XX and XXXVII) (***Lieberman***), Nadam LLC, an Ohio limited

liability company (in Counts I, XXIII, XXVI, XXVII and XL) (***Nadam***), RG Holdings Delaware,

LLC, a Delaware limited liability company (in Counts I, II, III, IV, V, VI, VII, VIII X, XI, XII,

XIII, XIX, XXI, XXII, XXIII, XXVI, XXVII, XXXIII, XXXIV, XXXV, XXXVI, XXXVIII,

XXXIX and XL) (***RG Delaware***), RG Holdings Perm, LLC, a Delaware limited liability company

(in Counts I, II, III, IV, V, VI, VII, VIII, X, XI, XII, XIII, XIX, XXI, XXII and XL) (***RG Perm***),

RG Holdings Perm II, LLC, a Delaware limited liability company (in Counts I, II, III, IV, V, VI,

VII, VIII, X, XI, XII and XL) (***RG Perm II***), RSN Holdings I, LLC, an Ohio limited liability

company (in Counts I, II, III, IV, V, VI, VII, VIII, X, XI, XII, XXVIII, XXIX, XXX, XXXI,

XXXII and XL) (***RSN I***), RSN Holdings II, LLC, an Ohio limited liability company (in Counts I,

XIII, XIX, XXI, XXII and XL) (***RSN II***), RSN Holdings 4, LLC, an Ohio limited liability company

(in Counts I, II, III, IV, V, VI, VII, VIII, X, XI, XII and XL) (***RSN 4***), RSN Holdings Delaware,

LLC, a Delaware limited liability company (in Counts I, II, III, IV, V, VI, VII, VIII, X, XI, XII

and XL) (***RSN Delaware***), R.S.N. Properties LLC, an Ohio limited liability company (in Counts

I, XIII, XIV, XVI, XVII, XVIII, XIX, XXI, XXII and XL) (***RSN Properties***), United Synergy

Group LLC, an Ohio limited liability company (in Counts I, XIII, XIX, XXI, XXII and XL)

(***United Synergy***), Wilmington Trust, National Association, as Trustee for the benefit of the

Holders of CoreVest American Finance 2019-1 Trust Mortgage Pass-Through Certificates (in

Counts X, XII, XXI and XXII) (***Wilmington***), and 6395 Pearl Road LLC, an Ohio limited liability

company (in Counts I, XIII, XIX, XXI, XXII and XL) (***Pearl Road***, and together with George

Nakhle, Samir Nakhle, Gutzky, CAF, Corevest, GS&M, Lieberman, Nadam, RG Delaware, RG

Perm, RG Perm II, RSN I, RSN II, RSN 4, RSN Delaware, RSN Properties, Wilmington , United

Synergy and Pearl Road, the ***Defendants***; GS&M, Nadam, RG Delaware, RG Perm, RG Perm II,

RSN I, RSN II, RSN 4, RSN Delaware, RSN Properties, United Synergy and Pearl Road are also additionally referred to as the **Controlled Entities** of Defendants George Nakhle, Samir Nakhle and Gutzky), inclusively, as follows, on personal knowledge of the Plaintiffs as to matters concerning them, and on information and belief as to all other matters:

1.      Despite the number of Plaintiffs and Defendants named, with overlapping but not identical claims, this case is straightforward.  Defendants' conduct is brazen highway robbery; it violates the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. 1961 et seq.) (the **RICO Act**).

2.      Put simply, the Nakhles and Gutzky used the Controlled Entities to fraudulently acquire over 200 real properties located in Northern Ohio and money pursuant to loans associated therewith, in violation of their contractual obligations and assurances, at Plaintiffs' expense. Plaintiffs were the victims of a host of chronologically overlapping fraud schemes that were executed simultaneously, with almost all defaults under all business arrangements happening at one time, namely, in the late summer of 2019.

3.      Defendant Corevest provided mortgages on the properties acquired by the Nakhles and Gutzky through their Controlled Entities.  Corevest later transferred some of the mortgages to CAF, and CAF and Corevest then transferred some of the mortgages to Defendant Wilmington.

4.      Defendant Lieberman aided and abetted the fraud by permitting it to be conducted through their law firm and, despite receiving a *pro forma* conflict waiver, in brazen violation of their professional obligations to the Plaintiffs.  Defendant Lieberman acted for the clear benefit of the Nakhles, Gutzky and their various Controlled Entities to the detriment of their Plaintiff clients.

5.      The fraud perpetrated by the Nakhles and Gutzky through their various controlled entities can be broken into five separate schemes, of which one involved multiple tranches.  The

fraudulent schemes employed are as follows: (1) a complex real estate fraud scheme that saw the Nakhles and Gutzky fraudulently acquire 194 properties in Cuyahoga County, Ohio, from 80 individual investors, the vast majority of which were Florida limited liability companies owned by Israeli investors not resident in the United States (of which Plaintiff Shnizel is the assignee for 78 of 80 individual investors owning 192 of such 194 properties) (the ***Property Fraud***), (2) a similar real estate fraud scheme through which the Nakhles set up a joint venture entity, Plaintiff Finance, ostensibly to acquire and renovate a further 29 properties in Cuyahoga County, Ohio, which properties were fraudulently registered to Controlled Entities instead of being registered to Finance, after which time the Nakhles' defaulted on their obligations to Plaintiff Finance (the ***JV Fraud***), (3) a fraud almost identical to the JV Fraud involving the creation of an entity with Adam (Nadam) that bought a property involved in the Property Fraud that was then transferred to RG Delaware by George Nakhle (the ***Nadam Fraud***), (4) a fraud perpetrated by the Nakhles against Plaintiff Adam, who was induced to provide the Nakhles with loans based on their misrepresentations to use proceeds from the real estate transactions to repay the loans, which never happened (the ***Loan Fraud***), and (5) a real estate fraud scheme separate from the Property Fraud and JV Fraud involving the transfer of one piece of real estate in Cuyahoga County, Ohio that Defendant George Nakhle did not pay the purchase price for as stipulated (as in the Property Fraud), but which also suffered a fire from which Defendant George Nakhle received insurance proceeds that were pocketed rather than used to pay the sale price still due to the owner, Bavaria MF LLC (the ***Bavaria MF Fraud***).

6.      The Property Fraud was executed in three tranches or "lots", with the defaults on the first lot not occurring until the third lot had been transferred.

7.     At all times, Plaintiffs relied on Lieberman to apprise them of any issues or problems with the legality of the actions that the Nakhles and Gutzky were taking through their Controlled Entities for the Property Fraud, JV Fraud and Bavaria MF Fraud.  While it was understood that Lieberman was representing both sides, the Plaintiffs were not aware that Lieberman was in fact turning a blind eye to wrongdoing committed by the Nakhles and Gutzky against Plaintiffs.

8.     In the Property Fraud, JV Fraud and Bavaria MF Fraud, Defendant Corevest provided mortgages to the various Controlled Entities.  These mortgages were partially transferred to CAF, and then Corevest and CAF transferred some of the mortgages to Wilmington.

9.     In each fraud scheme, the Nakhles and Gutzky brazenly pocketed the proceeds of their wrongdoing and have since raised the laughable argument that they can repay the Plaintiffs whenever they feel like it.

10.     The net result of the fraud perpetrated by the Nakhles and Gutzky through their Controlled Entities has been the loss of over 200 real properties and all income (rents, maintenance fees and otherwise) associated with such properties, which the Nakhles and Gutzky continue to collect even as the properties themselves are neglected, as well as the loss of loans and the associated interest income.

11.     Because the Nakhles and Gutzky were only interested in fraudulently pulling cash out the properties, many of the properties are now falling into disrepair, and at least four actions have been initiated against some of the properties by the tax assessor for Cuyahoga County, Ohio, for failure to pay property taxes as the same became due.

12.     The actions by the Nakhles and Gutzky, acting through the alter egos of their Controlled Entities, used the instrumentalities of interstate commerce and constitute, among other things, mail fraud and wire fraud.

13.     As a result of the fraud perpetrated by the Nakhles and Gutzky through the Controlled Entities, they have acquired over $12.8 million in value from the Plaintiffs.

14.     Due to the willful neglect, waste and delinquency of the Nakhles and Gutzky, combined with the high mortgage amounts encumbering the properties, the value of the properties are diminishing as the Nakhles and Gutzky continue to openly misappropriate value from the properties.

15.     The fact that the properties now bear mortgages is the result of loans issued by Corevest to the Controlled Entities on the basis of bank fraud committed by the Nakhles and Gutzky.

16.     To this day, the Nakhles and Gutzky continue to make money from their fraudulent schemes, earning money from the properties and running them into the ground at the same time.

17.     Plaintiffs bring this consolidated case against the Defendants for, among other things, fraud, fraudulent misrepresentation, conversion, and claims under the RICO Act.

## PARTIES

18.     Plaintiff Dror Adam is an individual residing at Kibutz Ashdot Yacov Meuhad, D.N. Jordan Valley, 1515000 Israel, and is acting both on behalf of himself as the creditor in the Loan Fraud and as the assignee of the claims of Bavaria MF LLC (***Bavaria***) with respect to the Bavaria MF Fraud.  Adam was a lender in the Loan Fraud and assignee of claims in the Bavaria MF Fraud.

19.     Plaintiff Adam Beres, LLC a/k/a Adam Beres One, LLC is a Florida limited liability company in good standing and registered with the Ohio Department of State to do business in Ohio, with a business address at 1423 SE 10th Street, Suite 1, Cape Coral, FL 33990.  Adam is a member and manager of ABO.  ABO was a lender in the Loan Fraud.

20.     Plaintiff Beres Adam One LLC is a Florida limited liability company in good standing in good standing and registered with the Ohio Department of State to do business in Ohio, with a business address at 1423 SE 10th Street, Suite 1, Cape Coral, FL 33990.  Adam is a member and manager of BAO.  BAO was a lender in the Loan Fraud.

21.     Plaintiff D. Mody Properties, Ltd. is an Israeli limited liability company and registered with the Ohio Department of State to do business in Ohio, with a business address of 31 Lechi Street, Bnei Brak, 5120052 Israel.  D. Mody was a defrauded member of the joint venture in the JV Fraud.

22.     Plaintiff RSN Finance, LLC is an Ohio limited liability company in good standing with principal operations in Cuyahoga County, Ohio, with a business address of c/o Adam Beres, LLC, 1423 SE 10th Street, Suite 1, Cape Coral, FL 33990.  Finance was the joint venture started in the JV Fraud and the derivative claims connected to Finance are being brought on behalf of its members.

23.     Plaintiff Shnizel OH, LLC is an Ohio limited liability company in good standing, with a business address of 1423 SE 10th Street, Suite 1, Cape Coral, FL 33990.  Shnizel is the assignee of all rights and interests, including the property interests at issue and causes of action alleged in this lawsuit, of the 78 investors identified in Exhibit 1 attached hereto and incorporated by reference (the ***Property Fraud Investors***), each of whom was defrauded of their property in connection with the Property Fraud.

24.     Plaintiff Zuk Domestic Holdings, Inc. is a Florida corporation in good standing and registered with the Ohio Department of State to do business in Ohio, with a business address of 2001 NW 44th Street, Pompano Beach, FL 33064.  Zuk was a defrauded member of the joint venture in the JV Fraud.

25.     Plaintiff Zuk Marble is an Israeli corporation in good standing, with a business address of 2 Ha'Nagar Street, Kfar Saba, Israel 4442532.  Zuk Marble loaned $1,000,000 to Finance on behalf of Plaintiff Zuk pursuant to a promissory note and loan agreement secured by a guarantee, which money was stolen as part of the JV Fraud.

26.     Defendant George Nakhle is a Cuyahoga County, Ohio resident residing at 17590 Parkside Drive North, North Royalton, OH 44133.  George Nakhle instigated and executed the Property Fraud, the JV Fraud, the Nadam Fraud, the Loan Fraud and the Bavaria MF Fraud.

27.     Defendant Samir Nakhle is, upon information and belief, a Cuyahoga County, Ohio resident residing at 7420 Cherry Hill, Broadview Heights, OH 44147, who also lives part time in Florida.  Samir Nakhle executed the Property Fraud, the JV Fraud, the Nadam Fraud, the Loan Fraud and the Bavaria MF Fraud.

28.     Defendant Richard Russell Gutzky is, upon information and belief, a Florida resident.  Gutzky executed the Property Fraud, the JV Fraud, the Nadam Fraud, the Loan Fraud and the Bavaria MF Fraud.

29.     Defendant CAF Borrower GS, LLC is a Delaware limited liability company with an address at c/o VCORP Services, LLC, Statutory Agent, 1013 Centre Road, Suite 403-B, Wilmington, DE 19805, and is a lender to real estate investors.  CAF holds mortgages from the Property Fraud.

30.    Defendant Corevest American Finance Lender, LLC is a Delaware limited liability company with an address at c/o VCORP Agent Services, Inc., Statutory Agent, 4400 Easton Commons Way, Suite 125, Columbus, OH 43219, and is a lender to real estate investors.  Corevest was involved in providing mortgages and other loans in connection with the Property Fraud, the JV Fraud and the Bavaria MF Fraud.

31.    Defendant GS & M LLC is an Ohio limited liability company with an address at c/o GL Administrative Services Company, Statutory Agent, 30195 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124 that, upon information and belief, is controlled by the Nakhles and Gutzky. GS&M was involved in the Property Fraud.

32.    Defendant Lieberman, Dvorin & Dowd LLC is an Ohio limited liability company and law firm with an address at 3019 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124. Lieberman is working out of the same address and suite as GL Administrative Services Company and LDD Administrative Service Company, LLC, both of which act as the statutory agents for all of the Controlled Entities of the Nakhles and Gutzky, and the latter of which at least is, based on its initials, clearly associated with Lieberman.  Lieberman aided and abetted the Property Fraud, the JV Fraud and the Bavaria MF Fraud.

33.    Defendant Nadam LLC is an Ohio limited liability company with an address at c/o LDD Administrative Service Company, LLC, Statutory Agent, 30195 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124 that, upon information and belief, is controlled by the Nakhles and Gutzky. Nadam was involved in the Loan Fraud.

34.    Defendant RG Holdings Delaware LLC is a Delaware limited liability company with an address at c/o LDD Administrative Service Company, LLC, Statutory Agent, 30195 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124 that, upon information and belief, is controlled

by the Nakhles and Gutzky. RG Delaware was involved in the Property Fraud, the JV Fraud, the Loan Fraud and the Bavaria MF Fraud.

35. Defendant RG Holdings Perm, LLC is a Delaware limited liability company with an address at c/o LDD Administrative Service Company, LLC, Statutory Agent, 30195 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124 that, upon information and belief, is controlled by the Nakhles and Gutzky. RG Perm was involved in the Property Fraud and the JV Fraud.

36. Defendant RG Holdings Perm II, LLC is a Delaware limited liability company with an address at c/o LDD Administrative Service Company, LLC, Statutory Agent, 30195 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124 that, upon information and belief, is controlled by the Nakhles and Gutzky. RG Perm II was involved in the Property Fraud.

37. Defendant RSN Holdings I, LLC is an Ohio limited liability company with an address at 17830 Englewood Drive, Middleburg Heights, OH 44130, that, upon information and belief, is controlled by the Nakhles and Gutzky. RSN I was involved in the Property Fraud and the Loan Fraud.

38. Defendant RSN Holdings II, LLC is an Ohio limited liability company with an address at c/o LDD Administrative Service Company, LLC, Statutory Agent, 30195 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124, that, upon information and belief, is controlled by the Nakhles and Gutzky. RSN II was involved in the JV Fraud.

39. Defendant RSN Holdings 4, LLC is an Ohio limited liability company with an address at c/o LDD Administrative Service Company, LLC, Statutory Agent, 30195 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124, that, upon information and belief, is controlled by the Nakhles and Gutzky. RSN 4 was involved in the Property Fraud and the Loan Fraud.

40.     Defendant RSN Holdings Delaware, LLC is a Delaware limited liability company with an address at c/o LDD Administrative Service Company, LLC, Statutory Agent, 30195 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124, that, upon information and belief, is controlled by the Nakhles and Gutzky.  RSN Delaware was involved in the Property Fraud and the Loan Fraud.

41.     Defendant R.S.N. Properties LLC is an Ohio limited liability company with an address at c/o LDD Administrative Service Company, LLC, Statutory Agent, 30195 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124, that, upon information and belief, is controlled by the Nakhles and Gutzky.  RSN Properties was involved in the JV Fraud.

42.     Defendant United Synergy Group, LLC is an Ohio limited liability company with an address at c/o LDD Administrative Service Company, LLC, Statutory Agent, 30195 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124, that, upon information and belief, is controlled by the Nakhles and Gutzky.  United Synergy was involved in the JV Fraud.

43.     Defendant Wilmington Trust, National Association is a [need information] with an address at [address].  Several of the mortgages for the properties in the Property Fraud and the JV Fraud were assigned to Wilmington.

44.     Defendant 6395 Pearl Road LLC is an Ohio limited liability company with an address at c/o LDD Administrative Service Company, LLC, Statutory Agent, 30195 Chagrin Blvd., Suite 300, Pepper Pike, OH 44124, that, upon information and belief, is controlled by the Nakhles and Gutzky.  Pearl Road was involved in the JV Fraud.

## JURISDICTION AND VENUE

45.     This action arises under the Federal laws of the United States of America, specifically, the RICO Act.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331,18 U.S.C. § 1964, and 18 U.S.C. § 1961 et seq.

46.     This Court has supplemental jurisdiction over Ohio state law claims pursuant to 28 U.S.C. § 1367(a) as those claims are so related to the Federal claims in this action that they form part of the same case or controversy.

47.     Venue is proper in this Court pursuant to 18 U.S.C. 1965(a), because all of the causes of action alleged herein first came into existence in Cuyahoga County, Ohio, where all properties converted in the Property Fraud, the JV Fraud and the Bavaria MF Fraud are located, where the Property Fraud, the JV Fraud, the Loan Fraud and the Bavaria MF Fraud were committed, and where the damages to the Plaintiffs and Property Fraud Investors initially arose and first took effect.

## STANDING

48.     Plaintiff Shnizel has standing as the due assignee of the Property Fraud Investors to bring their claims directly with respect to the Property Fraud.

49.     Plaintiff Adam has standing as the due assignee of Bavaria to bring its claims directly with respect to the Bavaria MF Fraud.

50.     Plaintiffs ABO, D. Mody and Zuk are bringing a derivative action on behalf of Plaintiff Finance pursuant to Ohio R.C. 1705.49.  Management of Finance is not reserved to its members but its two managers, whose decisions must be unanimous.  One of the managers is Defendant George Nakhle, who clearly will not authorize the filing of a lawsuit against him, his

father Samir, his business partner Gutzky and their Controlled Entities, thus authorizing ABO, D. Mody and Zuk to bring derivative action on their behalf with respect to the JV Fraud.

51.     With respect to all other causes of action, the Plaintiffs have standing to bring their claims directly against the Defendants.

## STATEMENT OF FACTS

**A.     Introduction**

52.     The fraud perpetrated against the Plaintiffs arises from the fact that 80 limited liability companies, mostly formed in Florida, with Israeli citizens as their principals, invested in 194 properties in Cuyahoga County, Ohio, as an investment.

53.     The investor claims relating to 192 of the properties were subsequently assigned to Shnizel, and the properties forming the subject matter for such claims are hereinafter referred to as the ***Property Fraud Properties***.  The remaining 2 properties not covered by this lawsuit were nonetheless sold in the same transactions as the Property Fraud Properties as part of the Property Fraud, but to avoid confusion will not be discussed in this complaint.

54.     The Property Fraud Properties are rental properties that consist of a variety of single family homes and multi-family buildings of up to 17 units.

55.     The Property Fraud Investors were capable of receiving gross rents of $170,000 to $200,000 per month on the Property Fraud Properties, depending on occupancy.

56.     Although the Property Fraud Properties were generating profits for the Property Fraud Investors, the Property Fraud Investors were, as previously alleged, owned by individuals residing in Israel.  This made hands-on management of the Property Fraud Properties difficult and led the Property Fraud Investors to consider the idea of selling all of the Property Fraud Properties as a portfolio.

57.     At some point in 2017, the Nakhles and Gutzky became aware of the opportunity to purchase the Property Fraud Properties.  They conducted some due diligence and then offered to purchase all of the Property Fraud Properties on an "as is" basis.

58.     The Nakhles acted as the "face" of the Controlled Entities, with Gutzky acting as the "silent partner" and majority owner.

## B.     The Defendants Set up the Property Fraud

59.     The managers for the Property Fraud Investors engaged Lieberman to act as their counsel.  They, on behalf of the Property Fraud Investors, executed engagement agreements with Lieberman pursuant to which Lieberman would act as "deal counsel" to all the parties in any transactions with the Nakhles, Gutzky and the Controlled Entities.

60.     Lieberman made the parties execute a *pro forma* conflict waiver that stated, among other things, that " ... each Party has been urged to seek independent legal counsel ... and has had a fair and reasonable opportunity to seek independent legal counsel and each have elected not to do so."

61.     Despite making this formal disclosure, Lieberman promised in its engagement letter that it would represent the Property Fraud Investors.  In its representation, it was obligated to adhere to Rule 1.7(b)(1) of the Ohio Rules of Professional Conduct, which states that an attorney or firm may not waive a conflict unless " ... the lawyer will be able to provide competent and diligent representation to each client".

62.     As we shall see, Lieberman did not fulfill its obligations to any of the Plaintiffs, instead reassuring them that their rights were protected even as they aided and abetted the various fraud schemes of the Nakhles, Gutzky and the Controlled Entities.

63.     The principals of the Property Fraud Investors, as well as the managers and principals of the other entity Plaintiffs, are nonresident Israeli citizens who did not understand every nuance of the US legal system or what risks it posed to them. The *pro forma* nature of the conflict waiver, coupled with the expectation that the attorneys would still provide advice to the Plaintiffs as clients and George Nakhle's reassurances regarding the arrangement, gave the Plaintiffs a false sense of security that their interests were being protected even as Lieberman was permitting the Nakhles, Gutzky and the Controlled Entities to systematically defraud them of all of their holdings in Ohio.

64.     On or about August 10, 2017, the Nakhles executed a binding Letter of Agreement with the managers of the Property Fraud Investors on Lieberman letterhead, presumably drafted by Lieberman (the ***Property LOA***), in which the Nakhles covenanted to purchase the Property Fraud Properties. Because the Property LOA contains a confidentiality provision it is not attached to this complaint. However, the full list of the Property Fraud Properties has been attached hereto as <u>Exhibit 1</u>, together with the name of the Property Fraud Investor defrauded of that particular property, address of such property and parcel number.

65.     Pursuant to the Property LOA, the Nakhles agreed to pay certain prices per Property Fraud Property, based on the type of property: (a) $47,500 for single family homes, (b) $60,000 for duplexes, (c) $100,000 for 4-unit buildings, (d) $200,000 for 8-unit buildings, (e) $275,000 for 11-unit buildings, (f) $462,500 for 14-unit buildings, and (g) $450,000 for 17-unit buildings. These base prices were subject to adjustment due to circumstances specific to each Property Fraud Property. To further induce the Property Fraud Investors, George Nakhle and Samir Nakhle jointly signed a personal guaranty to secure payments pursuant to the Property LOA.

66.     Pursuant to the Property LOA, the Nakhles agreed that one of the Controlled Entities would enter into a land installment contract for each Property Fraud Property which envisioned an installment sale for each property paid for out of profits earned from managing the property (each, a ***Land Contract***).  Following execution of the Land Contract, the acquiring Controlled Entity would become responsible for operating the related Property Fraud Property.

67.     The Property LOA also envisioned that the Controlled Entities would begin to acquire the Property Fraud Properties by August 10, 2018 and complete all purchases within 5 years of the effective date of each Land Contract.

68.     The Property LOA also imposed obligations on the Controlled Entities to move in a timely fashion to pay off any unpaid installments on the Property Fraud Properties, giving the Property Fraud Investors the right to terminate the underlying Land Contracts for breach by the Controlled Entities, retain liquidated damages and recover the underlying Property Fraud Properties.

69.     It does not appear that the Nakhles ever intended to honor their obligations in the Property LOA.  Upon information and belief, Gutzky was aware of the Nakhles' fraudulent misrepresentations in the Property LOA.

70.     The plan that the Nakhles and Gutzky formulated was to take title to the Property Fraud Properties, squeeze every penny possible out of them while failing to keep the Property Fraud Properties in good order and repair or to pay taxes on them, and then abandon them when could not squeeze any more money out of them.  This was the plan of the Property Fraud.

71.     The Nakhles and Gutzky used the instrumentalities of interstate commerce to make their fraudulent promises and inducements, both under the Property LOA and under each Land Contract.

## C.     The Property Fraud Continues: Mismanagement

72.     There were initial warning signs that gave the Property Fraud Investors and the managers of the other entity Plaintiffs (including Adam) some concerns, though the Nakhles and Gutzky, acting through the Controlled Entities and on an individual basis, were able temporarily to assuage these concerns and through a host of misrepresentations keep the Property Fraud, the JV Fraud, and the Loan Fraud concealed and ongoing.

73.     At the time the Property LOA was executed, most of the Property Fraud Properties were being managed by a variety of property management companies.  The Property Fraud Investors were absent and reliant on these management companies to derive revenue from their investments.

74.     The Property Fraud Investors suggested that the existing management companies continue managing the various Property Fraud Properties until the Controlled Entities planning on acquiring the same were ready to assume day-to-day operations in the management of the Property Fraud Properties.  The Property Fraud Investors also suggested that some of the properties should continue to be managed by third party management companies.

75.     The Nakhles, acting on behalf of themselves and Gutzky through the Controlled Entities, instead indicated that the Controlled Entities would immediately assume management of the Property Fraud Properties and insisted on taking over management of all of the Property Fraud Properties.

76.     There is no indication that the Nakhles and Gutzky were prepared or planning on actually managing the Property Fraud Properties.  As mentioned earlier, their sole interest was to use the Property Fraud Properties to generate illegal profits at Plaintiffs' expense in a short period

of time. The Nakhles and Gutzky delayed their assumption of even nominal management for at least 3 months following execution of the Property LOA.

77. As a result of this delay, the previous property managers were able to encourage tenants to move to other locations managed by those managers. These tenants left behind unpaid rents, bills and property damage. If the Nakhles and Gutzky were actually interested in purchasing, maintaining and managing real estate, they would not have allowed this.

78. The Nakhles and Gutzky, through the Controlled Entities, continued to mismanage the properties for several months before proceeding to execute further documents to continue the Property Fraud. The Covered Investors do not know the extent of damage, waste or mismanagement at this time.

79. Through various false promises, the Nakhles convinced the Property Fraud Investors and their managers that the disruptions caused by the Nakhles in assuming management of the Property Fraud Properties were normal, expected and nothing more than minor irritations.

80. The Nakhles used the instrumentalities of interstate commerce to make their fraudulent promises and inducements with respect to their ability to manage the Property Fraud Properties.

**D.    The JV Fraud and Loan Fraud are Initiated**

81. With the Property Fraud Investors reassured and the Property Fraud progressing, the Nakhles and Gutzky, acting through the Controlled Entities, became more brazen and set up two more fraudulent schemes to victimize the Plaintiffs.

82. On or about November 2, 2017, George Nakhle approached Adam, whose entities were among the Property Fraud Investors, and represented that he needed a loan in order to assist in preparing the Property Fraud Properties for refinancing. He convinced Adam to extend a loan

to a Controlled Entity, RSN I, from Adam's company, BAO, in the amount of $125,000, with interest at 9%, payable quarterly from November 1, 2017, and principal repayment after 2 years, or November 1, 2019 (the *First Loan*). Under the terms of the loan agreement RSN I had the right to extend the maturity date one time by six months, or until May 2, 2020, at an interest rate of 10% for the period after the initial stated maturity. George Nakhle personally guaranteed RSN I's repayment of the First Loan. A copy of this loan agreement is attached as <u>Exhibit 2</u> and incorporated by reference.

83. The First Loan would never be repaid, nor did George Nakhle ever intend to repay the First Loan, and the November 2, 2017 loan agreement constitutes the first portion of the Loan Fraud. The stated maturity of the First Loan extended by the loan agreement gave George Nakhle enough time to execute all of the fraudulent schemes outlined in this complaint, but even had it not, he could have extended the stated maturity by another six months if he, Samir Nakhle and Gutzky were running behind schedule.

84. At around the same time, George Nakhle convinced Adam (acting through ABO) and the principals of D. Mody and Zuk to enter into a joint venture limited liability company, Finance. Finance was formed on November 29, 2017.

85. George Nakhle explained to the principals of ABO, D. Mody and Zuk that Finance, together with another proposed company to be named RSN Renovations LLC, the members of Finance would acquire, improve, sell and lease real estate, and finance and refinance real estate transactions. George Nakhle proposed that the parties all advance their own funds to get the business started, but thereafter to repay these initial capital contributions with proceeds, and to reinvest the remainder to expand their portfolio of rental properties and sales. George Nakhle also

proposed Lieberman again as "deal counsel", causing ABO, D. Mody and Zuk to execute Lieberman's *pro forma* conflict waiver.

86.     Conveniently for the Nakhles and Gutzky, their entity, RSN Properties, which held a 30% interest in Finance, was to contribute money last.   This agreement was finalized on December 13, 2017 in a second Letter of Agreement on Lieberman letterhead (the ***JV LOA***) that provided a minimal understanding among the parties and did not contain many of the standard provisions that an operating agreement would contain, despite the fact that Finance had existed for two weeks.   A copy of the JV LOA is attached hereto as <u>Exhibit 3</u> and incorporated by reference.

87.     Pursuant to the JV LOA, ABO held 30% of the ownership of Finance, D. Mody held 20%, RSN Properties held 30%, and Zuk held 20%.   George Nakhle was appointed as the initial manager but was prohibited from transferring properties without approval from Adam (as the manager of ABO) or Moshe Zuk (as the manager of Zuk).   It was envisioned that Adam would become a second manager, and so the two entities with managers were accorded 30%, while the other two members held only 20%.

88.     George Nakhle convinced the managers of ABO, D. Mody and Zuk that capitalization of Finance should be staggered, with D. Mody and Zuk providing $1,000,000 each in the first year in the form of loans, ABO would provide a $1,000,000 loan after Finance was in existence for one year, and RSN Properties would provide a $1,000,000 loan within two years.

89.     Again, George Nakhle created a situation in which his contributions would only be required in the Fall of 2019, which served to allow him to execute the various fraudulent schemes outlined in this complaint.   The failure of RSN Properties to contribute any money to Finance was a portion of the JV Fraud, but as will be shown later in this complaint, it was the misappropriation

of the funds contributed by the other members and the conversion of the same that would constitute the essence of the JV Fraud.

90.     In initiating the JV Fraud, the Nakhles made use of the instrumentalities of interstate commerce to cause RSN Properties make fraudulent misrepresentations to its fellow members in Finance.

91.     Lieberman knew or should have known that the lack of a formal operating agreement, coupled with a demand that D. Mody and Zuk contribute money immediately, were benefiting the Nakhles, Gutzky and the Controlled Entities, and exposing the other members and their capital contributions to significant risk.  Despite this knowledge, no warnings or advice were given to the members regarding the JV LOA on Lieberman letterhead or the risks of the investment.

92.     Furthermore, Lieberman permitted the capital contributions to be structured as loans, despite the fact that the initial loans were used to purchase the initial assets of Finance and could likely be recharacterized as capital contributions anyway[1].  This did not matter, however, because no assets were ultimately acquired by Finance itself.

93.     ABO and RSN Properties were also required to advance $100,000 annually to Finance until they funded their obligations, which would be treated as a 10% annual yield on their delayed loans.

94.     On or about January 17, 2018, D. Mody and Zuk's affiliate Zuk Marble did in fact execute cognovit promissory notes and loan agreements for $1,000,000 each to Finance pursuant to the JV LOA.  The amounts were fully funded by October 2018.  Copies of the loan agreements

---

[1] See *Schnitzer v. Commissioner*, 13 T.C. 43 (1949).  *Schnitzer* has been cited in countless cases and remains the seminal precedent for the analysis of whether explicit partnership debt should be recharacterized as a capital contribution.

are attached hereto as <u>Exhibit 4</u> and <u>Exhibit 5</u> and incorporated by reference, and copies of the promissory notes are attached hereto as <u>Exhibit 6</u> and <u>Exhibit 7</u> and incorporated by reference.

95.    ABO and RSN Properties each issued guarantees to D. Mody and Zuk to cover their respective deferred obligations.    Copies of RSN Properties' guarantees are attached hereto as <u>Exhibit 8</u> and <u>Exhibit 9</u> and incorporated by reference.    George Nakhle also assigned and pledged all of his rights and membership interests in RSN Properties to D. Mody and Zuk as an additional assurance.    Copies of these pledge agreements are attached hereto as <u>Exhibit 10</u> and <u>Exhibit 11</u> and incorporated by reference.

96.    It does not appear that these pledges were properly perfected.    There is no record that any certificate was presented to Lieberman to hold in escrow pursuant to RSN Properties' pledge agreement and no copy of such certificate was presented as a result of discovery in the action initiated in Cuyahoga County courts.

97.    The personal pledge by George Nakhle indicates that the interest pledged is uncertificated but that if a certificate is issued, it must be handed over to the secured party (D. Mody and Zuk, though how the same certificate was pledged twice is not adequately described). In the absence of a certificate, the pledge should have been perfected by filing a UCC-1 financing statement for the uncertificated interest.

98.    Lieberman performed no such actions on behalf of the secured parties, despite knowing that such actions needed to be taken.    They acted recklessly at best and willfully to the Plaintiffs' disadvantage at worst.

99.    The misrepresentations made by RSN Properties and George Nakhle gave the other members in Finance the false belief that their investments were in good hands and would be rewarded by reinvestment and growth.    This was not to happen, as will be shown below, because

their money was used to purchase properties that would never be registered to Finance, the source of the funding for such purchases.

100. At some point prior to the end of 2017, a full operating agreement, backdated to November 29, 2017, was finally executed by the members of Finance, duly naming Adam as a second manager of Finance. This step also calmed any concerns the members might have had, because it ostensibly showed that, despite any delays in implementing their plans, the members were acting in good faith. As events transpired, this sense of calm was a misplaced one. The operating agreement is attached hereto as Exhibit 12 and incorporated by reference.

101. The Finance operating agreement also contained several other provisions that the members believed would protect their interests: (a) the affirmative vote of both managers (George Nakhle and Adam) were required to make all managerial decisions; (b) the affirmative vote of all four members were required to sell, exchange, or convey any real property; (c) all real and personal property was to be acquired in the name of Finance, and title to any such property was to vest in Finance; (d) the managers were tasked with discharging their duties and the affairs of Finance in a prudent and businesslike manner, devoting such time as reasonably necessary to manage such affairs; and (e) the managers were liable to Finance and its members for their actions to the extent that such actions involved fraud, willful misconduct, gross negligence or breach of fiduciary duty.

102. With the members of Finance thus placated and comfortable that the risk of loss had been mitigated by taking several steps, the Nakhles and Gutzky were positioned to execute the JV Fraud.

**E. The Land Contracts for the Property Fraud are Executed**

103. As 2018 began, the Nakhles and Gutzky, through their Controlled Entities, had put into place a mechanism to acquire the Property Fraud Properties (the Property LOA), a joint

venture entity that was going to acquire and manage properties (such entity being Finance), and drawn on a loan to provide them with the means of paying the bills associated with executing the Property Fraud and JV Fraud (such loan constituting the first part of the Loan Fraud).

104.    The next step was to begin transferring the Property Fraud Properties to the Controlled Entities.    Acting under the Property LOA, the Controlled Entities executed Land Contracts for most of the Property Fraud Properties.  The Land Contracts were almost all executed in January 2018 and recorded between February and April 2018.

105.    The Land Contracts were largely identical to one another, and contain numerous representations, warranties, covenants and other promises that the Nakhles, Gutzky and the Controlled Entities never intended to honor.  The Land Contract for 1832 Willowhurst Road in Cleveland, Ohio, owned by Investor MF 1832, LLC, is attached as Exhibit 13 as an example and incorporated by reference.

106.    The Property Fraud Investors relied on the material misrepresentations and fraud of the Nakhles and Gutzky with respect to the Land Contracts, in each case to their material detriment.

107.    Section 3 of each Land Contract obligated the acquiring Controlled Entity to assume all responsibility for payments, including tax payments, for the related Property Fraud Property.  The obligation to pay taxes was restated in Section 8.  The obligation to engage in maintenance was restated at Section 10.  The obligation to pay utilities was restated at Section 15. As previously mentioned, at least four of the Property Fraud Properties are now subject to tax foreclosure proceedings for breach of this provision, and upon information and belief, other Property Fraud Properties have suffered damage that has not been repaired and have unpaid taxes that have not advanced to the collections stage.

108.     Section 4 of each Land Contract required that the full purchase price for the related Property Fraud Property be paid in full within 36 months of signing.  As this complaint will highlight later on, the Nakhles and Gutzky failed to make those payments and subsequently did not even attempt to make partial payments in good faith even as they acquired money sufficient to make such payments.  They pocketed the money and willfully defaulted on the Land Contracts.

109.     Section 5 of each Land Contract required that interest payments be made on the outstanding unpaid purchase price, which the Nakhles and Gutzky ostensibly were going to make from the rental proceeds collected from each property.  These payments were made only sporadically and partially until the Property Fraud was complete, after which time all rent proceeds were used by the Nakhles and Gutzky for their own, unrelated expenses.

110.     Section 6 of each Land Contract stated that the acquiring Controlled Entity had had a chance to conduct adequate due diligence with respect to the related Property Fraud Property and was acquiring it on an "as is" basis, without any representations or warranties on the part of the Property Fraud Investor selling such Property Fraud Property.

111.     Section 19 of each Land Contract on its face contained key protections for the Property Fraud Investors.  It states that if the Controlled Entity acquiring the related Property Fraud Property (a) fails to make interest payments in 5 days, (b) otherwise defaults in its obligations, and fails to remedy the breach within 60 days following notice, (c) fails to maintain adequate insurance or (d) abandons the Property Fraud Property or commits waste, among other events of default, then the Property Fraud Investor shall have the right, in addition to other remedies in law or at equity, to (i) retain all payments made to date as liquidated damages, (ii) rescind the transfer and recover the related Property Fraud Property, (iii) become entitled to 12 months of interest on the Property Fraud Property, or (iv) become entitled to 10% of the purchase price.

112.    Upon information and belief, the Nakhles and Gutzky, acting through the Controlled Entities, did not make interest payments as required under the Land Contracts, defaulted on other obligations, may have failed to maintain adequate insurance and have permitted waste at some of the properties at a minimum.  They blatantly violated the provisions of the Land Contracts.

113.    The Nakhles also jointly acted as personal guarantors under a guaranty executed in conjunction with the Land Contracts, despite the fact that they did not have assets sufficient to cover all possible damages for their failure to perform.  These guaranties represented fraud and misrepresentation.  The Covered Investors relied on these representations and guaranties to their material detriment.  A copy of one of the guaranties is attached hereto as Exhibit 14 and incorporated by reference.

114.    The Nakhles made use of the instrumentalities of interstate commerce to make their fraudulent misrepresentations under the Land Contracts and related guaranties.

115.    The Nakhles personally signed Land Contracts and related personal guaranties representing all 194 of the Property Fraud Properties.  Each of these Land Contracts was executed with the knowledge that the Nakhles and Gutzky did not have the requisite experience, competence and ability to manage the Covered Properties and with the goal of making quick money.

**F.    The Nadam Fraud is Initiated**

116.    Shortly after all the Land Contracts were executed, George Nakhle convinced Adam in February 2018 to form yet another joint venture enterprise, this one solely between ABO and George Nakhle personally.

117.    The purpose of the new joint venture, Nadam, was to acquire, manage and sell real estate investment properties, much the same as Finance, but on a smaller scale and with fewer

properties. A copy of the operating agreement of Nadam is attached as <u>Exhibit 15</u> and incorporated by reference.

118.     The Nadam operating agreement gave George Nakhle managerial authority, but no sale of real property was permitted without the approval of ABO as well as George Nakhle.

119.     The initial property identified by Nadam was the property located at 13802-13810 Byron Avenue in Cleveland, Ohio (the ***Byron Property***), which was one of the Property Fraud Properties then under contract in one of the Land Contracts executed in January 2018.

120.     As will be seen, the Byron Property was ultimately purchased with Nadam money contributed by ABO, but the title to the Byron Property was registered with RG Delaware, a Controlled Entity. None of this would happen until later, when the Property Fraud was actively being conducted.

121.     Around the same time, RSN I failed to make its first payment under the First Loan. George Nakhle reassured Adam that the loan would be repaid and the interest would be paid, but that the costs of management of the Property Fraud Properties and all of the other costs associated with Finance and Nadam were making it difficult. Adam, on behalf of BAO, accepted this explanation without formally waiving any rights. Adam, on behalf of BAO, continued to permit RSN I to be in default when it failed to make other payments in 2018. Adam relied on George Nakhle's misrepresentations to BAO's detriment.

122.     Additionally, George Nakhle was misrepresenting his activities as manager of Finance and concealing the true scope of his actions from Adam and the members of Finance. Over the course of 2018, he embezzled money from Finance, taking $5,000 in August 2018 and $8,500 per month thereafter, and making large withdrawals, such as a $26,000 withdrawal on July 24, 2018, $37,900 on December 24, 2018, and $9,780 on December 31, 2018. Because Adam is

an Israeli citizen and not present in the United States, and because George Nakhle misrepresented the purposes of the withdrawals and never provided Adam with documentary evidence regarding the withdrawals, both Adam and the members of Finance did not know, and could not have known, that this money was being stolen and pocketed by George Nakhle.

## G.     The First Properties are Converted in the Property Fraud and JV Fraud

123.     In order to execute all of the Land Contracts, the Nakhles and Gutzky realized that they would have to show some ability to make some payment.   George Nakhle was claiming that his failure to pay on the First Loan was due to a need to close on the Property Fraud Properties, and since the Land Contracts had been executed no payments had been made.

124.     In furtherance of the Property Fraud, the Nakhles misrepresented to the Property Fraud Investors that they would need to finance their purchases even though the Land Contracts did not specify any mortgage contingency.

125.     The Nakhles also falsely represented to the Property Fraud Investors that the only way for the Controlled Entities to obtain financing to cover the full purchase price for the Property Fraud Properties would be for the Property Fraud Investors to transfer title for the Property Fraud Properties officially to the Controlled Entities.

126.     The Nakhles further misrepresented to the Property Fraud Investors that the proceeds of the mortgages would be used to pay the purchase prices for each such property.

127.     The Nakhles used the instrumentalities of interstate commerce to make these fraudulent misrepresentations to each of the Property Fraud Investors.

128.     The Property Fraud Investors each relied on the misrepresentations made by the Nakhles to their material detriment.

129. The Nakhles and Gutzky turned to Corevest, a financial institution that agreed to issue mortgages for the Property Fraud Properties. Based on materials provided by Corevest in a related state proceeding, it has come to the Plaintiffs' attention that Gutzky provided personal guaranties under each of the mortgages. Corevest ultimately agreed to issue the mortgages even though Gutzky's personal net worth and creditworthiness were insufficient to act as a guarantor for all of the Property Fraud Properties.

130. As a result of the extension of credit by Corevest to the various Controlled Entities, the Nakhles and Gutzky were able to continue their fraudulent operations in the Property Fraud, the JV Fraud, the Nadam Fraud and the Bavaria MF Fraud.

131. The payments by the Controlled Entities materially induced the Property Fraud Investors to transfer more and more of the Property Fraud Properties. The Property Fraud Investors relied on these false inducements to their material detriment.

132. The Property Fraud Investors and the Controlled Entities further agreed that if the financing proceeds were insufficient to pay the entire purchase prices for the Property Fraud Properties, then the Property Fraud Investors and the Controlled Entities would agree on payment terms for the balances of purchase prices, and if the Controlled Entities failed to obtain financing, they would restore title to each Property Fraud Property to the transferring Property Fraud Investor.

133. Both according to the terms of the Land Contracts and the further agreements between the Property Fraud Investors and the Controlled Entities, the Land Contracts were to remain in full force and effect until the full purchase price and all interest was paid on the related Property Fraud Property.

134. As this complaint outlines shortly, the Nakhles and Gutzky misrepresented their intentions to the Property Fraud Investors and the Property Fraud Investors relied on such misrepresentations to their material detriment.

135. The Nakhles and Gutzky used the instrumentalities of interstate commerce to make their misrepresentations, both to the Property Fraud Investors and, upon information and belief, to Corevest.

136. In late 2018, the Controlled Entities agreed to close on the purchase of the first 40 Property Fraud Properties, later reduced to 37 Covered Properties (**Lot One**) by obtaining partial financing from Corevest. Plaintiff Shnizel is the assignee of all 37 Property Fraud Properties in Lot One. *See* Exhibit 1.

137. Based on the misrepresentations made to the Property Fraud Investors in Lot One, the Property Fraud Investors in Lot One transferred title pursuant to Land Contracts for the related Property Fraud Properties so that the Controlled Entities could obtain financing from Corevest. They were also instructed that they needed to transfer the Land Contracts themselves in order to receive the full purchase price.

138. Accordingly, the Property Fraud Investors in Lot One transferred their Land Contracts as well.

139. Lieberman knew or should have known that a transfer of the Land Contracts in addition to a transfer of title of the properties in Lot One would deprive the Property Fraud Investors in Lot One of any recourse in the event that a default occurred under the Land Contracts, as well as effectively extinguish all rights that the Property Fraud Investors in Lot One were entitled to pursuant to their Land Contracts. Despite this, Lieberman did not warn the Property Fraud Investors that they were effectively handing over their properties without any rights to

demand compensation or effect rescission in the event of a default. Indeed, the entire concept of a default was extinguished when the Land Contracts were assigned. Instead of protecting the investors, Lieberman instructed the Lot One investors to cancel their Land Contracts, knowing full well they were depriving the Lot One investors of recourse under the Land Contracts by doing so, in total disregard of their ethical obligations, and to the benefit of the Nakhles, Gutzky and the Controlled Entities.

140.    The Nakhles and Gutzky claimed that when they ultimately applied for mortgages for the Lot One properties, they were informed that they could not obtain 100% financing for the Lot One properties. This was an outright lie. The Property Fraud Investors in Lot One relied on this lie to their material detriment.

141.    The Nakhles and Gutzky used the instrumentalities of interstate commerce to mislead and lie to the Lot One Property Fraud Investors.

142.    In order to execute the Property Fraud, the Nakhles returned to the Property Fraud Investors for Lot One and agreed with the Property Fraud Investors that the initial payments pursuant to the related Land Contracts would provide approximately 65% of the total purchase prices for the Lot One properties, termed "release prices", with the financing proceeds, and then pay the balance plus all other amounts due pursuant to the Land Contracts paid over time. They did not explain that by assigning the Land Contracts, any rights to payment over time would be the right of the assignee, not the assignor Property Fraud Investors.

143.    Lieberman did not explain this to the Property Fraud Investors in Lot One. Instead, Lieberman instructed the Lot One investors to transfer their Land Contracts.

144.    The Property Fraud Investors' manager executed a letter requested by the Defendants setting forth the "release prices" for the Lot One properties, attached hereto as

<u>Exhibit 16</u> and incorporated by reference. The Nakhles requested this letter in order to make it appear that the "release prices" were the entire purchase price, when in fact this was not the agreement of the parties.

145. The Property Fraud Investors for Lot One transferred title to the Property Fraud Properties in Lot One, after which the Controlled Entities did obtain financing and did pay the "release prices" to the Lot One investors by the end of 2018.

146. Unbeknownst to the Lot One investors, however, the Nakhles and Gutzky in their applications for loans from Corevest had stated the fair market values of the Property Fraud Properties in Lot One as being in excess of the total purchase price for the properties, obtaining in some cases an amount that was in excess of 100% financing of the full purchase price for the properties, which were themselves much higher than the "release prices" that the Nakhles had offered to pay.

147. This activity constitutes bank fraud by the Nakhles and Gutzky.

148. The Lot One investors relied on the misrepresentations made by the Nakhles and Gutzky to their material detriment.

149. The Nakhles and Gutzky used the instrumentalities of interstate commerce to perpetuate their bank fraud and mislead the Lot One investors.

150. Defendant Corevest recorded mortgages on the Lot One properties based on the fair market value stated by the Nakhles and Gutzky. The Nakhles and Gutzky then paid the "release prices" to the Lot One investors and transferred the rest of the money received to themselves.

151. The Lot One investors and the Nakhles and Gutzky, acting through RSN I and GS&M, entered into a supplemental agreement to the Lot One Land Contracts, titled "Purchase of 40 Properties at 12/2018" (the ***Lot One Supplemental Agreement***), setting forth the terms for the

repayment of the remaining amounts due and payable under the Land Contracts. A copy of the Lot One Supplemental Agreement is attached hereto as <u>Exhibit 17</u> and incorporated by reference.

152. Pursuant to the Lot One Supplemental Agreement, the Nakhles and Gutzky, acting through RSN I and GS&M, agreed to pay the outstanding and unpaid portion of the purchase price for the Lot One properties as follows: (a) 65% as the "release price" pursuant to which title was transferred, (b) approximately 2.5% additionally upon closing and transfer of title, (c) 2.5% of the purchase price for the Lot One properties, or $47,247, no later than January 20, 2019, (d) $235,886 no later than August 31, 2019, and (e) $485,347 no later than December 31, 2019. Additionally, the Lot One Supplemental Agreement clearly states that there was a 12% default rate of interest on overdue payments, and George Nakhle personally guaranteed the purchasers' obligations under the Lot One Supplemental Agreement.

153. Upon information and belief, George Nakhle does not have assets sufficient to cover the guaranties made by him and his guaranty was a fraudulent misrepresentation when issued.

154. The Lot One investors relied on the assurances made in the Lot One Supplemental Agreement and related guaranty to their material detriment, in addition to their lack of knowledge about the actual mortgage amounts obtained.

155. The Nakhles and Gutzky, as has been stated, caused the Controlled Entities that entered into the transactions for the Lot One properties to pay the 65% "release prices" as well as the 2.5% of the purchase price due at transfer of title. No other money was ever paid to the Lot One investors.

156. At roughly the same time that the Lot One transactions were being consummated, the JV Fraud was actively moving forward.

157.     ABO was unable to make its full $100,000 annual advance in Finance as required by the terms of investment that the members had agreed to in December 2017 (*see* paragraph 91, *above*).  This is because it was relying on rents generated from properties and sale proceeds, and the first sales of Lot One properties took place in December 2018.  Because the Nakhles and Gutzky had decided to purchase ABO's properties through Land Contracts, George Nakhle agreed that the proceeds would be paid directly to Finance.  George Nakhle informed ABO that these amounts would be sufficient both to cover the $100,000 advance and ABO's $1,000,000 contribution/loan to Finance.

158.     ABO did receive some partial payments in 2018 and the members believed George Nakhle's false assertions that more money would be coming as the Property Fraud Properties were transferred, mortgages were obtained and rental income began to come in.  The members also accepted this explanation as the reason why RSN Properties failed to make is $100,000 advance.

159.     By exercising total control over Finance, George Nakhle had been removing money from the company, as has already been discussed (*see* Paragraph 122, *above*).

160.     In addition, over the course of 2018 George Nakhle used the money contributed by D. Mody and Zuk Marble to purchase approximately 29 properties, a list of which is attached as Exhibit 18 and incorporated by reference (the ***JV Properties***).  ABO, D. Mody and Zuk discovered in 2021 that Nakhle already owned 24 of the 29 properties he purportedly purchased for Finance and many of the properties were in bad condition.  George Nakhle actually used the money to pay off and pay down his loans, and to pay himself hundreds of thousands of dollars.  None of these properties were ever registered in the name of Finance.

161.     Instead, the JV Properties were registered as being owned by Controlled Entities RG Delaware, RG Perm, RSN II, United Synergy and Pearl Road, entities owned by the Nakhles and Gutzky in which none of ABO, D. Mody or Zuk hold any interest or control.

162.     Lieberman was aware of the fact that the JV Properties were registered to Controlled Entities but failed to take any steps to protect ABO, D. Mody or Zuk at any time, despite their requests.  In fact, Lieberman assisted the Nakhles and Gutzky with transferring titles to other Controlled Entities instead of to Finance, in furtherance of the fraudulent scheme.  This is a staggering lapse of ethics that goes far beyond the scope of any conflict waiver and shows that Lieberman was aiding serious wrongdoing by the Nakhles, Gutzky and the Controlled Entities.  Lieberman also acted in full knowledge that the actions taken were the direct and proximate cause of damages to Adam and ABO, who had guaranteed payments to D. Mody and Zuk in reliance on revenues that were supposed to be generated from the properties owned by Finance.

163.     Despite this fraud, George Nakhle continued to misrepresent that he would produce documents showing that the JV Properties had been transferred to Finance, with detailed information about each JV Property.

164.     Four of the JV Properties were subsequently foreclosed and sold at a sheriff's sale, thus depriving the Plaintiffs in the JV Fraud of any ability to recover the JV Properties.  Another 18 of the JV Properties are significantly delinquent on real estate taxes, placing them at risk of loss, as well.

165.     All of George Nakhle's purchases of the JV Properties with Finance funds were made without receiving the proper authorizations because they were not in fact purchased by Finance, nor did Finance receive the benefit from the same other than some sporadic rental payments that George Nakhle deposited with Finance in order to fool the members of Finance into believing Finance owned the JV Properties.  The purchase by Controlled Entities of the JV Properties effectively caused a transfer of property of Finance without the required approval of Adam as manager or ABO, D. Mody and Zuk as members.

166.    George Nakhle shut out Adam as a co-manager of Finance, by (among other things) placing Finance's real estate and financial assets out of Adam's reach, by failing to keep Adam informed and provide requested information and documents, by making decisions without Adam's agreement, and by refusing to restore Adam as a signatory on Finance's Chase bank account.

167.    In November 2018, George Nakhle took a personal loan from Finance in the amount of $50,000 with a 45 day repayment schedule but never repaid this loan.

168.    On information and belief, at least a part of the money stolen from Finance by George Nakhle in 2018 was used to meet the "release prices" on the Lot One properties, thus using the JV Fraud as a means of partially funding the Property Fraud.  Some of the money stolen by George Nakhle from Finance was also used to establish a $10 million line of credit that Corevest was supposed to issue Finance, but which George Nakhle instead took out in the name of a Controlled Entity and subsequently used to purchase over 100 properties unrelated to the frauds described in this Complaint.  It is unclear whether these properties were also purchased through fraudulent schemes.

## H.    The Property Fraud Continues, the Loan Fraud Expands and Defaults Occur

169.    By the start of 2019, the various frauds were being held together by false statements made by the Nakhles that all would be well as soon as the sales of the Property Fraud Properties were finalized.

170.    The expectation that money would be forthcoming when the Property Fraud Properties were fully transferred, as well as lack of knowledge about the JV Fraud, caused the Nakhles' misrepresentations to be taken at face value.  The Plaintiffs believed that the problems that they had experienced up to the present, from the interest defaults on the First Loan to the failure to fully pay Lot One and the disruptions caused by the lack of a smooth transition of

management, were temporary problems that would be overcome once the remaining properties in the Property Fraud were transferred.

171.    For this reason, the Lot One Investors were concerned but did not take action when the January 2019 payment under the Lot One Supplemental Agreement, in the amount of $47,247, was not paid by the Controlled Entities.

172.    Knowing that they could only keep their fraudulent schemes going on for as long as they were able to come up with money somewhere, the Nakhles and Gutzky decided that they needed to move quickly and close as many properties as possible.

173.    The Nakhles and Gutzky set out in early 2019 to close a second lot of Property Fraud Properties, totaling 107 Properties, the claims regarding all of which have been transferred to Plaintiff Shnizel (*Lot Two*). *See* <u>Exhibit 1</u>.

174.    Having successfully misled the Lot One investors about the purported difficulty in obtaining financing, the Nakhles and Gutzky once again made fraudulent misrepresentations to Property Fraud Investors, this time the Lot Two investors.

175.    As with the Lot One investors, the Lot Two investors transferred title to the properties in Lot Two, after which the Controlled Entities did obtain financing from Corevest.  As with the Lot One properties, the Nakhles and Gutzky stated a fair market value of the Lot Two properties in excess of the purchase price, again obtaining mortgages in excess of 100% of the purchase price.

176.    This activity constitutes another series of likely bank fraud transactions by the Nakhles and Gutzky.  The underlying bank fraud, as well as the concomitant wire and mail fraud perpetuated by the Nakhles and Gutzky, is part of a set pattern that the Nakhles and Gutzky perfected, in violation of the RICO Act.

177.     The Lot Two investors relied on the misrepresentations made by the Nakhles and Gutzky to their material detriment.

178.     The Nakhles and Gutzky used the instrumentalities of interstate commerce to perpetuate their bank fraud and mislead the Lot Two investors.

179.     Defendant Corevest recorded mortgages on the Lot Two properties to secure loans that exceeded the purchase prices.

180.     As with Lot One, the Nakhles directly negotiated "conveyance prices" (effectively the same as the "release prices" for Lot One) for Lot Two.   Attached hereto as <u>Exhibit 19</u> is a table requested by George Nakhle listing the "conveyance prices" for the Lot Two properties.  As with the letter stating the "release prices" for Lot One, the Nakhles wanted to create a false documentary record to misrepresent the actual purchase prices at a later date.

181.     The Lot Two investors transferred title in the same fashion that the Lot One investors transferred title, namely, by transferring title and canceling the related Land Contracts for the properties.

182.     The Nakhles and Gutzky received financing, and Corevest recorded mortgages on all of the Lot Two properties.

183.     As with Lot One, the Lot Two investors were induced by misrepresentations to also transfer their Land Contracts to the Controlled Entities as a condition to the Controlled Entities obtaining financing.  The Lot Two Investors therefore assigned their Land Contracts.

184.     Lieberman yet again did not explain to the Property Fraud Investors that by assigning the Land Contracts, any rights to payment over time would be the right of the assignee, not the assignor Property Fraud Investors.   Instead of protecting the investors, Lieberman instructed the Lot Two investors to cancel their Land Contracts, knowing full well they were

depriving the Lot Two investors of recourse under the Land Contracts by doing so, in total disregard of their ethical obligations, and to the benefit of the Nakhles, Gutzky and the Controlled Entities. Lieberman also failed to explain to the investors that the language used by the Nakhles would create a false impression that the "conveyance prices" represented the full purchase price, when both Lieberman and the parties to the transactions were aware this was not the intent.

185.    The Nakhles and Gutzky, acting through RSN I, RSN 4  and GS&M, executed a supplemental agreement like the Lot One Supplemental Agreement, titled "Loan Agreement after Sale of 107 Properties in 3/2019" (the *Lot Two Supplemental Agreement*).  A copy of the Lot Two Supplemental Agreement is attached hereto as <u>Exhibit 20</u> and incorporated by reference.

186.    The Lot Two Supplemental Agreement promised the Lot Two investors $20,750 each at transfer of title, plus $1,000 extra to cover closing costs and $1,000 extra for deferral of other payments, so that each Lot Two investor received $22,750 in total when the Lot Two properties were transferred.  The remainder of the purchase price for each property was to be paid over 42 months with 4% interest accruing on the unpaid portions and a 10% default rate if an event of default occurred.   The Lot Two Supplemental Agreements were further secured by a personal guaranty from George Nakhle.

187.    The specific dates for payment and amounts due on each such date pursuant to the Lot Two Supplemental Agreement were as follows: (a) $256,225 no later than February 28, 2020, (b) $512,450 no later than August 31, 2020, (c) $512,450 no later than February 28, 2021, (d) $512,450 no later than August 31, 2021, (e) $512,450 no later than February 28, 2022, and (f) $486,828 no later than August 31 2022.

188.    Unfortunately for the Lot Two investors, the initial payment was the only money they would ever see The Nakhles and the Gutzkys, in furtherance of their fraudulent schemes, did not pay the Lot Two investors any more money.

189.    The Controlled Entities did issue two checks to cover the initial February 28, 2020 payment and delivered these in 2019, but they were cancelled and when the Lot Two investors attempted to deposit them, the checks were dishonored.

190.    The Nakhles and Gutzky, acting through their Controlled Entities, never paid any of the other scheduled payments.  As a result, the Lot Two investors never received payment in full for the transfers of their Property Fraud Properties.

191.    Upon information and belief, George Nakhle does not have assets sufficient to cover the guaranties made by him and his guaranty was a fraudulent misrepresentation.

192.    The Lot Two investors relied on the assurances made in the Lot Two Supplemental Agreement and related guaranty to their material detriment, in addition to their lack of knowledge about the actual mortgage amounts obtained.

193.    In January 2019, BAO covered an obligation by RSN I in the amount of $11,000 against RSN I's promise to pay the same in February 2019.  No payment was made then, or later on this loan (the **Second Loan** in the Loan Fraud).

194.    Despite having misgivings about the inability of the Nakhles, Gutzky and their Covered Entities to make certain payments, most notably on the First Loan and Second Loan and contributions required to Finance, as well as the failure to make the January 2019 payments for the Lot One properties, there was still optimism on the part of the Plaintiffs and the Property Fraud Investors because properties were being transferred and money was being paid.  This situation was about to change dramatically.

## I.    Early 2019: The Third Loan and the Bavaria MF Fraud

195.    On or about April 8, 2019, Adam, RSN I and George Nakhle entered into a "Loan Agreement for 8.4.2019", a copy of which is attached as <u>Exhibit 21</u> and incorporated by reference. Adam had previously borrowed funds from third parties to make available to RSN I and Nakhle in order to help them finish the transfers of the Property Fraud Properties, at which time Adam anticipated that the Nakhles, Gutzky and the Controlled Entities would get current with all obligations.

196.    Adam was unaware that the Nakhles and Gutzky had been profiting from mortgaging the Lot One properties, Lot Two properties, and JV Properties (the latter yet to be explained). He believed that by extending additional credit he would assist in consummating the last sales of properties to the Controlled Entities.

197.    Pursuant to the April 8, 2019 loan agreement, Adam personally loaned $144,000 to RSN I (the ***Third Loan***). RSN I agreed to pay 8% interest on $124,000 of the principal amount of the Third Loan and 12% interest on $20,000 of the principal, for a total of $3,080 per month, which RSN I was to pay directly to Adam's lenders. The Third Loan was secured by a personal guaranty from George Nakhle.

198.    RSN I made its interest payments on the Third Loan through September 2019, after which time those payments, along with any other payments of any sort to any of the Plaintiffs ceased.

199.    When RSN I ceased making payments under the Third Loan in October 2019, causing a default under the April 8, 2019 loan agreement, this also caused Adam to default on his loans from third party creditors.

200.    The Nakhles and RSN I were aware that their failure to pay would cause this default of Adam but did not care.  Instead, the Nakhles and Gutzky continued extracting money from the Controlled Entities and pocketing it.

201.    On or about December 30, 2018, RG Delaware entered into an agreement to purchase from Bavaria a property located at 17568 Lake Shore Boulevard in Cleveland, Ohio (the **Bavaria Property**).  The purchase agreement is attached hereto as <u>Exhibit 22</u> and incorporated by reference (the **Bavaria Agreement**).

202.    The Bavaria Property was a multi-dwelling residential property with 12 residential units and 2 commercial units that had suffered significant damage in a fire on June 11, 2018, following which 6 units were unusable.  Bavaria asked Adam to discuss transferring the property with George Nakhle and Adam agreed to act as guarantor of the purchaser's obligations due to his ongoing relationship with the Nakhles and the Controlled Entities.

203.    The Bavaria Agreement envisioned that the purchaser, RSN I, would either purchase the property or the owner, Bavaria MF, LLC, and assume a $150,000 loan that had to be repaid for repairs to the property.  An additional $78,000 was due upon transfer, with $400,000 more due on July 31, 2019.  Until such time as the purchase price was paid in full, RSN I agreed to pay $3,000 per month in interest, with an optional extension of the payment of the purchase price to August 31, 2019, but with $5,000 in interest for August 2019.  If the purchase price were not paid in full by such time, seller Bavaria had the option of repurchasing the Bavaria Property (or Bavaria itself if that were sold) for $1.

204.    Under the terms of the Bavaria Agreement, purchaser RSN I was also entitled to the insurance proceeds from the fire.

205.    The Bavaria Property was in fact transferred on or about May 24, 2019, but RSN I never paid the downpayment.  Subsequently, RSN I applied for a mortgage from Corevest and received $455,000.  RSN I used $215,000 to cover the cost of renovations and then the Nakhles and Gutzky distributed $240,000 to themselves.

206.    No further money was paid and the Nakhles and Gutzky ignored Bavaria's demand to repurchase the Bavaria Property when only $25,000 was paid in August 2019 as a partial payment, and that only when a second check was issued after an initial check was dishonored.

207.    Adam relied on the Nakhles and RSN I to his material detriment and was forced to cover the cost of the Bavaria MF Fraud to the owners, and is now their assignee in seeking damages from the Nakhles, Gutzky and the Controlled Entities.

208.    The Nakhles, Gutzky and RSN I used the instrumentalities of interstate commerce to commit the Bavaria MF Fraud.

209.    The present fair market value of the Bavaria Property following restoration is estimated at in excess of $700,000 and potentially $1,000,000.

**J.      Lot Three and the Conclusion of the Nadam and JV Frauds**

210.    The Nakhles and Gutzky agreed to close on the purchase of another 50 properties, of which 48 of those properties are Property Fraud Properties for whom Shnizel is an assignee (***Lot Three***).  The Nakhles and Gutzky moved to close on these properties, as with Lot Two, prior to the August 2019 payment for Lot One, because they were not planning on making the August 2019 payment.  *See* Exhibit 1 for a list of Lot Three properties.

211.    The Nakhles and Gutzky once again made fraudulent misrepresentations to Property Fraud Investors, this time the Lot Three investors.

212.     The Lot Three investors transferred title to the Lot Three properties, after which the Controlled Entities again did obtain financing.  As with the Lot One and Lot Two properties, the Nakhles and Gutzky stated the fair market value of the Lot Three properties as being in excess of the purchase price, again obtaining valuations in excess of 100% of the stated purchase prices.

213.     As with Lots One and Two, the Nakhles represented to the investors that they were unable to receive full financing and could not pay for the Lot Three properties in full upon transfer.

214.     Copies of 4 of the mortgages for Lot Three properties are attached hereto as Exhibits 23, 24, 25 and 26.  Two of these mortgages were later transferred to Defendant CAF.

215.     This activity constitutes yet more potential bank fraud by the Nakhles and Gutzky. The underlying bank fraud, as well as the concomitant wire and mail fraud perpetuated by the Nakhles and Gutzky, is in violation of the RICO Act.

216.     The Lot Three investors relied on the misrepresentations made by the Nakhles and Gutzky to their material detriment.

217.     The Nakhles and Gutzky used the instrumentalities of interstate commerce to mislead the Lot Three investors.

218.     Defendant Corevest recorded mortgages on the Lot Three properties at the stated fair market value, which in many cases was in excess of the purchase prices.

219.     As with Lot One and Lot Two, the Nakhles directly negotiated "conveyance prices" (effectively the same as the "release prices" for Lot One) for Lot Three.    Attached hereto as Exhibit 27 and incorporated by reference is a letter requested by George Nakhle listing the "conveyance prices" for the Lot Three properties.  As with Lots One and Two, the Nakhles demanded the letter in order to misrepresent the purchase prices at a later date by falsely claiming

that the "conveyance" prices were the full purchase price, rather than merely an initial downpayment.

220. The Lot Three investors transferred title in the same fashion that the Lot One and Lot Two investors transferred title, the Nakhles and Gutzky received financing, and Corevest recorded mortgages on all of the Lot Three properties.

221. As with Lots One and Two, the Lot Three investors transferred their Land Contracts to Controlled Entities based on misrepresentations by the Nakhles that the transfers were necessary to obtaining financing. In reality, these transfers were not required.

222. Lieberman once again permitted the sellers to hand over their rights, not alerting the Lot Three investors to the fact that the Lot Three investors were essentially handing over their rights in exchange for nothing and instead, instructing the Lot Three investors to assign their Land Contracts to the investors' detriment and the benefit of the Nakhles, Gutzky and their Controlled Entities. Lieberman also once again failed to explain that the language used in the Nakhles' letter could create the false impression that the "conveyance price" was the full purchase price, rather than merely a downpayment on the full purchase price.

223. Unfortunately for the Lot Three investors, they would never see a penny of their money. The Nakhles and the Gutzkys, in furtherance of their fraudulent schemes, did not pay the Lot Three investors any money whatsoever because Lot Three conveyances took place in August 2019, when all of the fraudulent schemes by the Nakhles and Gutzky had been consummated and real estate had been effectively converted into cash.

224. Having successfully transferred all of the Property Fraud Properties to their Controlled Entities, the Nakhles and Gutzky saw no reason to pay any money to any of the investors.

225.     As part of the Lot Three Property Fraud, Nadam agreed to purchase the Byron Property for $140,000, with $100,000 to be paid to the seller and $40,000 paid to cover delinquent taxes and closing costs.

226.     Nadam member ABO contributed $17,000 to Nadam to cover a portion of the taxes and closing costs and an additional $50,000 to fully renovate the Byron Property and turn it into an investment property capable of generating $100,000 in annual gross revenues.

227.     George Nakhle committed to pay $23,000 to cover the balance of delinquent taxes and closing costs, and agreed to obtain financing to pay the $100,000 due to the seller for the Byron Property.  There is no evidence that his $23,000 payment was made.

228.     As with all of the other Lot Three properties, even though the Seller transferred title of the Byron Property to Nadam, George Nakhle never paid the balance of the purchase price to the seller.

229.     Instead, George Nakhle transferred title to the Byron Property from Nadam to RG Delaware.  A copy of the deed from Nadam to RG Delaware is attached as <u>Exhibit 28</u> and incorporated by reference.

230.     Following the transfer of the Byron Property to RG Delaware, the Nakhles and Gutzky obtained a mortgage on the Byron Property, distributed the cash proceeds to themselves, and have been collecting rent for their own benefit.  A copy of the mortgage on the Byron Property is attached hereto as <u>Exhibit 29</u> and incorporated by reference.

231.     The seller of the Byron Property, like all of the Lot Three investors, never received any payment for the Byron Property, and ABO never received any compensation of the contributions it made to pay a portion of the purchase price.

232.     In March 2019 payments to Finance from former ABO-held properties stopped, causing ABO to fall short of its financing obligations to Finance.  RSN Properties never advanced its $100,000 advance payment or its $1,000,000.

233.     Prior to the Lot Three transactions being consummated to finish the Property Fraud, George Nakhle misrepresented to the members of Finance that if D. Mody and Zuk would release their mortgage interest on the ABO-owned properties which they were holding to secure ABO's interest in Finance, George Nakhle could finance his purchase of the properties and the proceeds could be used to fulfill ABO's commitments to Finance.  D. Mody and Zuk agreed.

234.     Instead of doing as he had promised, George Nakhle failed to pay the full purchase prices as agreed, and he failed to provide any financing documents to D. Mody, Zuk or ABO.

235.     George Nakhle also borrowed approximately $183,000 of funds from Finance to complete the renovation of a property on Lake Shore Boulevard in Cleveland, Ohio that he said he would transfer to Finance.  Instead, this money was used to pay other debts, and no portion of this loan was ever repaid to Finance, nor was the property transferred as promised.

236.     ABO, D. Mody and Zuk (along with its affiliate, Zuk Marble) relied on George Nakhle's misrepresentations to their material detriment.

237.     George Nakhle used the instrumentalities of interstate commerce to engage in his fraud and deceit, both individually and through RSN Properties.

238.     RSN Properties did convey a mortgage interest in some of the properties acquired with Finance funds in exchange for a substantial loan from Corevest, but George Nakhle failed to provide any details about this transaction and withheld all information about the proceeds from the other members of Finance.  Upon information and belief, any economic benefit from this action

was also distributed to George Nakhle and/or to RSN Properties for distribution to both the Nakhles and Gutzky.

239. George Nakhle and RSN Properties also rented a property purchased with Finance funds to his parents and allowed them to break their lease with several years remaining without penalty and without finding a replacement tenant.

240. George Nakhle also refused, despite repeated requests by ABO, D. Mody and Zuk to provide any adequate accounting or status report of actions taken *ultra vires* by him as manager of Finance. ABO, D. Mody and Zuk became aware of the full extent of George Nakhle's misconduct in the JV Fraud in the Fall of 2019 when the Lot Three investors failed to receive payment and the extent of fraud perpetrated by the Nakhles and Gutzky became apparent.

## K. Conclusion: The Damage

241. When the Controlled Entities failed to pay the Lot Three investors any money, the defaults began to pile up and it quickly became apparent to the Plaintiffs that the failures that they previously believed to be errors were actually part of the plan.

242. Although the fraudulent schemes were executed concurrently, when assessing the damage it is helpful to break them out and recap the total damage caused.

### 1. The Property Fraud Damage

243. The Property Fraud Investors were defrauded by the Nakhles and Gutzky and transferred titles to valuable real estate consisting of 192 various properties that generate approximately $170,000 to $200,000 in monthly rentals, while paying only a portion of the price to the Lot One and Lot Two investors and no money at all to the Lot Three investors.

244. The Nakhles' representation that the Nakhles would not be able to obtain, and did not in fact obtain, financing to cover the full purchases prices of the Property Fraud Properties was

false, as financing documents since discovered reveal that the Nakhles and Gutzky reported the values of the Property Fraud Properties as equaling or exceeding the full purchase prices, not the "conveyance prices," and in many instances the Nakhles and Gutzky received substantially more in financing proceeds for Property Fraud Properties than the purchase prices.

245.     The money obtained was not used to pay for the Property Fraud Properties.  It was brazenly taken by the Nakhles and Gutzky, while they intentionally refused to pay debts to the Plaintiffs incurred since 2017.

246.     The Nakhles' representation that they or the Controlled Entities must hold legal title to the Property Fraud Properties and the Land Contracts to qualify for financing was false, as financing documents since discovered reveal that their true motive was to package the Property Fraud Properties with other properties to obtain up to millions of dollars in loans from Defendant Corevest.

247.     The requests for documents setting forth the "release prices" or "conveyance prices" for financing purposes, which represent only percentage of the full agreed-upon purchase prices, was for fraudulent purposes, as the Nakhles and Gutzky have since falsely claimed that the "release prices" or "conveyance prices" were reduced purchase prices.

248.     Defendant Lieberman knew or should have known that the Property Fraud Investors, in transaction after transaction, were giving up valuable properties and significant rights and protections with respect to those properties, without understanding the full implications of what was happening.  Instead of protecting the investors, Lieberman instructed the Property Fraud Investors to cancel their Land Contracts, knowing full well they were depriving the Property Fraud Investors of recourse under the Land Contracts by doing so, in total disregard of their ethical obligations, and to the benefit of the Nakhles, Gutzky and the Controlled Entities.

249. The Nakhles' representations that the Nakhles and Gutzky, acting through the Controlled Entities, would pay the balance of the purchase prices and deferred rents over time were false, as they knew when they made the representations that the Nakhles and Gutzky had no intentions of paying the full purchases prices and deferred rents.

250. The Nakhles' misrepresentations that the Land Contracts would be cancelled and the Property Fraud Properties restored to the investors if Nakhles and Gutzky failed to pay the full purchase prices for the Property Fraud Properties was false, because immediately after the Property Fraud Investors transferred titles and the Land Contracts to the Controlled Entities, the Nakhles and Gutzky repudiated all liability under all agreements and subsequently cancelled the Land Contracts (which were superfluous since both parties to the Land Contracts were now Controlled Entities).

251. The Nakhles and Gutzky continue to own and operate the 192 Property Fraud Properties valued at over $10 million, for which the Nakhles and Gutzky only paid a fraction of the purchase price. To put things simply, the Nakhles and Gutzky effectively stole real estate and converted it into cash.

252. The Nakhles and Gutzky obtained financing sufficient to cover most if not all of the total purchase price for all 192 Investment Properties, but they paid only a fraction of the proceeds to the Property Fraud Investors and kept the rest of the cash, approximately $3.725 million, for their own use.

253. Upon information and belief, the Nakhles and Gutzky failed to disclose to Corevest their financial and contractual obligations to the Investors in relation to the Property Fraud Properties.

254. The Nakhles and Gutzky continue collecting the substantial rents generated by the Property Fraud Properties, but refuse to pay the balances of the purchase prices, deferred rents, interest or fees due the Covered Investors.

255. The Nakhles, Gutzky and the Controlled Entities are liable to Plaintiff Shnizel as assignee of the Covered Investors for an amount in excess of $8,350,000, consisting of the principal amount due, unpaid deferred rents, estimated actual rents, fees and interest. This consists of approximately $930,000 owed to the Lot One investors, $3,130,000 to the Lot Two investors, and $3,880,000 to the Lot Three investors, plus fees for each lot in the hundreds of thousands of dollars.

256. In the alternative, the Nakhles and Gutzky must return the Property Fraud Properties, free and clear of any and all liens and encumbrances of any sort whatsoever (most notably, the mortgages from Corevest, CAF and/or Wilmington), and pay damages for the waste and negligence suffered by the Property Fraud Properties and lost profits of the Property Investors.

### *A Sample Property: Willowhurst*

257. Just one of the 192 Property Fraud Properties, the 17-unit residential building located at 1832 Willowhurst Road in Cleveland, Ohio (***Willowhurst***), is a good example of the ongoing scheme perpetrated by the Nakhles and Gutzky.

258. The owner of Willowhurst was the Property Fraud Investor known as MF 1832, LLC. MF 1832, LLC was the record titleholder to Willowhurst.

259. MF 1832, LLC entered into a Land Contract dated January 26, 2018, to sell Willowhurst to RSN I, a Controlled Entity, for $450,000. In the Land Contract the entity name is misstated as MF 1823, LLC. *See* <u>Exhibit 30</u>, incorporated by reference.

260. RSN I agreed to pay interest on the purchase price and close on the purchase within 36 months.

261. George Nakhle personally represented to representatives of MF 1832, LLC that RSN I must receive and hold title to the Willowhurst in order for it to obtain financing and pay the purchase price. The Land Contract would of course remain in effect unless and until the full purchase price was paid.

262. In reliance on the misrepresentations made by George Nakhle, MF 1832, LLC transferred title to RSN 4, a Controlled Entity, on August 28, 2019. The record of transfers for the property shows a purchase price of $450,000. *See* Exhibit 31, incorporated by reference. This transfer was part of Lot Three.

263. MF 1832, LLC further assigned the Land Contract to RSN 4 in reliance on the misrepresentations made to MF 1832, LLC by George Nakhle. RSN 4 agreed to pay a "conveyance price" of $100,000 of the $450,000 purchase price upon obtaining financing secured by Willowhurst. *See* Exhibit 27.

264. RSN 4 then immediately cancelled the Land Contract with RSN I without MF 1832, LLC's knowledge or consent. A copy of this termination is attached hereto as Exhibit 32, incorporated by reference.

265. RSN 4 then transferred Willowhurst to Defendant RG Delaware, again without MF 1832, LLC's knowledge or consent. A copy of the deed is attached hereto as Exhibit 33, incorporated by reference.

266. RG Delaware then obtained a loan from Corevest, which the Nakhles and Gutzky did not disclose to MF 1832, LLC.

267. The Plaintiff has subsequently discovered through financing documents that RG Delaware reported the value of Willowhurst to Corevest as $690,000 and received net financing proceeds in the amount of $528,833.44, almost $80,000 in excess of the total (unpaid) purchase price. A copy of the financing closing statement is attached as <u>Exhibit 34</u>, incorporated by reference.

268. Despite receiving financing proceeds in excess of the purchase price, the Nakhles, Gutzky and their Controlled Entities never paid a single dollar to MF 1832, LLC, not even the $100,000 "conveyance price", instead keeping all the financing proceeds for their own benefit.

269. The Nakhles and Gutzky have now taken the position (based on no legal theory or document) that the $100,000 payment was not a downpayment on the purchase price, but the full purchase price, which they may pay whenever they choose to.

270. The Nakhles and Gutzky, through RG Delaware, have been collecting substantial rents generated by Willowhurst, estimated to be $5,400 per month.

**2. The JV Fraud Damage**

271. The JV Fraud was committed when the Nakhles convinced ABO, D. Mody and Zuk to invest money in a joint venture entity, Finance.

272. D. Mody and Zuk (acting through Zuk Marble) did in fact invest $1,000,000 each into the company, which George Nakhle siphoned off and used. To be blunt, George Nakhle abused his position as manager of Finance to embezzle and steal this money.

273. D. Mody and Zuk (together with Zuk Marble) lost not only the amount of their initial investments, but also the interest and proceeds that they planned on deriving from their investments.

274.     ABO remains liable to D. Mody and Zuk for the guaranty that it provided, for which Adam is ultimately personally responsible.

275.     As in the Property Fraud, Defendant Lieberman was aware or should have been aware that Finance was being systematically looted of all of the money that Plaintiffs D. Mody and Zuk had deposited into it, with the proceeds being used to purchase properties that were registered in the name of Controlled Entities.  This was a gross breach of legal ethics that no conflict waiver can excuse.

276.     George Nakhle used the instrumentalities of interstate commerce to commit the JV Fraud, and Samir Nakhle and Gutzky knowingly benefited from the fraud perpetrated.

277.     The Nakhles, Gutzky and the Controlled Entities owe ABO, D. Mody and Zuk (or its affiliate Zuk Marble) amounts in excess of $3,180,000, plus interest and penalties, as a result of the JV Fraud.

### 3.     The Nadam Fraud Damage

278.     The Nadam Fraud involves both the underlying Property Fraud with respect to the property acquired, as well as the misappropriation of $150,000 contributed by ABO to Nadam.

279.     In this instance, as in the JV Fraud, George Nakhle embezzled funds, using the instrumentalities of interstate commerce.

280.     Plaintiff ABO relied on George Nakhle's misrepresentations to his material detriment.

281.     Plaintiff ABO is entitled to $230,000 plus interest and penalties for the Nadam Fraud.

### 4. The Loan Fraud Damage

282. The combined value of the First Loan, Second Loan and Third Loan is $276,000 in principal, plus interest, which at the present time comes to a total loss to ABO, BAO and Adam of in excess of $342,000.

283. Plaintiffs ABO, BAO and Adam relied on misrepresentations made to them by the Nakhles and the Controlled Entities to their material detriment.

284. The Nakhles, acting through the Controlled Entities, used the instrumentalities of interstate commerce to effect the Loan Fraud.

### 5. The Bavaria MF Fraud Damage

285. The Bavaria MF Fraud permitted the Nakhles and Gutzky to acquire a valuable property that was undervalued due to fire damage. By simply making a single payment of $25,000 in August 2019, the Nakhles and Gutzky were able to acquire a property that saw them put $240,000 in their own pockets, as well as encumber a property worth $700,000 or more with only $455,000 in debt.

286. Adam provided a personal guaranty to seller Bavaria and has incurred losses as a result of standing by that guaranty, for total damages in the Bavaria Fraud in excess of $669,000. In the alternative, the Nakhles and Gutzky can transfer ownership of the Bavaria Property, free and clear of any liens or encumbrances, to Adam to compensate him for his damages.

### COUNT I – CIVIL RICO (18 U.S.C. 1962(c))
### (for all Frauds made by all Plaintiffs against the Nakhles, Gutzky and all of the Controlled Entities)

287. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 286 as if fully set forth herein.

288.     Section 1962(c) of the RICO Act states, "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

289.     The RICO predicates that must therefore be established are that "persons" be "employed by or associated with any enterprise" that is engaged in "racketeering activity."

290.     Section 1961(3) of the RICO Act identifies "person" as "... any individual or entity capable of holding a legal or beneficial interest in property." Each of the Nakhles, Gutzky and their Controlled Entities qualify as "persons" under this standard.

291.     Section 1961(4) of the RICO Act identifies "enterprise" as "... any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The Nakhles' and Gutzky's associations with one another, both informally and through their Controlled Entities, constitutes an "enterprise" for purposes of the RICO Act.

292.     "A pattern of racketeering activity" is defined in Section 1961(1) of the RICO Act as at least two acts of racketeering, one of which occurred after the passage of the RICO Act and the last one which occurred no more than 10 years after the prior qualifying act.

293.     Acts of "racketeering" include mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) and bank fraud (18 U.S.C. § 1344).

294.     Upon information and belief, the Nakhles and Gutzky, acting on their own behalf and through the Controlled Entities, in violation of 18 U.S.C. § 1341, placed in post offices or official depositories of the United States Postal Service matter and things to be delivered by the US Postal Service, caused matter and things to be delivered by commercial overnight courier

services, and received matter and things from the US Postal Service or commercial overnight courier services, including, but not limited to, documents containing material misrepresentations that were calculated to defraud the Plaintiffs in the Property Fraud, the JV Fraud, the Loan Fraud, the Nadam Fraud and the Bavaria Fraud. The US mail was used to convey material misrepresentations, willful omissions of material facts, and other acts of fraud.

295. The number of instances of this mail fraud are far in excess of 2 instances in the period from 2017 through 2021, as every Land Contract, every Supplemental Agreement, and every other notarized document for 192 properties in the Property Fraud, every property in the JV Fraud, the property in the Nadam Fraud and the property in the Bavaria Fraud, were signed by sending originals through the mails or via courier service.

296. The brazen, unapologetic and willful failure to make required payments under the Property Fraud, JV Fraud, Nadam Fraud and Bavaria Fraud are prima facie evidence of fraudulent intent on the part of the Nakhles and Gutzky.

297. The mail fraud committed by the Nakhles and Gutzky caused the Plaintiffs to suffer direct and proximate damages by defrauding them out of properties and cash worth in excess of $12.8 million in the aggregate.

298. Upon information and belief, the Nakhles and Gutzky, in violation of 18 U.S.C. § 1343, transmitted and received by wire, phone, internet connection, or other electronic media, matters and things that were specifically designed to defraud the Plaintiffs in all five fraud schemes outlined in this Complaint (the Property Fraud, the JV Fraud, the Nadam Fraud, the Loan Fraud and the Bavaria Fraud) by material misrepresentations, willful omissions of material facts, and other acts of fraud.

299. As with the mail fraud, the number of instances in the period of 2017 through 2021 far exceed two acts, as the Nakhles in particular engaged in dozens if not hundreds of phone calls with the Plaintiffs and Property Fraud Investors, misrepresenting intentions and inducing (1) the Property Fraud Investors to transfer their properties without adequate compensation, (2) the members of Finance and Zuk Marble to invest money that was subsequently embezzled, (3) ABO to invest money in Nadam that was embezzled, (4) Adam, ABO and BAO to extend loans that were never repaid and (5) the seller of the Bavaria Property to transfer it without adequate compensation, in each case with the purpose of defrauding the relevant Plaintiffs. Many of these phone calls were international, as the principals of all of the Plaintiffs are Israeli citizens.

300. The numerous acts of wire fraud committed by the Nakhles and Gutzky have caused direct and proximate damages to the Plaintiffs because the Nakhles and Gutzky defrauded them out of properties and cash worth in excess of $12.8 million in the aggregate.

301. The Nakhles and Gutzky, in violation of 18 U.S.C. § 1344, materially misrepresented the values of the properties acquired by fraud in the Property Fraud, the JV Fraud, the Nadam Fraud and the Bavaria Fraud in order to obtain mortgages that in many cases were far in excess of the purchase price for the same. Gutzky in particular additionally agreed to act as guarantor for the mortgages.

302. As a result of the Nakhles' and Gutzky's bank fraud, the Plaintiffs in the Property Fraud, JV Fraud, Nadam Fraud and Bavaria Fraud have suffered direct and proximate damages because they cannot simply demand rescission and restitution. The mortgages encumber the properties that were involved in such frauds, and in some cases the properties may be deemed "underwater" (worth less than the mortgage).

303. The multiple acts of mail fraud, wire fraud and bank (financial institution) fraud satisfy the requirements of establishing a pattern of racketeering activity pursuant to the RICO Act.

304. The multiple acts of mail fraud, wire fraud and bank fraud are predicate acts under the RICO act because were related to each other in that they were committed as part of an illegal and fraudulent scheme to defraud the Plaintiffs out of money in numerous ways.

305. The Nakhles and Gutzky systematically converted approximately 218 real properties into cash by acquiring them without adequate consideration, mortgaging them and taking the money, as well as collecting rents and other income from such properties. In the process they borrowed and misappropriated large amounts of cash in order to finance the other frauds being committed. These overlapping schemes were timed so that the substantial defaults would all occur around the same time, namely, the Fall of 2019.

306. The brazen nature and overarching scope of the illegal acts committed amount to or pose a threat of continued criminal activity. Indeed, since committing these frauds the Nakhles and Gutzky continue to derive material benefit from their misdeeds.

307. The activity outlined above constitutes a violation of Section 1962(c) of the RICO Act.

308. Section 1964(c) permits civil remedies for RICO Act violations, specifically stating, "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee ..."

309. Plaintiffs therefore respectfully submit a request for treble damages, costs, attorneys' fees, and such other relief as this Court deems appropriate.

310.     Plaintiff further requests injunctive relief against the properties converted by the Nakhles, Gutzky and the Controlled Entities in the Property Fraud, JV Fraud, Nadam Fraud and Bavaria Fraud pursuant to Section 1964(a) of the RICO Act in the manner and extend that this Court deems appropriate.

## COUNT II – FRAUD
**(for the Property Fraud made by Plaintiff Shnizel against the Nakhles, Gutzky, GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware)**

311.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 310 as if fully set forth herein.  For purposes of this Count II "Controlled Entities" will refer only to those Controlled Entities that engaged in the Property Fraud, namely GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware.

312.     The Nakhles, Gutzky and the Controlled Entities executed a fraudulent scheme that was designed to deprive the Property Fraud Investors of the Property Fraud Properties.

313.     The Nakhles personally executed on behalf of various Controlled Entities the Property LOA, the Land Contracts, the Lot One Supplemental Agreement and the Lot Two Supplemental Agreement, in each case with no intention of performing on their obligations under those agreements.

314.     The Nakhles personally made false representations to the Property Fraud Investors, including (but not limited to): (a) that the Controlled Entities were unable to obtain financing for the Property Fraud Properties; (b) that the Controlled Entities must receive legal title to the Property Fraud Properties and an assignment of the Land Contracts in order to receive financing; (c) that the financing received was insufficient to pay the full purchase price immediately; (d) that the Controlled Entities would pay the balance of the purchase price and deferred rents over time; and (e) that the Land Contracts would remain in full force and effect.

315.     The Nakhles personally requested, on behalf of the Controlled Entities, that "release prices" and "conveyance prices" be confirmed to them in writing not, as they claimed, for financing purposes, but in fact so that they could later falsely claim that such "release prices" or "conveyance prices" were the full purchase price.

316.     Virtually every other representation, warranty, covenant and promise made in the relevant agreements were made by the Nakhles on behalf of the Controlled Entities falsely and in bad faith.

317.     The Nakhles and Gutzky acquired mortgages under false pretenses, taking the money that was designated in the Land Contracts and Supplemental Agreements for the Property Fraud Investors and keeping it for themselves.

318.     Once the Property Fraud Properties were transferred to the Controlled Entities, the Nakhles and Gutzky had successfully defrauded the Property Fraud Investors out of the Property Fraud Properties and the rental income associated therewith.

319.     The false representations made by the Nakhles and Gutzky were part of a concerted, organized and systematic scheme to defraud the Property Fraud Investors.

320.     The Covered Investors relied on the misrepresentations, material omissions and mischaracterizations that were willfully made to them, in each case to their material detriment, as they transferred the Property Fraud Properties to the Controlled Entities.

321.     Specifically, the Lot One and Lot Two investors received compensation far below the promised amounts in the Property LOA and either the Lot One Supplemental Agreement or the Lot Two Supplemental Agreement (as applicable), and the Lot Three investors received nothing from the Nakhles and Gutzky.

322.    Ever since the Nakhles and Gutzky declared that they were going to take over management of the Property Fraud Properties pending sales of the Property Fraud Properties, the Property Fraud Investors have lost rents and other recurring income related to the Property Fraud Properties.

323.    As a result of the fraudulent scheme, the Property Fraud Properties are now heavily leveraged with debt and, at least in some cases, tax liens for unpaid taxes.

324.    As a result of the fraudulent scheme, damage and waste is likely occurring on many of the Property Fraud Properties.

325.    The encumbrances on the Property Fraud Properties, the waste and the tax liens lead the Plaintiff, as assignee for the Property Fraud Investors, to request this Court to award the Plaintiff damages in excess of $8,350,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

**COUNT III – BREACH OF CONTRACT**
**(for the Property Fraud made by Plaintiff Shnizel against the Nakhles, Gutzky, GS&M,**
**RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware)**

326.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 325 as if fully set forth herein.  For purposes of this Count III "Controlled Entities" will refer only to those Controlled Entities that engaged in the Property Fraud, namely GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware.

327.    The Property Fraud Investors entered into legally valid, binding and enforceable agreements with the various Controlled Entities, including the Property LOA, the Land Contracts, the Lot One Supplemental Agreement and the Lot Two Supplemental Agreement, pursuant to

which the Controlled Entities agreed to purchase the Property Fraud Properties in accordance with terms and conditions negotiated by the Property Fraud Investors in good faith, with set prices.

328. The Property Fraud Investors also entered into legally valid, binding and enforceable agreements with the various Controlled Entities regarding the Controlled Entities' obligations to pay the purchase prices for the Property Fraud Properties, rents and interest over time.

329. The Property Fraud Investors materially performed all of their obligations pursuant to the relevant agreements executed with the Controlled Entities.

330. On the other hand, the Nakhles and Gutzky caused the Controlled Entities to intentionally breach nearly every provision in every agreement that was executed with the Property Fraud Investors.

331. Most importantly, the purchase prices were not paid (for Lot One and Lot Two investors in full, for Lot Three investors at all), no interest payments were made, no rents or other income were distributed and the Property Fraud Properties have been effectively lost to the Property Fraud Investors.

332. As a direct and proximate result of the breach of contract by the Nakhles and Gutzky, acting through the Controlled Entities, Plaintiff Shnizel, as assignee for the Property Fraud Investors, requests this Court to award Plaintiff Shnizel damages in excess of $8,350,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT IV – RESCISSION/CONSTRUCTIVE TRUST
**(for the Property Fraud made by Plaintiff Shnizel against GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware)**

333.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 332 as if fully set forth herein.  For purposes of this Count IV, "Controlled Entities" will refer only to those Controlled Entities that engaged in the Property Fraud, namely GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware.

334.    The Property Fraud Properties were transferred to the Controlled Entities as the result of a scheme of fraud and fraudulent misrepresentations.  The purchase prices required by the agreements pursuant to which the Property Fraud Properties were transferred were never paid.

335.    Plaintiff Shnizel, as the assignee of the Property Fraud Investors, is entitled to a declaration that all of the transfers of the Property Fraud Properties are rescinded, void, and of no legal force or effect whatsoever.

336.    Plaintiff Shnizel, as the assignee of the Property Fraud Investors, is further entitled to a declaration that the Property Fraud Investors retain legal title to the Property Fraud Properties and/or the imposition of a constructive trust with respect to the Property Fraud Properties, as well as the transfer of the Property Fraud Properties free and clear of any and all liens or encumbrances (including the Corevest,CAF and Wilmington mortgages) with respect to the Property Fraud Properties.

337.    Plaintiff Shnizel, as the assignee of the Property Fraud Investors, is entitled to the appointment of a receiver to protect and manage the Property Fraud Properties pending this litigation.

## COUNT V – UNJUST ENRICHMENT
### (for the Property Fraud made by Plaintiff Shnizel against the Nakhles, Gutzky, GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware)

338.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 337 as if fully set forth herein.  For purposes of this Count V, "Controlled Entities" will refer only to those Controlled Entities that engaged in the Property Fraud, namely GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware.

339.    Plaintiff Shnizel, as assignee of the Property Fraud Investors, conferred benefits upon the Nakhles, Gutzky and the Controlled Entities, namely, title to the Property Fraud Properties and the associated Land Contracts.

340.    The Nakhles, Gutzky and the Controlled Entities had knowledge of the benefits conferred, and have used said benefits to create a valuable real estate portfolio for themselves which they have used to generate millions of dollars in financing proceeds and rental proceeds.

341.    The Nakhles, Gutzky and the Controlled Entities have received these benefits without conferring the consideration that was promised therefor, namely, the purchase prices, interest and other amounts due and payable under the relevant agreements executed with the Property Fraud Investors.

342.    It is therefore unjust to permit the Nakhles, Gutzky and the Controlled Entities to retain the benefits of the Property Fraud Properties without payment to Plaintiff Shnizel as the assignee of the Property Fraud Investors.

343.    Plaintiff Shnizel, as assignee for the Property Fraud Investors, requests this Court to award Plaintiff Shnizel damages in excess of $8,350,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

**COUNT VI – RESTITUTION UNDER THE FAITHLESS SERVANT DOCTRINE**
**(for the Property Fraud made by Plaintiff Shnizel against the Nakhles, Gutzky, GS&M,**
**RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware)**

344.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 as if fully set forth herein.   For purposes of this Count VI, "Controlled Entities" will refer only to those Controlled Entities that engaged in the Property Fraud, namely GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware.

345.     The Nakhles and Gutzky, acting through the Controlled Entities, held themselves out to the Property Fraud Investors as management agents for the Property Fraud Properties.

346.     The Property Fraud Properties are located, and all management and related agent services were to be performed, in the State of Ohio.

347.     Ohio courts have applied the faithless servant doctrine, which prohibits an agent or employee from acting in any manner inconsistent with his agency or trust and requires him, at all times, to exercise the utmost faith and loyalty in the performance of his duties.

348.     In acting as agents for the Property Fraud Investors, the Nakhles and Gutzky, operating through the Controlled Entities, have failed to deliver any rents to the Property Fraud Investors.  They delayed assumption of management of the Property Fraud Properties, leading to a loss of tenants and unpaid bills and damages.  They have failed to pay taxes for at least some of the Property Fraud Properties.  They have permitted waste and deterioration of the buildings at some of the Property Fraud Properties.

349.     This behavior is a direct violation of trust and the duty of loyalty of an agent to its principal.

350.     As a result, the Nakhles, Gutzky and the Controlled Entities have forfeited their right to receive any compensation earned during the period of this disloyalty (i.e., the entire time

they have been managing the Property Fraud Properties) that has been earned in any way related to the Property Fraud Properties.

## COUNT VII – PROMISSORY ESTOPPEL
**(for the Property Fraud made by Plaintiff Shnizel against the Nakhles, Gutzky, GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware)**

351.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 350as if fully set forth herein.   For purposes of this Count VII, "Controlled Entities" will refer only to those Controlled Entities that engaged in the Property Fraud, namely GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware.

352.    The Nakhles and Gutzky, acting through the Controlled Companies, clearly and unambiguously misrepresented, among other things, that the Controlled Entities would purchase the Property Fraud Properties at agreed upon prices and in accordance with agreed upon terms, that the Controlled Entities would then obtain financing, pay the financing proceeds to the Property Fraud Investors, and then pay the balances and other amounts due and payable over time.

353.    The Property Fraud Investors reasonably and foreseeably relied upon the lies and misrepresentations made by the Nakhles and Gutzky, acting through the Controlled Companies, to their material detriment, as the Nakhles and Gutzky caused the Controlled Companies to dishonor their obligations.

354.    Rather than honor their obligations, the Nakhles and Gutzky retained the Property Fraud Properties for themselves, as well as the substantial monies that they obtained by mortgaging the Property Fraud Properties, and the rents earned from the Property Fraud Properties.  They effectively converted the Property Fraud Properties into cash for themselves, all while continuing to generate revenue from the Property Fraud Properties.

355.     As a result of the direct and proximate damages suffered by the Property Fraud Investors in reliance on the lies and misrepresentations made by the Nakhles and Gutzky through the Controlled Entities, Plaintiff Shnizel, as assignee for the Property Fraud Investors, requests this Court to award Plaintiff Shnizel damages in excess of $8,350,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT VIII – CIVIL CONSPIRACY
**(for the Property Fraud made by Plaintiff Shnizel against the Nakhles, Gutzky, GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware)**

356.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 355 as if fully set forth herein.  For purposes of this Count VIII, "Controlled Entities" will refer only to those Controlled Entities that engaged in the Property Fraud, namely GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware.

357.     The Nakhles and Gutzky, acting through the Controlled Entities, acted in concert with each other to take title to the Property Fraud Properties in exchange for little (in the case of Lot One and Lot Two) or no consideration (in the case of Lot Three), collect substantial financing and rental proceeds, and to hold and use the Property Fraud Properties and funds generated thereby for their own benefit.

358.     The actions by the Nakhles, Gutzky and the Controlled Companies constitute a knowing, voluntary, willful and malicious combination of two or more persons designed to injure the Property Fraud Investors.

359.     As a result of this civil conspiracy, Plaintiff Shnizel, as assignee for the Property Fraud Investors, requests this Court to award Plaintiff Shnizel damages in excess of $8,350,000

plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT IX – CIVIL CONSPIRACY
### (for the Property Fraud made by Plaintiff Shnizel against Lieberman)

360. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 359 as if fully set forth herein. For purposes of this Count IX, "Controlled Entities" will refer only to those Controlled Entities that engaged in the Property Fraud, namely GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware.

361. Defendant Lieberman acted as the attorneys for the Property Fraud Investors. Although Lieberman demanded and received a *pro forma* conflict waiver from the Property Fraud Investors to permit it to act as "deal counsel" for both sides, nothing in the conflict waiver permitted Lieberman to abandon its duties to inform its clients of potential risks or to ignore activities that were likely to actively diminish a client's rights.

362. Lieberman actively ignored and permitted to continue a process that saw the Property Fraud Investors transfer 192 properties to various Controlled Entities, including an assignment of the Land Contracts. Lieberman was also aware of the value of the mortgages received by Corevest and the failure of the Nakhles and Gutzky to cause any Controlled Entity to make required payments to the Property Fraud Investors. Lieberman was also aware that the Nakhles were making misrepresentations regarding the transaction to the Property Fraud Investors. Lieberman was also aware of a number of other aspects of the Property Fraud and, as professionals, should have warned the Property Fraud Investors regarding potential risks. Finally, Lieberman instructed the Property Fraud Investors to assign their Land Contracts, while knowing full well

that this was depriving the Property Fraud Investors of recourse under the Land Contracts for non-performance by the Nakhles, Gutzky and the Controlled Entities.

363.     Lieberman continues to assist the Nakhles, Gutzky and the Controlled Entities in furthering their fraudulent schemes with respect to the Property Fraud Properties, and Plaintiff Shnizel continues to receive bills from Lieberman showing that work continues to evict multiple tenants and serve on "general matters".

364.     Lieberman's silence was a breach of its ethical obligations to its clients and substantially assisted the Nakhles and Gutzky in executing the Property Fraud through their Controlled Entities.  Its continued actions to this day on behalf of the Nakhles, Gutzky and the Controlled Entities shows that it is assisting them in continuing their fraud.

365.     Lieberman's activities proximately caused damage to the Property Fraud Investors and continues to cause damage to the Property Fraud Investors.

366.     The actions by Lieberman constitute a knowing, voluntary, willful and malicious combination of two or more persons designed to injure the Property Fraud Investors.

367.     As a result of this civil conspiracy to assist the fraud committed by the Nakhles and Gutzky, Plaintiff Shnizel, as assignee for the Property Fraud Investors, requests this Court to award Plaintiff Shnizel damages in an amount to be established by this Court at trial, but in no event less than $8,350,000, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

### COUNT X – DECLARATORY JUDGMENT
**(for the Property Fraud made by Plaintiff Shnizel against the Nakhles, the Gutzkys, CAF, Corevest, Wilmington, GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware)**

368.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 367 as if fully set forth herein.  For purposes of this Count X, "Controlled Entities" will refer only to

those Controlled Entities that engaged in the Property Fraud, namely GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware.

369.    The Nakhles and Gutzky, acting through the Controlled Entities, acquired titles to the Property Fraud Properties by fraud and in breach of their agreements and legal responsibilities to the Property Fraud Investors.

370.    The Nakhles and Gutzky caused the Controlled Entities to mortgage the Property Fraud Properties to Corevest, which yielded significant proceeds for the Nakhles and Gutzky, which the Nakhles and Gutzky have used for their own benefit.

371.    The Nakhles and Gutzky caused the Controlled Entities to pay little (in the case of Lot One and Lot Two) or no consideration (in the case of Lot Three) for the Property Fraud Properties.

372.    Because the Controlled Entities obtained title to each of the Property Fraud Properties by fraud and in breach of contractual and legal duties, a real, justiciable controversy exists between Plaintiff Shnizel, as assignee of the Property Fraud Investors, and the Defendants relating to the validity of the transfer of title to the Property Fraud Properties and the mortgages subsequently obtained, such that declaratory relief from this Court is necessary to eliminate the uncertainty and controversy.

373.    Plaintiff Shnizel, as assignee of the Property Fraud Investors, is entitled to judgment from this Court declaring that the transfer of the deeds for the Property Fraud Properties and the mortgages imposed on the Property Fraud Properties subsequent to such transfers, are unenforceable, invalid and void *ab initio*, and restoring free and clear titles to the Property Fraud Properties to the Plaintiff.

## COUNT XI – FRAUDULENT TRANSFERS
### (for the Property Fraud made by Plaintiff Shnizel against the Nakhles, Gutzky, GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware)

374.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 373 as if fully set forth herein.  For purposes of this Count XI, "Controlled Entities" will refer only to those Controlled Entities that engaged in the Property Fraud, namely GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware.

375.     The Nakhles and Gutzky, acting through the Controlled Entities, knowingly transferred assets, including the Property Fraud Properties and monies derived therefrom (whether as rents, mortgage proceeds or otherwise), to and among the Controlled Entities, with a design to hinder, delay and defraud the Property Fraud Investors' interest in, to and under the Property Fraud Properties and frustrate their claims to the same.

376.     The Property Fraud Investors did not receive equivalent value in exchange for their transfers of assets, including the Property Fraud Properties, to and amongst the Controlled Entities, and it is likely that the Controlled Entities transferred the Property Fraud Properties among one another without consideration.

377.     As a result of the fraudulent transfer of assets (including the Property Fraud Properties) by the Nakhles, Gutzky and the Controlled Entities, the transfers are void and invalid *ab initio*, and the Nakhles, Gutzky and the Controlled Entities are directly liable to Plaintiff Shnizel, as assignee of the Property Fraud Investors, damages in excess of $8,350,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XII – QUIET TITLE

**(for the Property Fraud made by Plaintiff Shnizel against the Nakhles, Gutzky, CAF, Corevest, Wilmington, GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware)**

378.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 377 as if fully set forth herein.

379.     Defendants Nakhles and Gutzky, acting through GS&M, RG Delaware, RG Perm, RG Perm II, RSN I, RSN 4 and RSN Delaware, claim to have an interest in the Property Fraud Properties adverse to Plaintiff Shnizel.

380.     Defendants CAF, Corevest and Wilmington claim to have an interest in the Property Fraud Properties subject to a mortgage adverse to Plaintiff Shnizel.

381.     Plaintiff Shnizel is entitled to an order under R.C. 5303.01 to quiet title against any and all such unlawful adverse interests of these Defendants.

## COUNT XIII – FRAUD

**(for the JV Fraud made by Plaintiffs ABO, D. Mody, Zuk, Zuk Marble and Finance against the Nakhles, Gutzky, RG Delaware, RG Perm, RSN II, RSN Properties, United Synergy and Pearl Road)**

382.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 381 as if fully set forth herein.  For purposes of this Count XII "Controlled Entities" will refer only to those Controlled Entities that engaged in the JV Fraud, namely RG Delaware, RG Perm, RSN II, RSN Properties, United Synergy and Pearl Road.

383.     The Nakhles, Gutzky and the Controlled Entities executed a fraudulent scheme that was designed to deprive the members of Finance of their investments.

384.     The Nakhles personally executed on behalf of various Controlled Entities the JV LOA and the operating agreement of Finance, in each case with no intention of performing on their obligations under those agreements.

385. The Nakhles personally made false representations to the members of Finance, including (but not limited to): (a) that Adam would have access and control of Finance and George Nakhle would be unable to take actions without his approval; (b) that Finance would acquire properties with the members' investments; (c) that no investments could be made without the approval of all of the members; (d) that RSN Properties would invest first $100,000 and then $1,000,000 in Finance; (e) that the Nakhles would collect rents and other income from ABO's properties and directly invest the same into Finance; and (f) that Finance did, in fact, own various properties purchased with the members' money.

386. Virtually every other representation, warranty, covenant and promise made in the relevant agreements were made by the Nakhles on behalf of the Controlled Entities falsely and in bad faith.

387. The Nakhles and Gutzky acquired mortgages for the properties that were purchased with the money of the members, converting the cash of the members into real estate held by a Controlled Entity and then effectively back into ostensibly unrelated cash.

388. The false representations made by the Nakhles and Gutzky were part of a concerted, organized and systematic scheme to defraud the members that were defrauded in the JV Fraud.

389. Plaintiffs ABO, D. Mody and Zuk relied on the misrepresentations, material omissions and mischaracterizations that were willfully made to them, in each case to their material detriment.

390. The fraud committed in the JV Fraud leads ABO, D. Mody, Zuk and Zuk Marble to request this Court to award the Plaintiffs in the JV Fraud damages in excess of $3,180,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses

(including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XIV– BREACH OF CONTRACT
**(for the JV Fraud made by Plaintiffs ABO, D. Mody, Zuk, Zuk Marble and Finance against the Nakhles, Gutzky and RSN Properties)**

391.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 390 as if fully set forth herein.  For purposes of this Count XIII "Controlled Entities" will refer only to those Controlled Entities that engaged in the JV Fraud, namely RG Delaware, RG Perm, RSN II, RSN Properties, United Synergy and Pearl Road.

392.     Plaintiffs ABO, D. Mody, Zuk and Zuk Marble entered into legally valid, binding and enforceable agreements with the various Controlled Entities, including the JV LOA and the Operating Agreement of Finance.  D. Mody and Zuk Marble additionally entered into promissory notes and loan agreements that George Nakhle executed as manager of Finance.

393.     The Nakhles and Gutzky caused RSN Properties to breach its agreements and its implied obligations of good faith and fair dealing by the actions taken by RSN Properties to defraud ABO, D. Mody and Zuk.  George Nakhle also personally breached his promises as well as implied obligations of good faith and fair dealing in his capacity as a manager of Finance, and caused Finance to enter into the promissory notes and loan agreements with no intention of performing on them.

394.     Defendant George Nakhle failed to act in a prudent and businesslike manner, devoting such time as reasonably necessary to manage Finance's affairs, instead acting with fraud, willful misconduct, gross negligence and breach of fiduciary duty

395. Defendant RSN Properties, acting under the control of the Nakhles and Gutzky, breached its contractual obligations to its fellow members and permitted manager George Nakhle to loot the company and transfer all of the assets of the company into Controlled Entities.

396. The Nakhles and Gutzky caused RSN Properties and Finance to intentionally breach nearly every provision in every agreement that was executed with ABO, D. Mody, Zuk and Zuk Marble. George Nakhle personally breached nearly every provision regarding his duties as manager.

397. As a direct and proximate result of the breach of contract by the Nakhles and Gutzky, acting through RSN Properties and ostensibly on behalf of Finance, and as a direct and proximate result of the breach of contract by George Nakhle as manager, Plaintiffs ABO, D. Mody, Zuk and Zuk Marble request this Court to award them damages in excess of $3,180,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XV – RESTITUTION UNDER THE FAITHLESS SERVANT DOCTRINE
### (for the JV Fraud made by Plaintiffs ABO, D. Mody, Zuk and Finance against George Nakhle)

398. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 397 as if fully set forth herein.

399. George Nakhle served as the manager of Finance.

400. Finance is an Ohio limited liability company located, and all management and related services were to be performed, in the State of Ohio.

401.    Ohio courts have applied the faithless servant doctrine, which prohibits an agent or employee from acting in any manner inconsistent with his agency or trust and requires him, at all times, to exercise the utmost faith and loyalty in the performance of his duties.

402.    In acting as manager of Finance, George Nakhle engaged in embezzlement and theft of funds, paying himself various amounts and engaging in self-dealing in violation of his duties to the members.

403.    This behavior is a direct violation of trust and the duty of loyalty of a manager to the members of a limited liability company.

404.    As a result, George Nakhle has forfeited his right to receive any compensation earned during the period of this disloyalty (i.e., the entire time he acted as manager of Finance), and Plaintiffs ABO, D. Mody and Zuk request this Court to award them damages in excess of $3,180,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

### COUNT XVI – BREACH OF STATUTORY AND FIDUCIARY DUTIES
**(for the JV Fraud made by Plaintiffs ABO, D. Mody, Zuk and Finance against the Nakhles, Gutzky and RSN Properties)**

405.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 404 as if fully set forth herein.

406.    George Nakhle as a manager of Finance, and RSN Properties as a member of Finance, owe statutory and fiduciary duties to Plaintiffs ABO, D. Mody and Zuk set forth in R.C. Chapter 1705, and common law fiduciary duties.

407.    Both George Nakhle and RSN Properties breached their statutory and fiduciary duties by, among other things, exercising exclusive control over Finance and the properties

acquired with Finance's capital, failing to turn over to Finance monies earned from the properties purchased with Finance's capital, and using Finance for their own benefit, failing to produce an accounting and other information concerning Finance, and other misdeeds described above.

408.    The Nakhles and Gutzky caused RSN Properties to engage in such breaches.

409.    Both George Nakhle and RSN Properties acted intentionally and in knowing violation of the law or, at the very least, in a grossly negligent manner.

410.    As a direct and proximate result of the breaches of statutory and fiduciary duty engaged in by George Nakhle and RSN Properties, Plaintiffs ABO, D. Mody, Zuk and Finance request this Court to award them damages in excess of $3,180,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

### COUNT XVII – RIGHT TO BOOKS AND RECORDS
**(for the JV Fraud made by Plaintiffs ABO, D. Mody, and Zuk against the Nakhles, Gutzky and RSN Properties)**

411.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 410 as if fully set forth herein.

412.    ABO, D. Mody and Zuk have a right to true and full information regarding the status of Finance and its financial condition pursuant to Ohio law and R.C. 1705.22.

413.    ABO, D. Mody and Zuk have repeatedly requested an accounting and status report of Finance and for each of the properties acquired with Finance funds or acquired ostensibly on its behalf, as most recently reflected in Exhibit 35, incorporated herein by reference.

414.    George Nakhle and RSN Properties have failed and refused to produce any of the requested information, in violation of Ohio law and R.C. 1705.22.

415.    The Nakhles and Gutzky have caused RSN Properties to fail to comply with the books and records demands made by Plaintiffs ABO, D. Mody and Zuk.

416.    Plaintiffs ABO, D. Mody and Zuk are entitled to an order directly George Nakhle and RSN Properties to produce a complete accounting of Finance and each of the properties purchased with Finance funds or ostensibly acquired on its behalf.

## COUNT XVIII – PROMISSORY ESTOPPEL
### (for the JV Fraud made by Plaintiffs ABO, D. Mody, Zuk and Zuk Marble against the Nakhles, Gutzky and RSN Properties)

417.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 416 as if fully set forth herein.

418.    The Nakhles and Gutzky, acting through RSN Properties, clearly and unambiguously promised, among other things, to contribute $100,000 as an advance payment and then $1,000,000 as a capital contribution or loan.

419.    Plaintiffs ABO, D. Mody, Zuk and Zuk Marble reasonably and foreseeably relied upon the misrepresentations made by RSN Properties to their material detriment, as the Nakhles and Gutzky caused RSN Properties and Finance to dishonor their respective obligations.

420.    Rather than honor these obligations, the Nakhles and Gutzky permitted member George Nakhle, acting as the manager of Finance, to loot Finance and divert its funds into properties that were registered to Controlled Entities of the Nakhles and Gutzky.

421.    George Nakhle also promised to purchase properties on behalf of Finance, as well as to contribute monies collected from ABO's properties to help ABO satisfy its own capital contribution obligations.

422.     Rather than honor these obligations, George Nakhle took money from Finance for his own benefit, looted Finance, diverted its funds to properties that were registered to Controlled Entities, and never contributed any money collected from ABO's properties into Finance.

423.     As a result of the direct and proximate damages suffered by ABO, D. Mody, Zuk and Zuk Marble in reliance on the misrepresentations made by the Nakhles and Gutzky through RSN Properties and George Nakhle directly, Plaintiffs ABO, D. Mody, Zuk and Zuk Marble request this Court award them damages in excess of $3,180,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XIX – CIVIL CONSPIRACY
**(for the JV Fraud made by made by Plaintiffs ABO, D. Mody, Zuk, Zuk Marble and Finance against the Nakhles, Gutzky, RG Delaware, RG Perm, RSN II, RSN Properties, United Synergy and Pearl Road)**

424.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 423 as if fully set forth herein.  For purposes of this Count XVIII, "Controlled Entities" will refer only to those Controlled Entities that engaged in the JV Fraud, namely RG Delaware, RG Perm, RSN II, RSN Properties, United Synergy and Pearl Road.

425.     The Nakhles and Gutzky, acting through the Controlled Entities, acted in concert with each other to take title to the properties purchased with the funds of Finance or ostensibly on its behalf, and to hold and use such properties and funds generated thereby for their own benefit.

426.     The actions by the Nakhles, Gutzky and the Controlled Companies constitute a knowing, voluntary, willful and malicious combination of two or more persons designed to injure Plaintiffs ABO, D. Mody, Zuk and Zuk Marble (and, by extension, Finance).

427.     As a result of this civil conspiracy, Plaintiffs ABO, D. Mody, Zuk, Zuk Marble and Finance request this Court award them damages in excess of $3,180,000 plus additional damages

as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XX – CIVIL CONSPIRACY
### (for the JV Fraud made by Plaintiffs ABO, D. Mody, Zuk, Zuk Marble and Finance against Lieberman)

428. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 427 as if fully set forth herein. For purposes of this Count XIX, "Controlled Entities" will refer only to those Controlled Entities that engaged in the JV Fraud, namely RG Delaware, RG Perm, RSN II, RSN Properties, United Synergy and Pearl Road.

429. Defendant Lieberman acted as the attorneys for ABO, D. Mody, Zuk and Zuk Marble. Although Lieberman demanded and received a *pro forma* conflict waiver from such Plaintiffs to permit it to act as "deal counsel" for both sides, nothing in the conflict waiver permitted Lieberman to abandon its duties to inform its clients of potential risks or to ignore activities that were likely to actively diminish a client's rights.

430. Lieberman actively ignored and permitted to continue a process that saw the George Nakhle systematically loot Finance and use its funds for properties registered to Controlled Entities. Lieberman was also aware of the value of the mortgages received by Corevest and the failure of the Nakhles and Gutzky to in any way reimburse Finance for the purchase of the properties that were subsequently mortgaged. Lieberman was also aware that the Nakhles were making misrepresentations regarding the transaction to the Plaintiffs in the JV Fraud. Lieberman was also aware of a number of other aspects of the JV Fraud and, as professionals, should have warned the Property Fraud Investors regarding potential risks. In particular, Lieberman took no

steps to ensure proper perfection of pledges by the Plaintiff members of Finance and frequently misrepresented to the Plaintiffs that their investments were protected when, in fact, they were not.

431.  Lieberman continues to assist the Nakhles, Gutzky and the Controlled Entities in furthering their fraudulent schemes with respect to the JV Properties.

432.  Lieberman's silence was a breach of its ethical obligations to its clients and substantially assisted the Nakhles and Gutzky in executing the JV Fraud through their Controlled Entities.  Its continued actions to this day on behalf of the Nakhles, Gutzky and the Controlled Entities shows that it is assisting them in continuing their fraud.

433.  Lieberman's activities proximately caused damage to ABO, D. Mody, Zuk, Zuk Marble and Finance.

434.  Lieberman further knew at all times that Plaintiff ABO, and ultimately Adam personally, would be personally liable for the guaranty signed by ABO, and that as a result of Lieberman's actions, ABO and Adam would incur this additional liability, which represents a further breach of Lieberman's ethical obligations with respect to ABO and Adam in particular.

435.  The actions by Lieberman constitute a knowing, voluntary, willful and malicious combination of two or more persons designed to injure ABO, D. Mody, Zuk, Zuk Marble and Finance.

436.  As a result of the civil conspiracy to assist the fraud committed by the Nakhles and Gutzky, Plaintiffs ABO, D. Mody, Zuk, Zuk Marble and Finance request this Court award them damages in an amount to be established by this Court at trial, but in no event less than $3,180,000, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XXI – DECLARATORY JUDGMENT
### (for the JV Fraud made by Plaintiffs ABO, D. Mody, Zuk and Finance against the Nakhles, Gutzky, CAF, Corevest, Wilmington, RG Delaware, RG Perm, RSN II, RSN Properties, United Synergy and Pearl Road)

437.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 436 as if fully set forth herein.  For purposes of this Count XX, "Controlled Entities" will refer only to those Controlled Entities that engaged in the JV Fraud, namely RG Delaware, RG Perm, RSN II, RSN Properties, United Synergy and Pearl Road.

438.    The Nakhles and Gutzky, acting through the Controlled Entities, acquired titles to the properties purchased with Finance funds or ostensibly on its behalf by fraud and in breach of their agreements and legal responsibilities to Plaintiffs ABO, D. Mody and Zuk.

439.    The JV Properties were purchased with Finance's money but instead registered with the Controlled Entities.

440.    The Nakhles and Gutzky caused the Controlled Entities to mortgage the JV Properties to Corevest, which yielded significant proceeds for the Nakhles and Gutzky, which the Nakhles and Gutzky have used for their own benefit.

441.    Neither the purchase nor the subsequent mortgages were authorized or permitted by the operating agreement of Finance and other documents of the company.

442.    Because the Controlled Entities obtained title to each of the JV Properties by fraud and in breach of contractual and legal duties, a real, justiciable controversy exists between Plaintiffs ABO, D. Mody and Zuk, and the Nakhles, Gutzky and their Controlled Entities relating to the validity of the title to the JV Properties and the mortgages subsequently obtained, such that declaratory relief from this Court is necessary to eliminate the uncertainty and controversy.

443. Plaintiffs ABO, D. Mody and Zuk are entitled to judgment from this Court declaring that the transfer of the deeds for the JV Properties and the mortgages imposed on the JV Properties subsequent to such transfers, are unenforceable, invalid and void *ab initio*.

## COUNT XXII – QUIET TITLE
### (for the JV Fraud made by Plaintiffs ABO, D. Mody, Zuk and Finance against the Nakhles, Gutzky, Corevest, Wilmington, RG Delaware, RG Perm, RSN II, RSN Properties, United Synergy and Pearl Road)

444. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 443 as if fully set forth herein. For purposes of this Count XXI, "Controlled Entities" will refer only to those Controlled Entities that engaged in the JV Fraud, namely RG Delaware, RG Perm, RSN II, RSN Properties, United Synergy and Pearl Road.

445. Defendant Controlled Entities claim to have an interest in the JV Properties adverse to Plaintiffs ABO, D. Mody, Zuk and Finance.

446. Defendants Corevest and Wilmington claim to have an interest in the JV Properties subject to one or more mortgages adverse to Plaintiffs ABO, D. Mody, Zuk and Finance.

447. Plaintiffs ABO, D. Mody, Zuk and Finance are entitled to an order under R.C. 5303.01 to quiet title against any and all such unlawful adverse interests of these Defendants.

## COUNT XXIII – FRAUD
### (for the Nadam Fraud made by Plaintiffs Adam and ABO, against the Nakhles, Gutzky, Nadam and RG Delaware)

448. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 447 as if fully set forth herein.

449. George Nakhle, acting through Nadam, executed a fraudulent scheme that was designed to deprive Adam and ABO of financial value.

450. George Nakhle as manager and member executed the operating agreement of Nadam with no intention of performing on their obligations under those agreements.

451.     George Nakhle personally made false representations to Adam and ABO, including (but not limited to): (a) that Adam would have access and control of Nadam and George Nakhle would be unable to take actions without his approval; (b) that Nadam would acquire properties with the members' investments; (c) that no investments could be made without the approval of all of the members; (d) that the Byron Property would be registered in Nadam's name; and (e) that $50,000 was required to renovate the Byron Property.

452.     Virtually every other representation, warranty, covenant and promise made in the operating agreement were made by George Nakhle falsely and in bad faith.

453.     George Nakhle registered the Byron Property with RG Delaware, after which the Nakhles and Gutzky acquired mortgages for the Byron Property, converting the cash of the members into real estate held by RG Delaware and then effectively back into ostensibly unrelated cash.

454.     The false representations made by the Nakhles and Gutzky were part of a concerted, organized and systematic scheme to defraud Adam and ABO in the Nadam Fraud.

455.     Plaintiffs Adam and ABO relied on the misrepresentations, material omissions and mischaracterizations that were willfully made to them, in each case to their material detriment.

456.     The fraud committed in the Nadam Fraud leads Adam and ABO to request this Court to award the Plaintiffs in the Nadam Fraud damages in excess of $230,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XXIV – BREACH OF CONTRACT
**(for the Nadam Fraud made by Plaintiffs Adam and ABO against George Nakhle)**

457.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 456 as if fully set forth herein.

458.    Plaintiffs Adam and ABO entered into legally valid, binding and enforceable operating agreement with George Nakhle.  Plaintiffs Adam and ABO honored the terms of this operating agreement but Defendant George Nakhle did not.

459.    Defendant George Nakhle breached his obligations in the operating agreement by transferring the Byron Property to RG Delaware.  George Nakhle also breached his promises as well as implied obligations of good faith and fair dealing in his capacity as a manager of Nadam.

460.    Defendant George Nakhle failed to act in a prudent and businesslike manner, devoting such time as reasonably necessary to manage Nadam's affairs, instead acting with fraud, willful misconduct, gross negligence and breach of fiduciary duty

461.    As a direct and proximate result of the breach of contract by George Nakhle, Plaintiffs Adam and ABO request this Court to award them damages in excess of $230,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XXV – BREACH OF STATUTORY AND FIDUCIARY DUTIES
**(for the Nadam Fraud made by Plaintiffs Adam and ABO against George Nakhle)**

462.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 461 as if fully set forth herein.

463. George Nakhle as a manager and member of Nadam owes statutory and fiduciary duties to Plaintiffs Adam and ABO set forth in R.C. Chapter 1705, and common law fiduciary duties.

464. Defendant George Nakhle breached his statutory and fiduciary duties by, among other things, exercising exclusive control over Nadam and its finances, failing register the Byron Property in Nadam's name, and using Nadam for his own benefit, and other misdeeds described above.

465. George Nakhle acted intentionally and in knowing violation of the law or, at the very least, in a grossly negligent manner.

466. As a direct and proximate result of the breaches of statutory and fiduciary duty engaged in by George Nakhle Plaintiffs Adam and ABO request this Court to award them damages in excess of $230,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XXVI – CIVIL CONSPIRACY
**(for the Nadam Fraud made by Plaintiffs Adam and ABO against the Nakhles, Gutzky, Nadam and RG Delaware)**

467. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 466 as if fully set forth herein.

468. The Nakhles and Gutzky, acting through Nadam and RG Delaware, acted in concert with each other to take title to the Byron Property, and to hold and use the Byron Property and funds generated thereby for their own benefit.

469. The actions by the Nakhles, Gutzky, Nadam and RG Delaware constitute a knowing, voluntary, willful and malicious combination of two or more persons designed to injure Plaintiffs Adam and ABO.

470. As a result of this civil conspiracy, Plaintiffs Adam and ABO request this Court award them damages in excess of $230,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XXVII – DECLARATORY JUDGMENT
### (for the Nadam Fraud made by Plaintiffs Adam and ABO against the Nakhles, Gutzky, CAF, Corevest, Nadam and RG Delaware)

471. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 470 as if fully set forth herein.

472. The Nakhles and Gutzky, acting through Nadam and RG Delaware, acquired title to the Byron Property by fraud and in breach of their agreements and legal responsibilities to Plaintiffs Adam and ABO.

473. The Byron Property was purchased with Adam's money contributed through ABO but instead registered with RG Delaware.

474. The Nakhles and Gutzky caused RG Delaware to mortgage the Byron Property to Corevest, which yielded significant proceeds for the Nakhles and Gutzky, which the Nakhles and Gutzky have used for their own benefit.

475. Neither the purchase nor the subsequent mortgage were authorized or permitted by the operating agreement of Nadam and other documents of the company.

476. Because RG Delaware obtained title to the Byron Property by fraud and in breach of contractual and legal duties, a real, justiciable controversy exists between Plaintiffs Adam and

ABO, and the Nakhles, Gutzky and RG Delaware relating to the validity of the title to the Byron Property and the mortgage subsequently obtained, such that declaratory relief from this Court is necessary to eliminate the uncertainty and controversy.

477. Defendants Corevest and/or Wilmington may retain an interest in the Byron Property pursuant to the mortgage issued in connection therewith.

478. Plaintiffs Adam and ABO are entitled to judgment from this Court declaring that the transfer of the deed for the Byron Property and the mortgage imposed on the Byron Property subsequent to such transfer, are unenforceable, invalid and void *ab initio*.

## COUNT XXVIII – FRAUD
**(for the Loan Fraud made by Plaintiffs BAO and Adam, against the Nakhles, Gutzky and RSN I)**

479. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 478 as if fully set forth herein.

480. The Nakhles and Gutzky, acting through RSN I, executed a fraudulent scheme that was designed to deprive Adam and BAO of financial value.

481. George Nakhle personally made false representations to Adam and BAO, including (but not limited to): (a) that he guaranteed the First Loan and the Third Loan; (b) that he would directly repay Adam's third party lenders for the Third Loan; (c) that all payments of interest and principal would be made in a timely fashion; and (d) that the loans were needed in order to be able to effect other transactions.

482. Virtually every representation, warranty, covenant and promise made in the loan agreements by the Nakhles and Gutzky, acting through RSN I, were made falsely and in bad faith.

483. The money from the First Loan, Second Loan and Third Loan were taken by RSN I and no interest or principal repayments were ever made.

484.     The false representations made by the Nakhles and Gutzky were part of a concerted, organized and systematic scheme to defraud Adam and BAO in the Loan Fraud.

485.     Plaintiffs Adam and BAO relied on the misrepresentations, material omissions and mischaracterizations that were willfully made to them, in each case to their material detriment.

486.     The fraud committed in the Loan Fraud leads Adam and BAO to request this Court to award the Plaintiffs in the Loan Fraud damages in excess of $342,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XXIX – BREACH OF CONTRACT
**(for the Loan Fraud made by Plaintiffs BAO and Adam, against the Nakhles, Gutzky and RSN I)**

487.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 486 as if fully set forth herein.

488.     Plaintiffs Adam and BAO entered into three legally valid, binding and enforceable loan agreements with RSN I.  Plaintiffs Adam and BAO honored the terms of these loan agreements but the Nakhles, Gutzky and RSN I did not.

489.     Defendants Nakhles and Gutzky, acting through RSN I, failed to honor their obligations in the loan agreements by failing to make any payments of principal or interest on the loan agreements for the First Loan, the Second Loan and the Third Loan.

490.     As a direct and proximate result of the breach of contract by the Nakhles, Gutzky and RSN I, Plaintiffs Adam and BAO request this Court to award them damages in excess of $342,000 plus additional damages as they continue to accrue, plus punitive damages, litigation

expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XXX – CIVIL CONSPIRACY
**(for the Loan Fraud made by Plaintiffs BAO and Adam, against the Nakhles, Gutzky and RSN I)**

491.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 490 as if fully set forth herein.

492.     The Nakhles and Gutzky, acting through RSN I, acted in concert with each other to take the money of Plaintiffs Adam and BAO without any intention of repaying, and indeed did not pay any principal or interest on the First Loan, Second Loan or Third Loan, instead retaining all loaned amounts for their own benefit.

493.     The actions by the Nakhles, Gutzky and RSN I constitute a knowing, voluntary, willful and malicious combination of two or more persons designed to injure Plaintiffs Adam and BAO.

494.     As a result of this civil conspiracy, Plaintiffs Adam and BAO request this Court award them damages in excess of $342,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XXXI – UNJUST ENRICHMENT
**(for the Loan Fraud made by Plaintiffs BAO and Adam, against the Nakhles, Gutzky and RSN I)**

495.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 494 as if fully set forth herein.

496.     Plaintiffs Adam and BAO conferred benefits upon the Nakhles, Gutzky and RSN I, namely, the funds advanced as a result of the First Loan, the Second Loan and the Third Loan.

497.     The Nakhles, Gutzky and RSN I had knowledge of the benefits conferred, and have used said benefits to further their own interests.

498.     The Nakhles, Gutzky and RSN I have received these benefits without conferring the consideration that was promised therefor, namely, the repayment of principal and payment of interest as the same accrued on the First Loan, the Second Loan and the Third Loan.

499.     It is therefore unjust to permit the Nakhles, Gutzky and RSN I to retain the benefits of the Loan Fraud without payment to Plaintiffs Adam and BAO.

500.     Plaintiffs Adam and BAO request this Court award them damages in excess of $342,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XXXII – PROMISSORY ESTOPPEL
**(for the Loan Fraud made by Plaintiffs BAO and Adam, against the Nakhles, Gutzky and RSN I)**

501.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 500 as if fully set forth herein.

502.     The Nakhles and Gutzky, acting through RSN I, clearly and unambiguously promised, among other things, to repay the principal amounts of the First Loan, Second Loan and Third Loan, as well as to pay interest and other amounts due thereon.

503.     Plaintiffs Adam and BAO reasonably and foreseeably relied upon the misrepresentations made by the Nakhles and Gutzky, acting through RSN I, to their material detriment, as the Nakhles and Gutzky caused RSN I to dishonor their obligations.

504.     Rather than honor their obligations, the Nakhles and Gutzky have to this day not paid a single penny of interest or principal repayment pursuant to the First Loan, Second Loan and Third Loan.

505.     As a result of the direct and proximate damages suffered by Adam and BAO in reliance on the misrepresentations made by the Nakhles and Gutzky through RSN I, Plaintiffs Adam and BAO request this Court award them damages in excess of $342,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XXXIII – FRAUD
**(for the Bavaria MF Fraud made by Plaintiff Adam against the Nakhles, Gutzky, and RG Delaware)**

506.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 505 as if fully set forth herein.

507.     The Nakhles, Gutzky and RG Delaware executed a fraudulent scheme that was designed to deprive seller Bavaria of the Bavaria Property of economic benefit.  Plaintiff Adam is the assignee of Bavaria after personally guaranteeing the sale of the Bavaria Property to RG Delaware.

508.     The Nakhles personally executed on behalf of RG Delaware the purchase agreement for the Bavaria Property with no intention of performing on their obligations under those agreements.

509.     The Nakhles personally made false representations to Bavaria and Plaintiff Adam including (but not limited to): (a) that the Nakhles could quickly obtain insurance funds to restore the Bavaria Property; (b) that Bavaria would receive $400,000 by August 2019, in addition to

interest thereon; (c) that the Bavaria Property would be renovated; (d) that in the event that the necessary payments were not made either to purchase or renovate the Bavaria Property, Bavaria would have the right to repurchase the Bavaria Property for $1; and (e) that the Nakhles would collect rents and other income from the Bavaria Property and use these to pay outstanding amounts to Bavaria, among other promises.

510.    Virtually every representation, warranty, covenant and promise made in the purchase agreement were made by the Nakhles and Gutzky through RG Delaware falsely and in bad faith.

511.    The Nakhles and Gutzky acquired a mortgage for the Bavaria Property, converting the Bavaria Property into cash.

512.    The false representations made by the Nakhles and Gutzky were part of a concerted, organized and systematic scheme to defraud Bavaria and Adam as guarantor.

513.    Bavaria relied on the misrepresentations, material omissions and mischaracterizations that were willfully made to it, in each case to its material detriment.

514.    The fraud committed in the Bavaria MF Fraud leads Plaintiff Adam, as assignee for Bavaria, to request this Court to award Adam damages in excess of $669,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

### COUNT XXXIV – BREACH OF CONTRACT
**(for the Bavaria MF Fraud made by Plaintiff Adam against the Nakhles, Gutzky, and RG Delaware)**

515.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 511 as if fully set forth herein.

516.     Bavaria entered into legally valid, binding and enforceable purchase agreement with RG Delaware.  Plaintiff Adam is the assignee of Bavaria's claims.

517.     The Nakhles and Gutzky caused RG Delaware to breach these agreements and its implied obligations of good faith and fair dealing by the actions taken by RG Delaware to defraud Bavaria.

518.     Defendant RG Delaware, acting under the control of the Nakhles and Gutzky, breached its contractual obligations to its Bavaria to pay the purchase price for the Bavaria Property, as well as all other amounts due and payable, and also refused to permit Bavaria to exercise its right of repurchase when RG Delaware defaulted on its payment obligations.

519.     The Nakhles and Gutzky caused RG Delaware to intentionally breach nearly every provision in the purchase agreement for the Bavaria Property.

520.     As a direct and proximate result of the breach of contract by the Nakhles and Gutzky, acting through RG Delaware, Plaintiff Adam, as assignee for Bavaria, to request this Court to award Adam damages in excess of $669,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

<u>COUNT XXXV – PROMISSORY ESTOPPEL</u>
**(for the Bavaria MF Fraud made by Plaintiff Adam against the Nakhles, Gutzky, and RG Delaware)**

521.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 520 as if fully set forth herein.

522.     The Nakhles and Gutzky, acting through RG Delaware, clearly and unambiguously promised, among other things, to pay $478,000 for the purchase of the Bavaria Property, as well as to use insurance proceeds for renovation of the Bavaria Property.

523.    Bavaria reasonably and foreseeably relied upon the misrepresentations made by RG Delaware to its material detriment, as the Nakhles and Gutzky caused RG Delaware to dishonor its obligations.

524.    Rather than honor RG Delaware's obligations, the Nakhles and Gutzky simply did not pay the money due to Bavaria when the same became due and payable, and they did not cause RG Delaware to make any payments of interest or permit a repurchase of the Bavaria Property by Bavaria.

525.    As a result of the direct and proximate damages suffered by Bavaria, Plaintiff Adam, as assignee for Bavaria, to request this Court to award Adam damages in excess of $669,000 plus additional damages as they continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

### COUNT XXXVI – CIVIL CONSPIRACY
**(for the Bavaria MF Fraud made by Plaintiff Adam against the Nakhles, Gutzky, and RG Delaware)**

526.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 525 as if fully set forth herein.

527.    The Nakhles and Gutzky, acting through RG Delaware, acted in concert with each other to take title to the Bavaria Property, and to hold and use the Bavaria Property and funds generated thereby for their own benefit.

528.    The actions by the Nakhles, Gutzky and RG Delaware constitute a knowing, voluntary, willful and malicious combination of two or more persons designed to injure Bavaria.

529.    As a result of this civil conspiracy, Plaintiff Adam, as assignee for Bavaria, to request this Court to award Adam damages in excess of $669,000 plus additional damages as they

continue to accrue, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

<u>**COUNT XXXVII – CIVIL CONSPIRACY**</u>
**(for the Bavaria MF Fraud made by Plaintiff Adam against Lieberman)**

530.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 529 as if fully set forth herein.

531.    Defendant Lieberman acted as the attorneys for Bavaria.  Although Lieberman demanded and received a *pro forma* conflict waiver from Bavaria to permit it to act as "deal counsel" for both sides, nothing in the conflict waiver permitted Lieberman to abandon its duties to inform its client of potential risks or to ignore activities that were likely to actively diminish the client's rights.

532.    Lieberman actively ignored and permitted to continue a process that saw the Bavaria Property transferred for no value.  Lieberman was also aware of the value of the mortgage received by Corevest and the failure of the Nakhles and Gutzky to in any way reimburse Bavaria for the purchase of the Bavaria Property.  Lieberman was also aware that the Nakhles were making misrepresentations regarding the transaction to Bavaria.

533.    Lieberman continues to assist the Nakhles, Gutzky and the Controlled Entities in furthering their fraudulent schemes with respect to the Bavaria Property.

534.    Lieberman's silence was a breach of its ethical obligations to its client and substantially assisted the Nakhles and Gutzky in executing the Bavaria MF Fraud through RG Delaware.  Its continued actions to this day on behalf of the Nakhles, Gutzky and the Controlled Entities shows that it is assisting them in continuing their fraud.

535.    Lieberman's activities proximately caused damage to Bavaria.

536.     The actions by Lieberman constitute a knowing, voluntary, willful and malicious combination of two or more persons designed to injure Adam.

537.     As a result of civil conspiracy to assist the fraud committed by the Nakhles and Gutzky, Plaintiff Adam, as assignee for Bavaria, to request this Court to award Adam damages in excess of $669,000, plus punitive damages, litigation expenses (including attorneys' fees), pre- and post-judgment interest, and costs, as well as such other relief as this Court may deem appropriate.

## COUNT XXXVIII – DECLARATORY JUDGMENT
### (for the Bavaria MF Fraud made by Plaintiff Adam against the Nakhles, Gutzky, Corevest and RG Delaware)

538.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 537 as if fully set forth herein.

539.     The Nakhles and Gutzky, acting through RG Delaware, acquired title to the Bavaria Property by fraud and in breach of their agreements and legal responsibilities to Plaintiff Bavaria.

540.     The Nakhles and Gutzky caused RG Delaware to mortgage the Bavaria Property to Corevest, which yielded significant proceeds for the Nakhles and Gutzky, which the Nakhles and Gutzky have used for their own benefit.  The Bavaria Property is now estimated to be valued at over $700,000 and perhaps $1,000,000.

541.     Because RG Delaware obtained title to the Bavaria Property by fraud and in breach of contractual and legal duties, a real, justiciable controversy exists between Plaintiff Adam as assignee of Bavaria's claims, and the Nakhles, Gutzky and RG Delaware relating to the validity of the title to the Bavaria Property and the mortgage subsequently obtained, such that declaratory relief from this Court is necessary to eliminate the uncertainty and controversy.

542.     Plaintiff Adam as assignee of Bavaria is entitled to judgment from this Court declaring that the transfer of the deeds for the Bavaria Property and the mortgage imposed on the Bavaria Property subsequent to such transfers, are unenforceable, invalid and void *ab initio*.

## COUNT XXXIX – QUIET TITLE
### (for the Bavaria MF Fraud made by Plaintiff Adam against the Nakhles, Gutzky, Corevest and RG Delaware)

543.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 542 as if fully set forth herein.

544.     Defendants Nakhles and Gutzky, acting through RG Delaware, claim to have an interest in the Bavaria Property adverse to Plaintiff Adam as assignee of Bavaria.

545.     Defendant Corevest claims to have an interest in the Bavaria Property subject to a mortgage adverse to Plaintiff Adam as an assignee of Bavaria.

546.     Plaintiff Adam as an assignee of Bavaria is entitled to an order under R.C. 5303.01 to quiet title against any and all such unlawful adverse interests of these Defendants.

## COUNT XL – PIERCING THE CORPORATE VEIL
### (for all Frauds by all Plaintiffs against the Controlled Entities)

547.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 546 as if fully set forth herein.

548.     The Nakhles and Gutzky have at all times controlled all of the Controlled Entities, and their control has at all times been so complete that the Controlled Entities have no separate mind, will or existence of their own.

549.     The Nakhles and Gutzky used their control of the Controlled Entities for the purpose of committing fraud and illegal acts in the Property Fraud, the JV Fraud, the Nadam Fraud, the Loan Fraud and the Bavaria MF Fraud, from each of which the Nakhles and Gutzky personally benefited.

550. The Nakhles and Gutzky used their control of the Controlled Entities in such a manner as to cause injury and unjust loss to the Plaintiffs, the Property Fraud Investors and Bavaria.

551. The Nakhles and Gutzky have at all times treated the Controlled Entities as their personal piggy bank, taking the monies allocated to the Controlled Entities for their own personal use.

552. As a result, the Controlled Entities' corporate veil should be pierced and the Nakhles and Gutzky should be held personally liable to the Plaintiffs for any actions taken by them through the Controlled Entities.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

A.      For judgment for treble damages, costs, and attorneys' fees in excess of three times of the total aggregate damages for the Property Fraud, JV Fraud, Nadam Fraud, Loan Fraud and the Bavaria MF Fraud, plus additional damages as they continue to accrue, plus pre- and post-judgment interest, for violation of 18 U.S.C. 1962(c);

B.      For judgment for damages in an amount in excess of $12.8 million in the aggregate, plus additional damages as they continue to accrue, plus pre- and post-judgment interest;

C.      For judgment for punitive damages and litigation expenses, including attorneys' fees;

D.      For a preliminary and permanent injunction enjoining Defendants:

    (i)      from directly or indirectly transferring or encumbering titles to any of the properties related to the subject matter of this Complaint; and

    (ii)     from directly or indirectly expending any financing proceeds or rental proceeds generated by any properties related to the subject matter of this Complaint, except

as required by legitimate, arms- length contracts or by law and as approved by Plaintiff or the Court;

D.    For the imposition of a constructive trust over the Property Fraud Properties, JV Properties and the Bavaria Property, and over all financing proceeds, rental proceeds and any other funds and property in Defendants' possession now or in the future rightfully belonging to Plaintiffs;

E.    For the appointment of a receiver to manage the Property Fraud Properties, JV Properties and Bavaria Property pending the outcome of this litigation;

F.    For judgment declaring the deed transfers and subsequent mortgages for the Property Fraud Properties, JV Properties and Bavaria Property unenforceable, invalid and void *ab initio*;

G.    For judgment rescinding the deed transfers and restoring titles to the Property Fraud Properties, JV Properties and Bavaria Property, in each case free and clear of all encumbrances, including the mortgages and any other interests Corevest, CAF, Wilmington or any successor in interest may claim to have, in the name of Plaintiffs;

H.    For a mandatory injunction compelling Defendants to transfer to Plaintiffs free and clear title to and control over the Property Fraud Properties, JV Properties and Bavaria Property, and all financing proceeds, rental proceeds, and other funds and property in Defendants' possession or control presently or in the future;

I.    For an order directing Defendants to produce a complete accounting related to the Property Fraud Properties, JV Properties and Bavaria Property;

J.    For restitution of any monies recoverable pursuant to the faithless servant doctrine;

K.    For damages against Defendant Lieberman for their actions aiding and abetting the frauds perpetrated by the Nakhles and Gutzky through their Controlled Entities;

L.    For pre- and post-judgment interest;

M.     For costs; and

N.     For any and all further relief the Court deems just and equitable.

Respectfully submitted,


*/s/ Michael J. Matasich*
MICHAEL J. MATASICH (0078333)
McDonald Hopkins LLC
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114
Telephone:     (216) 348-5400
Facsimile:     (216) 348-5474
E-mail:  mmatasich@mcdonaldhopkins.com

and

Thomas C. Sima (*pro hac vice to be filed*)
The Law Firm Of Thomas C. Sima
275 Madison Ave #14
New York, NY 10016
Telephone:     (212) 796-6661
Email: tom@tsima.com

Attorneys for Plaintiffs




**JURY DEMAND**

Plaintiffs hereby demand a trial by jury for all issues so triable.


*/s/ Michael J. Matasich*
Michael J. Matasich