## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

**Dror Adam, et al.**                            **Case No. 1:22CV2183**

        **Plaintiffs,**

        **-vs-**

                                 **JUDGE PAMELA A. BARKER**

**George Nakhle, et al.,**

        **Defendants.**                            **MEMORANDUM OPINION & ORDER**

Currently pending is the Motion of Defendants George Nakhle; Samir Nakhle; Richard Russel Gutzky; GS & M, LLC; Nadam, LLC; RG Holdings Delaware, LLC; RG Holdings Perm, LLC; RG Holdings Perm II, LLC; RSN Holdings I, LLC; RSN Holdings II, LLC; RSN Holdings 4, LLC; RSN Holdings XV, LLC; RSN Holdings XXI, LLC; RSN Holdings Delaware, LLC; R.S.N. Properties LLC; United Synergy Group, LLC; 6395 Pearl Road LLC; and Park Knoll, LLC (referred to collectively as the "Moving Defendants") to Dismiss the First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. No. 62.) Plaintiffs Dror Adam; Adam Beres LLC a/k/a Adam Beres One LLC ("ABO"); Beres Adam One LLC ("BAO"); D. Mody Properties, Ltd.; RSN Finance, LLC; Shnizel OH LLC; Zuk Domestic Holdings, Inc.; and Zuk Marble Products, Ltd. (referred to collectively as "Plaintiffs") filed a Brief in Opposition on May 26, 2023, to which the Moving Defendants replied on June 9, 2023. (Doc. Nos. 70, 73.)

For the following reasons, the Moving Defendants' Motion to Dismiss (Doc. No. 62) is GRANTED with respect to Plaintiffs' claim for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), as set forth in Count I of the First Amended

Complaint.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims set forth in Counts II through XXXVII.

## I.    Factual Allegations

Plaintiffs allege that, between 2017 and 2019, the Moving Defendants engaged in multiple, overlapping schemes involving over 200 real properties in Northeast Ohio to defraud the Plaintiffs out of millions of dollars.  Specifically, Plaintiffs allege that the Moving Defendants engaged in the following five separate schemes:

(1) the **"Property Fraud"** scheme -- a complex real estate fraud scheme in which Defendants George and Samir Nakhle (referred to collectively as "the Nakhles") and Defendant Gutzky fraudulently acquired over 190 properties from 80 investors, the majority of whom allegedly assigned their claims to Plaintiff Shnizel OH LLC ("Plaintiff Shnizel"),

(2) the **"JV Fraud"** scheme -- a real estate fraud scheme in which the Nakhles set up a joint venture entity (Plaintiff RSN Finance, LLC) to acquire an additional 29 properties but then fraudulently registered those properties to various entities controlled by the Nakhles and Gutzky,

(3) the **"Nadam Fraud"** -- a real estate fraud scheme in which the Nakhles set up an entity (Defendant Nadam LLC) with Plaintiff Dror Adam that bought a certain property and then fraudulently transferred that property to Defendant RG Delaware, LLC,

(4) the **"Loan Fraud"** -- a fraudulent scheme in which the Nakhles fraudulently induced Plaintiff Adam to provide them with three loans which were never repaid, and

(5) the **"Bavaria MF Fraud"** -- a real estate fraud scheme involving the transfer of one piece of fire-damaged real estate to Defendant George Nakhle for which he never paid the full purchase price.

(Doc. No. 10 at ¶ 5.)  In the First Amended Complaint, Plaintiffs allege the factual predicates of these schemes at some length, with over five hundred paragraphs of allegations spanning over 100 pages. (Doc. No. 10.)  Considering the voluminousness of this pleading, the Court will not attempt at the

2

outset to detail all the specific factual allegations set forth in the First Amended Complaint.[1]  Rather, the Court will begin by presenting an overview of the Plaintiffs' factual allegations and will discuss specific allegations relating to the parties' legal arguments, as necessary, *infra.*

### A.     The Property Fraud and Loan Fraud

The Property Fraud relates to 192 rental properties located in Cuyahoga County, Ohio (referred to collectively as "the Property Fraud Properties").  (Doc. No. 10 at ¶¶ 54, 55.)  Eighty (80) limited liability companies with Israeli citizens as their principals invested in these properties and decided to sell them as a portfolio.[2]  (*Id.* at ¶¶ 54, 58.)  At some point in 2017, the Nakhles and Gutzky offered to purchase all the Purchase Fraud Properties on an "as is" basis.  (*Id.* at ¶ 59.)

On August 10, 2017, the Nakhles executed a Letter of Agreement (the "Property LOA") with the managers of the Property Fraud investors, in which the Nakhles agreed to purchase the Property Fraud Properties for certain prices delineated in that Agreement.[3]  (*Id.* at ¶ 66, 67.)  The Nakhles also signed a personal guaranty to secure payments pursuant to the Property LOA.  (*Id.* at ¶ 67.)  According to Plaintiffs, the Property LOA provides that one of the Nakhles' "Controlled Entities"[4] "would enter

---

[1] The Court notes that, in their briefing regarding the instant Motion to Dismiss, neither the Plaintiffs nor the Moving Defendants sufficiently present the factual allegations set forth in the First Amended Complaint. By way of example, the "Factual Background" section of Plaintiffs' Brief in Opposition contains only a brief, generalized description of the instant action and fails to direct this Court's attention to a single paragraph in the First Amended Complaint.  (Doc. No. 70 at pp. 2-3.)  This is neither helpful nor appropriate.

[2] Plaintiffs allege that these investors later assigned their claims to Plaintiff Shnizel.  (*Id.* at ¶ 55.)

[3] Plaintiffs do not attach a copy of the Property LOA to the First Amended Complaint because it contains a confidentiality provision.  (*Id.* at ¶ 66.)  However, Plaintiffs attach a full list of the Property Fraud Properties to the First Amended Complaint as Exhibit 1.  (Doc. No. 10-1.)

[4] Plaintiffs identify the Nakhles' "Controlled Entities" as Defendants GS&M, LLC ("GS&M"); Nadam, LLC ("Nadam"); RG Holdings Delaware, LLC ("RG Delaware"); RG Holdings Perm, LLC ("RG Perm"); RG Holdings Perm II, LLC ("RG Perm II"); RSN Holdings I, LLC ("RSN I"); RSN Holdings II, LLC ("RSN II"); RSN Holdings 4, LLC ("RSN 4"); RSN Holdings Delaware, LLC ("RSN Delaware"); RSN Properties, LLC ("RSN Properties"); United Synergy Group,

into a land installment contract for each Property Fraud Property which envisioned an installment sale for each property paid for out of profits earned from managing the property." (*Id*. at ¶ 68.) The Property LOA also "envisioned that the Controlled Entities would begin to acquire the Property Fraud Properties by August 10, 2018 and complete all purchases within 5 years of the effective date of each Land Contract." (*Id*. at ¶ 69.) In the event of a breach by the Controlled Entities, the Property LOA gave the Property Fraud Investors the right to terminate the underlying Land Contracts, retain liquidated damages, and recover the underlying Property Fraud Properties. (*Id*. at ¶ 70.)

After the Property LOA was executed, the Nakhles indicated that the Controlled Entities would immediately assume management of the Property Fraud Properties. (*Id*. at ¶ 77.) However, the Nakhles and Gutzky delayed the Controlled Entities' assumption of "even nominal management" for at least three months following the execution of the Property LOA, which resulted in unpaid rents, bills, and property damages. (*Id*. at ¶¶ 78, 79.)

On November 2, 2017, Defendant George Nakhle approached Plaintiff Adam and represented that he needed a loan to assist in preparing the Property Fraud Properties for refinancing. (*Id.* at ¶ 84.) Adam's company, Plaintiff BAO, extended a loan to one of the Controlled Entities, Defendant RSN I, in the amount of $125,000 with principal repayment due after two years (hereinafter referred to as the "First Loan"). (*Id*.) This Loan is the first of three loans that comprise the "Loan Fraud."

Also in November 2017, Defendant George Nakhle convinced Plaintiff Adam (acting through his company, Plaintiff ABO) and the principals of Plaintiffs D. Mody Properties, Ltd. ("D. Mody") and Zuk Domestic Holdings, LLC ("Zuk") to form a joint venture limited liability company, which

---

LLC ("United Synergy"); 6395 Pearl Road, LLC ("Pearl Road"); Park Knoll, LLC ("Park Knoll"); RSN Holdings XV, LLC ("RSN XV"); and RSN Holdings XXI, LLC ("RSN XXI"). (Doc. No. 10 at Preliminary Statement, pp. 3-4.)

4

came to be named Plaintiff RSN Finance, LLC ("Finance").  (*Id*. at ¶ 86.)  George Nakhle represented that Finance "would acquire, improve, sell, and lease real estate, and finance and refinance real estate transactions."  (*Id*. at ¶ 87.)  Each party was to advance their own funds to get Finance started, with George Nakhle (through his entity Defendant RSN Properties) to contribute last.  (*Id*. at ¶¶ 87, 88.)  The joint venture was finalized on December 13, 2017 in a second Letter of Agreement (hereinafter "the JV LOA.")  (*Id*.)  The JV LOA, and the overall management of Finance, form the basis of the JV Fraud, which is discussed in more detail *infra*.

In sum, then, Plaintiffs allege that "[a]s 2018 began, the Nakhles and Gutzky, through their Controlled Entities, had put into place a mechanism to acquire the Property Fraud Properties (the Property LOA), a joint venture entity that was going to acquire and manage properties (such entity being Finance), and drawn on a loan to provide them with the means of paying the bills associated with executing the Property Fraud and JV Fraud (such loan constituting the first part of the Loan Fraud)."  (*Id*. at ¶ 105.)  The "next step" was to execute the individual Land Contracts.  (*Id*. at ¶ 106.)

The Land Contracts were "almost all executed in January 2018 and recorded between February and April 2018."  (*Id*.)  Among other things, the Land Contracts obligated the acquiring Controlled Entity to assume all responsibility for payments (including tax payments) and maintenance of the property; pay the full purchase price within 36 months of signing; and make interest payments on the outstanding purchase price.  (*Id*. at ¶¶ 109, 110, 111.)  The Land Contracts provided that, in the event of a default, the Property Fraud Investor had the right to "(i) retain all payments made to date as liquidated damages, (ii) rescind the transfer and recover the related Property Fraud Property, (iii) become entitled to 12 months of interest on the Property Fraud Property, or (iv) become entitled to 10% of the purchase price."  (*Id*. at ¶ 113.)

5

Plaintiffs allege that, after executing the Land Contracts, the Nakhles "misrepresented to the Property Fraud Investors that they would need to finance their purchases even though the Land Contracts did not specify any mortgage contingency."  (*Id*. at ¶ 126.)  The Nakhles "falsely represented to the Property Fraud Investors that the only way for the Controlled Entities to obtain financing to cover the full purchase price for the Property Fraud Properties would be for the Property Fraud Investors to transfer title for the Property Fraud Properties officially to the Controlled Entities." (*Id*. at ¶ 127.)  The Nakhles further represented that the Property Fraud Investors "needed to transfer the Land Contracts themselves in order to receive the full purchase price."  (*Id*. at ¶ 139.)

In late 2018, the Controlled Entities agreed to close on the purchase of the first 40 (later reduced to 37) Property Fraud Properties.  (*Id*. at ¶ 138.)  Plaintiffs refer to this group of properties as "Lot One."  (*Id*.)  "Based on the misrepresentations made [by the Nakhles], the Property Fraud Investors in Lot One transferred title pursuant to the Land Contracts" so that the Controlled Entities could obtain financing.  (*Id*. at ¶ 139.)  The Property Fraud Investors in Lot One also transferred the Land Contracts themselves to the Controlled Entities.  (*Id*. at ¶ 140.)

The Nakhles and Gutzkky obtained financing from Corevest American Finance Lender, LLC ("Corevest"), "a financial institution that agreed to issue mortgages for the Property Fraud Properties."  (*Id*. at ¶ 131.)  The Nakhles and Gutzky falsely told the Property Fraud Investors that, when they applied for mortgages for the Lot One properties, they were informed that they could not obtain 100% financing for the Lot One properties.  (*Id*. at ¶ 142.)  Plaintiffs allege that, based on this misrepresentation, "the Nakhles returned to the Property Fraud Investors for Lot One and agreed with the Property Fraud Investors that the initial payments pursuant to the related Land Contracts would provide approximately 65% of the total purchase prices for the Lot One properties, termed 'release

prices,' with the financing proceeds, and then pay the balance plus all other amounts due pursuant to the Land Contracts paid over time." (*Id*. at ¶ 144.)

The Lot One Investors subsequently executed a letter setting forth the "release prices" for each of the Lot One properties. (*Id*. at ¶ 146.) Thereafter, the Lot One investors and the Nakhles and Gutzky (acting through Defendants RSN I and GS&M) entered into a supplemental agreement in December 2018, setting forth the terms for the repayment of the remaining amounts due and payable under the Land Contracts.[5] (*Id*. at ¶ 153.) Plaintiffs refer to this agreement as the "Lot One Supplemental Agreement." (*Id*.) Plaintiffs allege that Defendant George Nakhle personally guaranteed the purchasers' obligations under the Lot One Supplemental Agreement. (*Id*. at ¶ 154.)

The Controlled Entities paid the "release prices" for Lot One by the end of 2018. (*Id*. at ¶ 147.) However, "unbeknownst to the Lot One investors, the Nakhles and Gutzky in their applications for loans from Corevest had stated the fair market values of the Property Fraud Properties in Lot One as being in excess of the total purchase price for the properties, obtaining in some cases an amount that was in excess of 100% financing of the full purchase price for the properties, which were themselves much higher than the 'release prices' that the Nakhles had offered to pay." (*Id*. at ¶ 148.) Although the Nakhles and Gutzky paid the "release prices" to the Lot One investors, they "transferred the rest of the money received [from the Corevest loans] to themselves." (*Id*. at ¶ 152.)

_____

[5] Pursuant to the Lot One Supplemental Agreement these Defendants "agreed to pay the outstanding and unpaid portion of the purchase price for the Lot One properties as follows: (a) 65% as the 'release price' pursuant to which title was transferred, (b) approximately 2.5% additionally upon closing and transfer of title, (c) 2.5% of the purchase price for the Lot One properties, or $47,247, no later than January 20, 2019, (d) $235,886 no later than August 31, 2019, and (e) $485,347 no later than December 31, 2019." (*Id*. at ¶ 154.)

Meanwhile, the Nakhles (through Defendant RSN I) failed to make several payments on the First Loan, including the first payment which was due in February 2018.  (*Id*. at ¶ 123.)  Subsequently, in January 2019, Plaintiff BAO "covered an obligation by RSN I in the amount of $11,000 against RSN I's promise to pay the same in February 2019" (hereinafter referred to as the "Second Loan"). (*Id*. at ¶ 195.)  Defendant RSN I did not repay this loan, either in February 2019 or at any point in time thereafter.  (*Id*.)  In addition, the Controlled Entities failed to make the first payment on the Lot One Supplemental Agreement in January 2019.  (*Id*. at ¶ 173.)  Plaintiffs were concerned by this series of defaults but "did not take action" because the Nakhles represented that "all would be well as soon as the sales of the Property Fraud Properties were finalized." (*Id*. at ¶¶ 171, 173.)

Thus, "the Nakhles and Gutzky set out in early 2019 to close a second lot of Property Fraud Properties, totaling 107 Properties."  (*Id*. at ¶ 175.)  Plaintiffs refer to these properties as "Lot Two." (*Id*.)  As they did with the Lot One investors, the Nakhles and Gutzky made fraudulent misrepresentations to the Lot Two investors regarding the need to transfer title in order for the Controlled Entities to obtain financing.  (*Id*. at ¶ 176.)  The Lot Two investors transferred title to the Lot Two properties, after which the Controlled Entities obtained financing from Corevest.  (*Id*. at ¶ 177.)  As they allegedly did with the Lot One properties, "the Nakhles and Gutzky stated a fair market value of the Lot Two properties in excess of the purchase price, again obtaining mortgages in excess of 100% of the purchase price."  (*Id*.)  Corevest recorded mortgages on the Lot Two properties "to secure loans that exceeded the purchase prices."  (*Id*. at ¶ 181.)  The Nakhles then negotiated "conveyance prices" for Lot Two, which Plaintiffs allege was "effectively the same as the 'release

8

prices' for Lot One." (*Id*. at ¶ 182.)  The Lot Two investors cancelled and/or assigned[6] the related Land Contracts for the Lot Two properties.  (*Id*. at ¶¶ 183, 185.)

In March 2019, the Nakhles and Gutzky (through Defendants RSN I, RSN 4, and GS&M) executed a Lot Two Supplemental Agreement.  (*Id*. at ¶ 187.)  Pursuant to this Agreement, each Lot Two investor was to be paid $22,750 at the time of transfer of title, with the remainder of the purchase price to be paid over 42 months.  (*Id*. at ¶ 188.)  The first payment (in the amount of $256,225) was due on February 28, 2020, with additional payments due in August 2020, February and August 2021, and February and August 2022.  (*Id*. at ¶ 189.)  The Lot Two Supplemental Agreement was secured by a personal guaranty from George Nakhle.  (*Id*. at ¶ 188.)  Plaintiffs allege that "the initial payment was the only money they would ever see" on the Lot Two properties.  (*Id*. at ¶¶ 190, 192.)

In April 2019, Plaintiff Adam entered into a loan agreement with Defendants George Nakhle and RSN I.  (*Id*. at ¶ 197.)  Pursuant to this agreement, Adam personally loaned $144,000 to Defendant RSN I (hereinafter referred to as the "Third Loan").  (*Id*. at ¶¶ 197, 199.)  Adam had previously borrowed funds from third parties to make available to Defendants RSN I and George Nakhle to help them finish the transfers of the Property Fraud Properties.  (*Id*. at ¶ 197.)  Defendant RSN I agreed to pay $3,080 per month on this loan, and to make the payment directly to Adam's lenders.  (*Id*. at ¶ 199.)  Plaintiffs allege that RSN I made interest payments on the Third Loan through September 2019, but then ceased making payments.  (*Id*. at ¶ 200.)  Defendant RSN I's default, in turn, caused Plaintiff Adam to default on his loans from third party creditors.  (*Id*. at ¶ 201.)

---

[6] The First Amended Complaint is confusing on this point.  In one paragraph (¶ 183), Plaintiffs state that the investors "cancelled" the Land Contracts.  Several paragraphs later (¶ 185), Plaintiffs state that the investors "assigned" their Land Contracts. At other points in the First Amended Complaint, Plaintiffs allege that the investors "transferred" their Land Contracts. It appears that Plaintiffs are using these terms interchangeably, but it is not entirely clear.

At some point in 2019, the Nakhles and Gutzky agreed to close on the purchase of another 50 properties, of which 48 are Property Fraud Properties for whom Plaintiff Shnizel is an assignee.  (*Id.* at ¶ 212.)  Plaintiffs refer to these properties as "Lot Three."  (*Id.*)  The Nakhles and Gutzky made fraudulent misrepresentations to the Lot Three investors regarding the need to transfer title for the Controlled Entities to obtain financing.  (*Id.* at ¶ 213.)  The Lot Three investors transferred both the title and the Land Contracts relating to the Lot Three properties to the Controlled Entities, after which the Controlled Entities obtained financing from Corevest.  (*Id.* at ¶¶ 214, 220, 222, 223.)  As with the Lot One and Lot Two properties, the Nakhles and Gutzky "stated the fair market value of the Lot Three properties as being in excess of the purchase price, again obtaining valuations in excess of 100% of the stated purchase prices."  (*Id.* at ¶ 214.)  Despite this, the Nakhles "represented to the investors that they were unable to receive full financing and could not pay for the Lot Three properties in full upon transfer." (*Id.* at ¶ 215.)  The Nakhles then negotiated "conveyance prices" for the Lot Three properties, which were less than the full purchase price.  (*Id.* at ¶¶ 221, 224.)  Plaintiffs allege that the Lot Three Investors "would never see a penny of their money."  (*Id.* at ¶ 225.)

Plaintiffs allege that the Lot One, Lot Two, and Lot Three Investors were never alerted to the fact that, by transferring title and assigning/transferring the Land Contracts to the Controlled Entities, they were "essentially handing over their rights in exchange for nothing." (*Id.* at ¶ 224.)  Specifically, Plaintiffs claim that the Property Fraud Investors were not told that "by assigning the Land Contracts, any rights to payment over time would be the right of the assignee, not the assignor Property Fraud Investor."  (*Id.* at ¶ 186.)  *See also* Doc. No. 10 at ¶ 141.

Plaintiffs allege that "the Nakhles and Gutzky continue to own and operate the 192 Property Fraud Properties valued at over $10 million, for which [they] only paid a fraction of the purchase

price." (*Id*. at ¶ 253.)  In addition, the Nakhles and Gutzky "continue collecting the substantial rents generated by the Property Fraud Properties but refuse to pay the balances of the purchase prices, deferred rents, interest or fees due the Covered Investors." (*Id*. at ¶ 256.)

**B.**    **JV Fraud**

Meanwhile, and as noted above, the creation of the joint venture limited liability company Finance was finalized on December 13, 2017 via the execution of the JV LOA.  (*Id*. at ¶ 88.)  Pursuant to this Agreement, Plaintiff ABO held 30% of the ownership of Finance; Plaintiff D. Mody held 20%, Defendant RSN Properties held 30%, and Plaintiff Zuk held 20%.  (*Id*. at ¶ 89.)  George Nakhle convinced Plaintiffs ABO, D. Mody, and Zuk "that capitalization of Finance should be staggered, with D. Mody and Zuk providing $1,000,000 each in the first year in the form of loans, ABO would provide a $1,000,000 loan after Finance was in existence for one year, and RSN Properties would provide a $1,000,000 loan within two years."  (*Id*. at ¶ 90.)

 In January 2018, Plaintiffs D. Mody and Zuk's affiliate, Plaintiff Zuk Marble Holdings LLC ("Zuk Marble") executed cognovit promissory notes and loan agreements for $1,000,000 each to Finance pursuant to the JV LOA, which amounts were fully funded by October 2018.  (*Id*. at ¶ 96.) In the meantime, Plaintiff ABO and Defendant RSN Properties "were required to advance $100,000 annually to Finance until they funded their obligations, which would be treated as a 10% annual yield on their delayed loans." [7] (*Id*. at ¶ 95.)  Defendant George Nakhle was named Finance's initial manager and Plaintiff Dror Adam was named second manager.  (*Id*. at ¶¶ 89, 102.)

---

[7] In addition, ABO and RSN Properties each issued guarantees to D. Mody and Zuk to cover their respective deferred obligations. (*Id*. at ¶ 97.)

The JV LOA contained several provisions "that the members believed would protect their interests: (a) the affirmative vote of both managers (George Nakhle and Adam) were required to make all managerial decisions; (b) the affirmative vote of all four members were required to sell, exchange, or convey any real property; (c) all real and personal property was to be acquired in the name of Finance, and title to any such property was to vest in Finance; (d) the managers were tasked with discharging their duties and the affairs of Finance in a prudent and businesslike manner, devoting such time as reasonably necessary to manage such affairs; and (e) the managers were liable to Finance and its members for their actions to the extent that such actions involved fraud, willful misconduct, gross negligence or breach of fiduciary duty." (*Id*. at ¶ 103.)

However, over the course of 2018 (while the Land Contracts for the Lot One properties were being executed and transferred to the acquiring Controlled Entities), George Nakhle "embezzled money from Finance, taking $5,000 in August 2018 and $8,500 per month thereafter, and making large withdrawals, such as a $26,000 withdrawal on July 24, 2018, $37,900 on December 24, 2018, and $9,780 on December 31, 2018."[8]  (*Id*. at ¶ 124.)  In addition, in November 2018, George Nakhle took a personal loan from Finance in the amount of $50,000 with a 45-day repayment schedule, but never repaid this loan.  (*Id*. at ¶ 169.)

Meanwhile, neither Plaintiff ABO nor Defendant RSN Properties paid their respective $100,000 annual advances or $1,000,000 contribution, as required by the JV LOA.  (*Id*. at ¶¶ 159, 160, 234.) However, the Nakhles and Gutzky had decided to purchase Plaintiff ABO's properties

---

[8] Plaintiffs allege that, "[b]ecause Adam is an Israeli citizen and not present in the United States, and because George Nakhle misrepresented the purposes of the withdrawals and never provided Adam with documentary evidence regarding the withdrawals, both Adam and the members of Finance did not know, and could not have known, that this money was being stolen and pocketed by George Nakhle." (*Id*. at ¶ 124.)

through the Land Contracts in Lot One and George Nakhle "agreed that the proceeds would be paid directly to Finance" and "would be sufficient both to cover [ABO's] $100,000 advance and ABO's $1,000,000 contribution/loan to Finance."[9] (*Id*. at ¶ 159.) Plaintiffs allege that "George Nakhle failed to pay the full purchase prices as agreed, and he failed to provide any financing documents to D. Mody, Zuk or ABO." (*Id*. at ¶ 236.)

Contemporaneously, George Nakhle used the money that had been contributed by Plaintiffs D. Mody and Zuk Marble to fund Finance, to purchase twenty-nine (29) properties ("the JV Properties"). (*Id*. at ¶ 162.) Plaintiffs ABO, D. Mody, and Zuk later learned that "Nakhle already owned 24 of the 29 properties he purportedly purchased for Finance and many of the properties were in bad condition." (*Id*.) Plaintiffs allege that "George Nakhle actually used the money [contributed by D. Mody and Zuk] to pay off and pay down his loans, and to pay himself hundreds of thousands of dollars." (*Id*.) None of the JV Properties were registered in the name of Finance and, instead, they were registered as being owned by Controlled Entities RG Delaware, RG Perm, RSN II, United Synergy, Pearl Road, Park Knoll, and RSN XV, all of which are owned by the Nakles and Gutzky. (*Id*. at ¶¶ 162, 163.) Four of the JV Properties were subsequently foreclosed and sold at Sheriff's Sale. (*Id*. at ¶ 166.) Another 18 of the JV Properties "are significantly delinquent on real estate taxes." (*Id*.)

Plaintiffs allege that "George Nakhle's purchases of the JV Properties with Finance funds were made without receiving the proper authorizations because they were not in fact purchased by

---

[9] Specifically, George Nakhle misrepresented to the members of Finance that "if D. Mody and Zuk would release their mortgage interest on the ABO-owned properties which they were holding to secure ABO's interest in Finance, George Nakhle could finance his purchase of the properties and the proceeds could be used to fulfill ABO's commitments to Finance. D. Mody and Zuk agreed." (*Id*. at ¶ 235.)

13

Finance, nor did Finance receive the benefit from the same other than some sporadic rental payments that George Nakhle deposited with Finance in order to fool the members of Finance into believing Finance owned the JV Properties." (*Id*. at ¶ 167.) Plaintiffs allege that "[t]he purchase by Controlled Entities of the JV Properties effectively caused a transfer of property of Finance without the required approval of Adam as manager or ABO, D. Mody and Zuk as members." (*Id*.) In addition, "George Nakhle shut out Adam as a co-manager of Finance, by (among other things) placing Finance's real estate and financial assets out of Adam's reach, by failing to keep Adam informed and provide requested information and documents, by making decisions without Adam's agreement, and by refusing to restore Adam as a signatory on Finance's Chase bank account." (*Id*. at ¶ 168.)

According to Plaintiffs, "at least a part of the money stolen from Finance by George Nakhle in 2018 was used to meet the 'release prices' on the Lot One properties, thus using the JV Fraud as a means of partially funding the Property Fraud." (*Id*. at ¶ 170.) In addition, some of the money stolen by George Nakhle from Finance was used to "establish a $10 million line of credit that Corevest was supposed to issue Finance, but which George Nakhle instead took out in the name of a Controlled Entity and subsequently used to purchase over 100 properties unrelated to the frauds described in this Complaint." (*Id*.)

George Nakhle also borrowed approximately $183,000 of funds from Finance to complete the renovation of a property on Lake Shore Boulevard in Cleveland, Ohio that he said he would transfer to Finance. (*Id*. at ¶ 237.) Instead, "this money was used to pay other debts, and no portion of this loan was ever repaid to Finance, nor was the property transferred as promised." (*Id*.) Lastly, George Nakhle and RSN Properties rented a property purchased with Finance funds to his parents and

14

allowed them to break their lease with several years remaining without penalty and without finding a replacement tenant. (*Id*. at ¶ 241.)

Plaintiffs allege that, despite repeated requests, George Nakhle "refused to provide any adequate accounting or status report of actions taken ultra vires by him as manager of Finance." (*Id*. at ¶ 242.) Plaintiffs ABO, D. Mody and Zuk "became aware of the full extent of George Nakhle's misconduct in the JV Fraud in the Fall of 2019 when the Lot Three investors failed to receive payment." (*Id*.) ABO, D. Mody and Zuk later discovered that "George Nakhle had cleaned out all remaining funds in the Finance account that had been contributed by ABO, D. Mody and Zuk." (*Id*.)

### C. The Nadam Fraud

Meanwhile, in February 2018 (shortly after all the Land Contracts were executed), George Nakhle convinced Plaintiff Adam to form yet another joint venture enterprise (hereinafter referred to as "Nadam"), this one solely between Plaintiff ABO and George Nakhle personally. (*Id*. at ¶ 118.) The purpose of Nadam "was to acquire, manage and sell real estate investment properties, much the same as Finance, but on a smaller scale and with fewer properties." (*Id*. at ¶ 119.) The Nadam Operating Agreement gave George Nakhle managerial authority, but no sale of real property was permitted without the approval of ABO as well as George Nakhle. (*Id*. at ¶ 120.)

The initial property identified by Nadam was the property located at 13802-13810 Byron Avenue in Cleveland, Ohio (hereafter referred to as "the Byron Property"). (*Id*. at ¶ 121.) The Byron Property was one of the Property Fraud Properties then-under contract in one of the Land Contracts executed in January 2018. (*Id*.) Nadam agreed to purchase the Byron Property for $140,000, with $100,000 to be paid to the seller and $40,000 paid to cover delinquent taxes and closing costs. (*Id*. at ¶ 227.) Plaintiff ABO contributed $17,000 to Nadam to cover a portion of the taxes and closing

costs and an additional $50,000 to fully renovate the Byron Property and turn it into an investment property capable of generating $100,000 in annual gross revenues.  (*Id*. at ¶ 228.)  George Nakhle committed to pay $23,000 to cover the balance of delinquent taxes and closing costs and agreed to obtain financing to pay the $100,000 due to the seller for the Byron Property.  (*Id*. at ¶ 229.)

Although title to the Byron Property was transferred to Nadam, Plaintiff alleges that "[t]here is no evidence that [George Nakhle's] $23,000 payment was made."  (*Id*.)  In addition, Plaintiff claims George Nakhle "never paid the balance of the purchase price to the seller." (*Id*. at ¶¶ 230, 233.) Instead, George Nakhle transferred title to the Byron Property from Nadam to Defendant RG Delaware.  (*Id*. at ¶ 231.)  Following the transfer of the Byron Property to RG Delaware, "the Nakhles and Gutzky obtained a mortgage on the Byron Property, distributed the cash proceeds to themselves, and have been collecting rent for their own benefit."  (*Id*. at ¶ 232.)

### D.    The Bavaria MF Fraud

The final fraudulent scheme alleged in the First Amended Complaint is the so-called Bavaria MF Fraud.  Plaintiffs allege that, on December 30, 2018, Defendant RSN I[10] entered into an agreement to purchase from Bavaria MF, LLC ("Bavaria MF') a property located at 17568 Lake Shore Boulevard in Cleveland, Ohio (the "Bavaria Property").  (*Id*. at ¶ 203.)  Plaintiff Adam is the alleged assignee of the claims in the Bavaria MF Fraud.  (*Id*. at ¶ 19.)

---

[10] The First Amended Complaint alleges that Defendant RG Delaware entered into this agreement to purchase the Bavaria Property.  (*Id*. at ¶ 203.)  The Bavaria Agreement, however, states that it is between Bavaria MF, LLC and RSN Holding I, LLC (i.e., Defendant RSN I).  (Doc. No. 10-22 at PageID# 767.)

16

The Bavaria Property is a multi-dwelling residential property with 12 residential units and 2 commercial units[11] that had suffered significant damage in a fire on June 11, 2018, following which 6 units were unusable.  (*Id*. at ¶ 204.)  Bavaria MF asked Plaintiff Adam to discuss transferring the property with George Nakhle and Adam agreed to act as guarantor of the purchaser's obligations due to his ongoing relationship with the Nakhles and the Controlled Entities.  (*Id*.)

The Bavaria Agreement "envisioned that the purchaser, RSN I, would either purchase the property or the owner, Bavaria MF, LLC, and assume a $150,000 loan that had to be repaid for repairs to the property."  (*Id*. at ¶ 205.)  An additional $78,000 was due upon transfer, with $400,000 more due on July 31, 2019.  (*Id*.)  Until such time as the purchase price was paid in full, RSN I agreed to pay $3,000 per month in interest, with an optional extension of the payment of the purchase price to August 31, 2019, but with $5,000 in interest for August 2019.  (*Id*.)  If the purchase price was not paid in full by such time, Bavaria MF had the option of repurchasing the Bavaria Property (or Bavaria MF itself if that were sold) for $1.  (*Id*.)

The Bavaria Property was transferred on or about May 24, 2019, but RSN I never paid the down payment.  (*Id*. at ¶ 207.)  RSN I subsequently applied for a mortgage from Corevest and received $455,000.  (*Id*.)  RSN I used $215,000 to cover the cost of renovations and then the Nakhles and Gutzky distributed $240,000 to themselves.  (*Id*.)  According to Plaintiffs, "[n]o further money was paid and the Nakhles and Gutzky ignored Bavaria [MF]'s demand to repurchase the Bavaria Property when only $25,000 was paid in August 2019 as a partial payment, and that only when a second check was issued after an initial check was dishonored."  (*Id*. at ¶ 208.)  The present fair market value of

---

[11] The Bavaria Agreement states that the property contains 13 residential units and a store front (rather than 12 residential units and 2 commercial units, as alleged by Plaintiffs).  (Doc. No. 10-22 at PageID# 767.)

the Bavaria Property following restoration is "estimated to be in excess of $700,000 and potentially $1,000,000." (*Id*. at ¶ 211.)

## II. Procedural Background

The parties' business dealings have spawned at least three lawsuits in state court and two in federal court, including the instant action. The Court will provide brief overviews of the state and federal court proceedings separately, below.

### A. State Court Proceedings

#### 1. First State Court Case

On May 29, 2020, Plaintiffs ABO, Zuk, D. Mody, and Finance filed a Complaint in the Court of Common Pleas of Cuyahoga County, against George Nakhle, RSN Properties, United Synergy, RG Delaware, RG Perm, RSN II, and Pearl Road. *See Adam Beres, LLC, et al. v. George Nakhle, et al.,* Case No. CV-20-932929 (Cuy. Cty. Ct. Cmn. Pl.) (hereinafter "First State Court Case.") Plaintiffs ABO, Zuk, D. Mody, and Finance filed a First Amended Complaint on June 23, 2020 against the same defendants as well as newly added defendant Corevest.

Broadly speaking, the First State Court Case relates to what Plaintiffs herein refer to as the JV Fraud. Specifically, in the First State Court Case, Plaintiffs ABO, Zuk, D. Mody, and Finance alleged facts regarding the formation of Finance in late 2017 and the terms of the JV LOA, including the respective ownership percentages, staggered funding requirements, appointment of managers, and managerial responsibilities and duties, discussed *supra*. *See Adam Beres, LLC*, Case No. CV-20-932929 (Cuy. Cty. Ct. Cmn. Pl.) (First Amended Complaint). Plaintiffs alleged that the defendants therein ("the First State Court Case Defendants") breached their contractual and fiduciary duties by operating Finance for their own benefit, including (but not limited to) by (1) exercising exclusive

18

control over properties acquired by Finance funds; (2) failing to "turn over RSN Finance funds" and using those funds for defendants' exclusive benefit, (3) failing to advance funds required by the JV LOA; (4) making significant withdrawals and borrowing funds from Finance without repaying them; and (5) failing to provide an accounting and "shutting out" Adam as a co-manager. *Id.*

Plaintiffs ABO, D. Mody, Zuk, and Finance asserted claims against the First State Court Case Defendants for breach of statutory and fiduciary duties, breach of contract, civil conspiracy, right to books and records, declaratory judgment, and quiet title. *Id.* Plaintiffs sought compensatory damages in excess of $3,000,000, punitive damages, preliminary and permanent injunctive relief, attorney's fees, and costs. *Id.* Additionally, on August 28, 2020, Plaintiffs filed a Motion for Appointment of a Receiver to manage the affairs and finances of Finance and to perform an accounting. *Id.* (state court docket.)

On September 9, 2020, the First State Court Case Defendants filed an Answer and Counterclaims against ABO. *Id.* (Answer and Counterclaim). In their Counterclaims, these Defendants allege, generally, that ABO "acted as an intermediary between the [Defendants] and certain Israeli-based sellers but has steadfastly refused to disclose the specific nature and terms of its arrangements with these foreign-based sellers." *Id.* at p. 13. The First State Court Case Defendants allege that ABO "has refused to account for money that the [Defendants] have paid to related persons and entities; refused to accept payments into United States bank accounts; and demanded questionable and unexplained international wire transfers—all of which has exposed the [Defendants] to potential liability, in addition to the significant time and expense related to the instant action." *Id.* The First State Court Case Defendants asserted counterclaims for breach of fiduciary duty, slander of title, abuse of process, and declaratory judgment. *Id.* at pp. 20-23.

19

### 2. Second State Court Case

Meanwhile, on June 23, 2020, Plaintiffs Adam, BAO, and ABO filed a Complaint in the Cuyahoga County Court of Common Pleas, against George Nakhle, RSN Holdings, RSN Delaware, RSN 4, RG Delaware, Nadam, and Corevest. *See Adam, et al. v. George Nakhle, et al.*, Case No. CV-20-933677 (Cuy. Cty. Ct. Cmn. Pl.) (hereinafter referred to as "the Second State Court Case.")

The Second State Court Case relates to what the Plaintiffs herein refer to as the "Loan Fraud" and the "Nadam Fraud." Specifically, in the Second State Court Case, Plaintiffs Adam, BAO, and ABO alleged facts regarding the First Loan, Second Loan, and Third Loan, as well as facts regarding the formation of Nadam, the Nadam Operating Agreement, and the purchase of the Byron Property. *See Adam, et al.*, Case No. CV-20-933677 (Cuy. Cty. Ct. Cmn. Pl.) (Complaint). As to the Loan Fraud, Plaintiffs asserted claims for (1) breach of contract (Counts I, III, VI); (2) unjust enrichment (Counts II, V, VII); and (3) promissory estoppel as to the Second Loan only (Count IV). *Id*. As to the Nadam Fraud, Plaintiffs alleged claims for (1) breach of operating agreement (Count VIII); (2) breach of statutory and fiduciary duties (Count IX); (3) civil conspiracy (Count X); and (4) declaratory judgment (Count XI). *Id*. Plaintiffs sought compensatory damages in excess of $300,000, as well as punitive damages, attorney's fees, and costs. Plaintiffs also sought preliminary and permanent injunctive relief. *Id.*

On September 9, 2020, Defendants George Nakhle, RSN Holdings, RSN Delaware, RSN 4, RG Delaware, and Nadam (the "Second Court Case Defendants") filed an Answer and Counterclaims alleging facts similar to those set forth in their Counterclaims in the First State Court Case. These Defendants asserted counterclaims for declaratory judgment, breach of fiduciary duty, slander of title, civil conspiracy, and abuse of process. *Id*. (Answer and Counterclaim).

20

On November 24, 2020, a different and larger group of defendants (Defendants George Nakhle, Samir Nakhle, RSN Properties, RSN Delaware, RG Delaware, RG Perm, RG Perm II, RSN I, RSN II, RSN 4, United Synergy, and Pearl Road), moved the state court to consolidate the First and Second Court Cases. *Id*. (Motion to Consolidate.)  Plaintiffs opposed the motion, arguing that consolidation "would make these proceedings cumbersome and extraordinarily difficult to manage." *Id*. (Plaintiffs' Brief in Opposition to Motion to Consolidate at p. 1.) On January 25, 2021, the state court granted Defendants' Motion to Consolidate.  *Id*. (state court docket.)

### 4.    Third State Court Case

At roughly the same time that the First and Second State Court Cases were consolidated, Plaintiff Shnizel filed a Complaint in the Cuyahoga County Court of Common Pleas, against Defendants George Nakhle, Samir Nakhle, RSN I, GS&M, RSN 4, RG Delaware, RG Perm, RSN Delaware, RG Perm II, Corevest, and CAF Borrower GS LLC.  *See Shnizel Ohio LLC v. George Nakhle, et al.*, Case No. CV-21-943024 (Cuy. Cty. Ct. Cmn. Pl.) (hereinafter referred to as the "Third State Court Case").  Plaintiff Shnizel filed a First Amended Complaint on March 17, 2021 against the same Defendants.

The Third State Court Case relates to what the Plaintiffs herein refer to as the Property Fraud. Specifically, in the Third State Court Case, Shnizel alleged facts regarding the August 2017 Property LOA; the execution and terms of the Land Contracts for Lots One, Two, and Three; the Nakhles' fraudulent representations that the Lots One, Two, and Three investors needed to transfer both title and the Land Contracts themselves for the Defendants to obtain financing; and Defendants' failure to pay the purchase prices for the properties at issue despite receiving substantially more in financing proceeds for the properties than the purchase prices.  *See Shnizel Ohio LLC.*, Case No. CV-21-943024

21

(Cuy. Cty. Ct. Cmn. Pl.) (First Amended Complaint).  Shnizel alleged claims for fraud, breach of contract, unjust enrichment, promissory estoppel, civil conspiracy, declaratory judgment, fraudulent transfers, and piercing the corporate veil.  *Id*.  Shnizel sought compensatory damages in excess of $7,570,000, as well as punitive damages, attorney's fees, and costs. *Id*. Plaintiffs also sought preliminary and permanent injunctive relief, the imposition of a constructive trust, and an accounting. *Id*.

The Third State Court Case Defendants filed an Answer and Counterclaims on July 19, 2021. In their Counterclaims, these Defendants alleged (among other things) that Shnizel (and others associated with Shnizel, including Adam) falsely represented the occupancy rates of the Property Fraud Properties and failed to apply certain payments made by entities owned by George Nakhle to the amounts due and owing under the Land Contracts.  *Id*. (Answer and Counterclaims).  The Third State Court Case Defendants asserted claims for fraud, civil conspiracy, slander of title, abuse of process, and negligence. *Id*.

Although the Third State Court Case was filed on the same date as the consolidation of the First and Second State Court Cases, the Third State Court Case was not consolidated with those cases until much later, in January 2023.  *Id*. (state court docket).  In the meantime, the Third State Court Case was presided over by a different state trial court judge, who conducted a status conference and set case management deadlines for fact discovery, expert discovery, and dispositive motions.[12]  *Id.*

---

[12] In addition, the state court granted leave to intervene to FIG OH18, LLC ("FIG"), which had acquired an interest in the delinquent taxes of several of the properties at issue.  The state court docket reflects that FIG filed an Answer, Counterclaim and Crossclaim in June 2022, asserting that its Tax Certificates on the properties at issue were good and valid first liens and seeking foreclosure as to those properties.  FIG then successfully moved for the joinder of Pacific Western Bank; the State of Ohio, Department of Jobs & Family Services; the Cleveland Municipal Court—Criminal Division; and CAF Bridge Borrower MS, LLC, on the grounds that these entities held liens on the properties on which FIG sought foreclosure.

### 4.      Consolidated State Court Proceedings

Meanwhile, the First and Second State Court Cases proceeded. On February 9, 2021, the parties participated in a settlement conference but were unable to resolve the consolidated cases at that time. *See* First State Court Case, docket sheet. Shortly thereafter, on February 19, 2021, the state court was advised of ongoing settlement negotiations and held all pending motions in abeyance. *Id*. On July 30, 2021, the parties in the First and Second State Court Cases advised the state court that they had reached a settlement. *Id*. On that date, the state court issued a Judgment Entry stating (in relevant part) as follows: "Parties have reached a settlement and case is dismissed subject to a more definitive journal entry to follow." *Id*.

However, on February 25, 2022, Plaintiffs filed a "Motion to Set Aside the July 30, 2021 Journal Entry and to Reinstate Case." *Id*. (Motion to Set Aside Journal Entry). Plaintiffs asserted that "[w]hile the parties were able to reach common ground on some of the disputes between them, they did not reach an agreement on all material terms." *Id*. at p. 1. Plaintiffs indicated that the parties "did not finalize and execute a written settlement agreement or agree on a more definitive journal entry" and "are no longer negotiating." *Id*. Defendants opposed Plaintiffs' Motion. *See* First and Second State Court Docket Sheets. On July 26, 2022, the state court granted Plaintiffs' Motion and reinstated the First and Second Court Cases. *Id.*

Shortly thereafter, on August 9, 2022, Plaintiffs filed Notices of Voluntary Dismissal without Prejudice in the consolidated First and Second State Court Cases. *See* First and Second State Court Case Docket Sheets. On that same date, Plaintiff Shnizel filed a Motion to Dismiss its First Amended Complaint without prejudice in the Third State Court Case. *See Shnizel Ohio LLC*., Case No. CV-21-943024 (Cuy. Cty. Ct. Cmn. Pl.) (Motion to Dismiss without Prejudice). In that Motion, Plaintiff

23

Shnizel explained that "Plaintiff, along with the plaintiffs in two related cases [i.e., the First and Second State Court Cases], have since determined they have grounds to pursue a single, consolidated civil RICO claim in federal court against the Nakhles, Gutzky and their controlled entities due to their systematic, ongoing fraud perpetrated against many parties over several years." *Id*. at p. 1.

On August 15, 2022, the state court dismissed Plaintiffs' claims in the First and Second State Court Cases.  On August 22, 2022, the state court granted Plaintiff Shnizel's Motion to Dismiss without prejudice in the Third State Court Case.  In these cases, the state courts noted (in subsequent Judgment Entries) that, despite Plaintiffs' dismissals, the cases were on the active docket because Defendants' Counterclaims remained pending.

Subsequently, on December 14, 2022, the parties filed a Joint Motion to Consolidate the Third State Court Case with the already consolidated First and Second State Court Cases.  *See* Docket Sheets for First, Second, and Third State Court Cases.  The Joint Motion was granted in January 2023. *Id*.  The state court thereafter held a pretrial conference on February 1, 2023, at which time it set deadlines for fact discovery, expert discovery, and dispositive motions.  *Id*.  The state court also scheduled a Final Pretrial for January 10, 2024, and a trial date of February 12, 2024. *Id*.

On October 3, 2023, Plaintiffs filed a "Motion to Stay Defendants' Counterclaims pending the Resolution of the Federal RICO Lawsuit."  *Id*.  Defendants filed a Brief in Opposition on October 23, 2023.  *Id*.  On November 1, 2023, the state court denied Plaintiffs' Motion to Stay.  *Id*.

**B.  Federal Proceedings**

**1.  First Federal Case**

Meanwhile, Plaintiffs D. Mody and Zuk Marble filed a Complaint in this Court on July 21, 2021, against RSN Properties, LLC and RSN Finance, LLC. *See D. Mody Properties, LTD, et al., v.*

24

*RSN Finance, LLC,* Case No. 1:21CV1395 (N.D. Ohio) (Doc. No. 1) (hereinafter referred to as "the First Federal Case"). As set forth *supra*, at the time the First Federal Case was filed in this Court, the parties had just advised the state court that they had reached a settlement in the First and Second State Court Cases.

In the First Federal Case, D. Mody and Zuk Marble allege facts relating to certain aspects of what Plaintiffs herein refer to as the JV Fraud. Specifically, D. Mody and Zuk Marble alleged that, on January 17, 2018, they each loaned RSN Finance $1,000,000 and that RSN Properties executed an Unconditional and Absolute Continuing Guaranty of both loans. (*Id.*) D. Mody and Zuk Marble alleged that they fully funded the loans but that both RSN Finance and RSN Properties failed to perform their obligations under Loan Agreement and Guaranty, respectively. (*Id.*) D. Mody and Zuk Marble alleged claims for (1) Breach of Promissory Notes and Loan Agreements; and (2) Breach of Guaranty. (*Id.*) The case was assigned to District Judge Dan Polster.

Defendants filed an Answer on January 24, 2022, and Judge Polster set a Case Management Conference ("CMC") for March 16, 2022. Prior to the CMC, Plaintiffs and Defendants filed separate Reports of Parties' Planning Meetings. (Doc. Nos. 12, 13.) In Defendants' Report, Defendants RSN Finance and RSN Properties stated that "Plaintiffs have indicated that they will be seeking leave to file an Amended Complaint, which will substantially and materially alter the proceedings before this Court." (Doc. No. 12 at p. 2.) Defendants advised that "the proposed Amended Complaint includes 39 counts and is over 500 paragraphs long in addition to adding additional parties and raising additional claims." (*Id.*) Defendants asserted that "this case was settled and is related to" the First State Court Case. (*Id.*) Defendants further advised that "[o]n February 25, 2022, parties affiliated with Plaintiffs in the instant matter filed a Motion to Set Aside July 30, 2021 Journal Entry and

Reinstate Case" in the First State Court Case.  (*Id*.)  Defendants indicated that they "believe, but Plaintiffs dispute, [that] how Judge Fuerst rules on the Motion to Vacate would have direct impact on the instant case."  (*Id*.)  In Plaintiffs' Report, Plaintiffs confirmed they "are seeking leave to file an Amended Complaint to add additional parties to this action and raise additional claims." (Doc. No. 13 at p. 1.)  Plaintiffs further stated that "Plaintiffs and Defendants attempted to settle this case as part of the global settlement of other cases in the Cuyahoga County Court of Common Pleas but were unable to do so."  (*Id*. at p. 3.)

Judge Polster conducted the CMC on March 16, 2022.  (Doc. No. 15.)  In a "Minutes & Order" issued that date, Judge Polster found as follows:

> All parties confirmed that the claims raised in this case are part of the same dispute which they previously litigated in state court. The state court case was dismissed because the parties were working toward a resolution. The state court is in the best position to enforce the parties' agreement or to reactivate litigation between these parties. All of the parties' claims should be resolved in the same litigation, and the most appropriate forum is state court.

> Because the parties should resolve all of their claims in the same forum, and they have already begun this process in state court, the Court hereby DISMISSES the captioned case, without prejudice.

(*Id*.)  As discussed above, the state court subsequently granted Plaintiffs' Motion to Set Aside the July 30, 2021 Judgment Entry and reinstated the First and Second State Court Cases to the active docket.  Plaintiffs voluntarily dismissed their claims in August 2022, however, the First and Second State Court Defendants' Counterclaims remained (and continue to remain) pending.

## 2. Second Federal Case

On December 5, 2022, Plaintiffs Adam, ABO, BAO, D. Mody, Finance, Shnizel, Zuk, and Zuk Marble filed the instant action in this Court.  (Doc. No. 1.)  Plaintiffs thereafter filed a First Amended Complaint on January 17, 2023, against the Moving Defendants as well as Defendants

Lima One Capital, LLC[13] and Lieberman, Dvorin & Dowd, LLC.[14]  (Doc. No. 10.)  Plaintiffs allege the following thirty-seven (37) claims for relief:

    (1)    Civil RICO (18 U.S.C. § 1962(c)) (Count I),

    (2)    Fraud (Counts II, XIII, XXIII, XXVII, XXXII),

    (3)    Breach of Contract (Counts III, XIV, XXIV, XXVIII, XXXIII),

    (4)    Rescission/Constructive Trust (Count IV),

    (5)    Unjust Enrichment (Counts V, XXX),

    (6)    Promissory Estoppel (Counts VII, XVIII, XXXI, XXXIV),

    (7)    Civil Conspiracy (Counts VIII, IX, XIX, XX, XXVI, XXIX, XXXV, XXXVI),

    (8)    Breach of Statutory and Fiduciary Duties (Counts XVI, XXV),

    (9)    Restitution under the Faithless Servant Doctrine (Counts VI, XV),

    (10)   Piercing the Corporate Veil (Count XXXVII),

    (11)   Fraudulent Transfers (Counts XI),

    (12)   Quiet Title (Counts XII, XXII),

    (13)   Declaratory Judgment (Counts X, XXI), and

---

[13] Defendant Lima Capital One, LLC ("Lima One") filed an Answer on March 13, 2023.  (Doc. No. 58.) Lima is named as a Defendant in Counts X (Declaratory Judgment) and XII (Quiet Title) of the First Amended Complaint.  Defendant Lima One did not join in the instant Motion to Dismiss.

[14] Defendant Lieberman, Dvorin & Dowd LLC ("Lieberman") filed an Answer and Motion for Judgment on the Pleadings on March 13, 2023.  (Doc. Nos. 59, 60.)  Plaintiffs filed a Brief in Opposition to the Motion on April 26, 2023, to which Lieberman replied on May 17, 2023.  (Doc. Nos. 63, 68.) Thereafter, on July 6, 2023, Plaintiffs filed a "Motion to Drop Defendant Lieberman without Prejudice pursuant to Fed. R. Civ. P. 21." (Doc. No. 75.)  Lieberman filed a Response on July 12, 2023.  (Doc. No. 77.)  On July 12, 2023, this Court granted Plaintiffs' Motion and dismissed Defendant Lieberman without prejudice, as set forth in that Order.  (Doc. No. 78.) This results in the dismissal of certain Counts in the First Amended Complaint which are directed solely towards Defendant Lieberman, i.e., the civil conspiracy claims set forth in Counts IX, XX, and XXXVI.

(14)   Right to Books and Records (Count VXII).

(*Id.*)[15] Plaintiffs seek "judgment for damages in an amount in excess of $12.8 million in the aggregate, plus additional damages as they continue to accrue, plus pre- and post- judgment interest." (*Id.* at p. 100.)  Plaintiffs also seek the following:  (1) punitive damages, (2) preliminary and permanent injunctive relief, (3) imposition of a constructive trust over certain Property Fraud Properties and JV Properties, (4) appointment of a receiver; (5) a judgment declaring that certain deed transfers and subsequent mortgages are unenforceable, invalid, and void *ab initio*; (6) a judgment rescinding certain deed transfers and restoring title to certain properties in the name of Plaintiffs; (7) restitution; (8) a complete accounting related to the Controlled Entities; (9) pre- and post-judgment interest; (10) attorney's fees; and (11) costs.  (*Id.* at pp. 100-102.)

The Moving Defendants filed a Motion to Dismiss Plaintiffs' First Amended Complaint on April 12, 2023.  (Doc. No. 62.)  Plaintiffs filed a Brief in Opposition on May 31, 2023, to which the Moving Defendants replied on June 9, 2023.  (Doc. Nos. 70, 73.)  On June 6, 2023, Plaintiffs filed a Notice of Filing of Verification of the First Amended Complaint.  (Doc. No. 72.)  Lastly, on October 23, 2023, the Moving Defendants filed a document captioned "Supplemental Authority in Support of Motion to Dismiss.  (Doc. No. 83.)

---

[15] Count I is a Civil RICO claim "for all Frauds made by all Plaintiffs against the Nakhles, Gutzky, and all of the Controlled Entities." (Doc. No. 10 at p. 57.)  Counts II through XII are brought by Plaintiff Shnizel and assert claims relating to the Property Fraud.  Counts XIII through XXII assert claims relating to the JV Fraud.  Counts XXIII through XXVI assert claims relating to the Nadam Fraud.  Counts XXVII through XXXI assert claims relating to the Loan Fraud.  Counts XXXII through XXXVI assert claims relating to the Bavaria MF Fraud.  Lastly, Count XXXVII asserts a claim for Piercing the Corporate Veil "for all Frauds by all Plaintiffs against the Controlled Entities."  (*Id.* at p. 99.)

### III.    Standard of Review

The Moving Defendants seek dismissal under Fed. R. Civ. P. 12(b)(6).  (Doc. No. 62 at p. 1.) Under that Rule, the Court accepts the plaintiff's factual allegations as true and construes the Complaint in the light most favorable to the plaintiff.  *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  In order to survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–556 (2007)).

The measure of a Rule 12(b)(6) challenge — whether the Complaint raises a right to relief above the speculative level — "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir.2008) (quoting in part *Twombly*, 550 U.S. at 555–556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim

is and the grounds upon which it rests.'" *Gunasekera*, 551 F.3d at 466 (quoting in part *Erickson v. Pardus*, 551 U.S. 89 (2007). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 556 U.S. at 679.

## IV.  Analysis

The Moving Defendants seek dismissal of Plaintiffs' First Amended Complaint on several grounds. (Doc. No. 62.) First, the Moving Defendants argue that Plaintiffs were compelled under federal and state law to bring their current claims in the pending state court litigation and, therefore, "this Court is now barred from adjudicating this dispute." (*Id.*) Second, the Moving Defendants argue that Plaintiffs fail to state cognizable claims for violations of RICO, fraud, restitution under the faithless servant doctrine, and piercing the corporate veil. (*Id.*) Third, and finally, the Moving Defendants assert that Plaintiffs lack the requisite standing to bring a derivative claim or the assigned claims of the Property Fraud Investors or Bavaria. (*Id.*) Plaintiffs oppose each of the Moving Defendants' arguments. (Doc. No. 70.) The Court will address each of the above issues separately, below.

### A.  Whether Plaintiffs are Precluded from Bringing the Instant Action in Federal Court

The Moving Defendants first argue that Ohio Civ. R. 13(A) precludes Plaintiffs from litigating this dispute in federal court. (Doc. No. 62 at pp. 12-16.) Ohio Civil Rule 13(A) governs compulsory counterclaims. It provides, in relevant part, that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire

jurisdiction." Ohio Civ. R. 13(A). This Rule "requires all existing claims between opposing parties that arise out of the same transaction or occurrence to be litigated in a single lawsuit, regardless of which party initiates the lawsuit." *Rettig Enters., Inc. v. Koehler*, 626 N.E.2d 99, 102 (Ohio 1994).

"Ohio courts apply a two-prong test to determine whether Rule 13(A) bars a claim: (1) did the claim exist when the pleading was served in the prior case and (2) does the claim arise out of the transaction or occurrence that is the subject matter of the opposing claim?" *Hutchison v. Parent*, 773 Fed. Appx. 288, 291 (6th Cir. 2019). In determining the second prong (i.e., whether claims arise out of the same transaction or occurrence), Ohio courts ask whether the claims are "logically related"— that is, whether "separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts." *Id*. Put another way, "multiple claims are compulsory counterclaims where they 'involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties.'" *Id*. (quoting *Great Lakes Rubber Corp. v. Herbert Cooper Co*., 286 F.2d 631, 634 (3d Cir. 1961)).

Here, the Moving Defendants maintain that Plaintiffs' claims in the instant action are compulsory counterclaims under Ohio Civ. Rule 13(A). (Doc. No. 62.) The Moving Defendants assert that the first prong of the test under Rule 13(A) is satisfied because "Plaintiffs first asserted their claims in the State Court Cases nearly three (3) years ago" and, therefore, there is no question that Plaintiffs' claims existed when certain of the Moving Defendants asserted their counterclaims in the state court cases. (*Id* at p. 13.) The Moving Defendants next argue that the second prong of the test under Rule 13(A) is satisfied because Plaintiffs' claims herein "are logically related to" and "arise out the same transactions and occurrences" as the First, Second, and Third State Court Cases, as "all

of Plaintiffs' claims arise from the business relationship that began in 2017 between the Investors, Adam, the Nakhles, and Gutzky." (*Id*. at p. 13-14.) Thus, the Moving Defendants argue that Plaintiffs "were compelled to bring the claims in the Federal Complaint in response to the counterclaims pending in the State Court Cases, each of which were compulsory, and are now precluded from doing so based upon their failure." (*Id*. at p. 15-16.)

In response, Plaintiffs argue that Ohio Civ. R. 13(A) does not require dismissal because the state court has not yet issued a final judgment regarding Plaintiffs' claims. (Doc. No. 70 at pp. 5-8.) Citing *Quality Assocs. v. Proctor & Gamble Distrib. LLC*, 949 F.3d 283 (6th Cir. 2020), Plaintiffs maintain that this Court cannot enforce Ohio's compulsory counterclaim rule outside the preclusion context. (*Id*.) Because "the previous state cases were voluntarily dismissed," Plaintiffs assert that there "have not been judgments issued by any court" and, therefore, Plaintiffs' claims in the instant lawsuit are not precluded and this Court lacks authority to dismiss the instant action based on Ohio Civ. R. 13(A). (*Id*. at p. 7.) In the alternative, Plaintiffs argue (summarily and without citation to any authority) that Ohio R. Civ. 13(A) "has no application here" because (1) that Rule only applies to compulsory counterclaims in state court and "Defendants have not filed any complaints in state court in response to which Plaintiffs would be required to file any counterclaims;"[16] (2) Plaintiffs' claims herein do not arise out of the same transaction or occurrence as Defendants' counterclaims in

---

[16] Although the Court need not reach this issue, the Court notes that Plaintiffs' argument that Ohio Civ. R. 13(A) has no application here because "Defendants have not filed any complaints in state court" is without merit. As noted *supra*, the Moving Defendants have pending counterclaims against Plaintiffs in all three state court actions. In *Rettig Enterprises, Inc. v. Koehler*, 626 N.E.2d 99 (Ohio 1994), the Ohio Supreme Court explained that: "It makes no difference to the application of Civ. R. 13(A) that the opposing claim in the earlier action was a counterclaim rather than a complaint, or that the present claim was originally filed as a complaint in the earlier action and dismissed without prejudice after the defendant filed its counterclaim. *All existing claims* between opposing parties that arise out of the same transaction or occurrence must be litigated in a single lawsuit pursuant to Civ. R. 13(A), *no matter which party initiates the action*." *Id*. at 102 (emphasis added) (internal citations omitted).

state court; and (3) "Ohio Civ. R. 13(A) cannot be raised under Fed. R. Civ. P. 12(b)(6), which looks only to whether the complaint alleges facts which, if construed as true, would entitle the plaintiff to relief."  (*Id*. at p. 8, fn. 1.)

In their Reply Brief, the Moving Defendants argue that *Quality Associates* is distinguishable from the instant action because, in that case, the state court denied the plaintiff leave to amend its pending claims to add the claim it brought in federal court.  (Doc. No. 73 at p. 4.)  Here, by contrast, Plaintiffs "have made no such efforts to assert their claims in the State Court Cases after their dismissal."  (*Id*.)  The Moving Defendants argue that the Sixth Circuit's decision in *Hutchison v. Parent*, 773 Fed. Appx. 288 (6th Cir. 2019) is more directly on point and supports dismissal of the instant action with prejudice.  (*Id*. at pp. 3-4.)  The Moving Defendants maintain that "the Court can use its discretion now to prevent duplicative litigation and the possibility of inconsistent judgments by dismissing the [First Amended] Complaint under the authority of *Hutchison* and Civ. R. 13."  (*Id*. at p.5.)

For the following reasons, the Court agrees with Plaintiffs that, under *Quality Associates, supra*, this Court lacks the authority to enforce Ohio Civ. R. 13(A) because Plaintiffs' claims are not yet precluded.  In *Quality Associates*, Proctor & Gamble ("P&G") sued Quality Associates, Inc. ("QAI") in Ohio state court in early 2017 for breach of contract and injunctive relief.  *Quality Associates, Inc*., 949 F.3d at 286.  QAI answered and asserted counterclaims for breach of contract and declaratory judgment.  *Id*.  Notably, QAI did not assert, in the state court action, a counterclaim under 42 U.S.C. § 1981 based on racial discrimination.  *Id*.

Subsequently, in February 2018, QAI filed a stand-alone § 1981 claim against P&G in Ohio *federal* court.  *Id*.  P&G moved to dismiss QAI's federal complaint, in part, based on the argument

that QAI's § 1981 claim was a compulsory counterclaim in the ongoing state court litigation and, thus, needed to be resolved in state court. *Id*. The district court agreed and granted P&G's motion to dismiss. *Id*. QAI appealed to the Sixth Circuit. *Id*. At the same time, QAI sought leave in state court to add a § 1981 racial discrimination claim to its counterclaim that was identical to its (then-dismissed) federal claim. *Id*. at 287. The state court denied QAI's request, and the state court action proceeded on P&G's claims and QAI's counterclaims for breach of contract and declaratory judgment. *Id*.

Meanwhile, on appeal in the Sixth Circuit, QAI argued that the district court erred by construing its § 1981 claim as a compulsory counterclaim under Ohio Civ. R. 13(A), arguing that such claim was not "logically related" to the contract claims at issue in the pending state court proceeding. *Id*. The Sixth Circuit agreed with P&G and the district court that QAI's § 1981 claim is "analytically best classified as a compulsory counterclaim to the state-court proceeding" but "disagree[d] that that fact alone subjects QAI's claim to dismissal." *Id*. Rather, the Sixth Circuit held that "because a federal court cannot enforce a state compulsory-counterclaim rule against a federal litigant outside the preclusion context, and because QAI's claim is not yet precluded here (because the state court has not yet entered a final judgment), the district court lacked authority to base its judgment of dismissal on this ground." *Id*. The Sixth Circuit explained as follows:

> As an initial matter, we must explain why a federal court cannot enforce a state compulsory-counterclaim rule against a federal litigant unless it is part and parcel of a preclusion ruling. After all, one might ask, if a plaintiff files a claim in federal court that plainly should have been brought as a counterclaim in a state litigation, why should it matter whether the claim is precluded? The purpose of Ohio's compulsory-counterclaim rule is "to avoid a multiplicity of actions and to achieve a just resolution by requiring in one lawsuit the litigation of all claims arising from common matters." *Rettig*, 626 N.E.2d at 103. Allowing a federal court to enforce the rule, irrespective of procedural posture, seems to advance that purpose. In fact, one might note, had the parties' ongoing litigation been in federal court, rather than state court, federal law

would have almost certainly provided the district court a basis on which to dismiss, consolidate, stay, or transfer the later-filed suit. [internal citations omitted] Why should the result be any different just because one litigation is in state court and the other is in federal court?

At least two factors explain the differential treatment. First, in contrast to the purely federal context, **there is no statute or equitable doctrine authorizing a federal court to enforce state compulsory-counterclaim law or otherwise manage duplicative state-federal litigation**. *See* Miller, Federal Practice and Procedure § 1418; *see also Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 350–52 (D.C. Cir. 2003) (discussing state-federal distinction); *Smart v. Sunshine Potato Flakes, L.L.C.*, 307 F.3d 684, 687 (8th Cir. 2002) (same). **Unsurprisingly, then, we have "enforced" such law only by way of preclusion doctrine.** *See, e.g., Hutchison v. Parent*, 773 F. App'x 288 (6th Cir. 2019); *Hapgood v. City of Warren*, 127 F.3d 490 (6th Cir. 1997). But, for the reasons explained below, P&G cannot invoke preclusion here. So, in dismissing QAI's claim strictly on the basis of Ohio Rule of Civil Procedure 13(A), the district court exercised power that it did not have.

Second, as the Supreme Court has recognized, "state-federal concurrent jurisdiction" is different than "wholly federal concurrent jurisdiction" because federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Thus, **in the state-federal concurrent jurisdiction context, "the pendency of an action in [a] state court" generally is considered "no bar to proceedings concerning the same matter in the Federal court having jurisdiction."** *Id.* at 817, 96 S.Ct. 1236 (citation omitted). [Citations omitted]. Indeed, as the Court put it nearly a century ago, in *Penn General Casualty Co. v. Commonwealth of Pennsylvania ex rel. Schnader*, **"[w]here the judgment sought is strictly *in personam*, for the recovery of money or for an injunction compelling or restraining action by the defendant, both a state court and a federal court having concurrent jurisdiction may proceed with the litigation, at least until judgment is obtained in one court which may be set up as *res adjudicata* in the other."** 294 U.S. 189, 195, 55 S.Ct. 386, 79 L.Ed. 850 (1935). That this case implicates compulsory counterclaims does not, in our view, alter the basic federalist principle undergirding this precedent, namely, that **litigants are free to split their claims between state and federal court and "race to the first judgment," even if that stratagem is ill-advised and inefficient.**

*Id*. at 288-289 (emphasis added) (footnotes omitted).

The Sixth Circuit then explained that "[u]nder Ohio law, '[t]he doctrine of *res judicata* encompasses the two related concepts of claim preclusion, also known as *res judicata* or estoppel by

judgment, and issue preclusion, also known as collateral estoppel.'" *Id.* at 289 (quoting *Anderson v. City of Blue Ash*, 798 F.3d 338, 350 (6th Cir. 2015) (quoting *O'Nesti v. DeBartolo Realty Corp.*, 113 Ohio St.3d 59, 862 N.E.2d 803, 806 (2007)). "However classified, though, preclusion comes into play only when a state court has entered a *final judgment*." *Id.* (emphasis in original). The Sixth Circuit explained that QAI's § 1981 claim was not precluded because "the state trial court's decision dismissing QAI's § 1981 claim on the merits was not a final judgment." *Id.* "Rather, it was an interlocutory *decision*—that is, it did not dispose of the entire case, and can therefore be reconsidered at any point until final judgment." *Id.* (emphasis in original). Accordingly, the Sixth Circuit reversed the district court's decision and remanded for further proceedings.

Likewise, here, the Court finds that Plaintiffs' claims in the instant action are not precluded. As discussed at some length above, Plaintiffs voluntarily dismissed their claims without prejudice in the First and Second State Court Cases, and Plaintiff Shnizel filed a Motion to Dismiss its claims without prejudice in the Third State Court Cases. The state trial courts entered the dismissals without prejudice in August 2022, but expressly noted that the cases were on the active docket because the counterclaims remained pending.[17] It is undisputed that all three state court cases remain pending as

---

[17] In the consolidated First and Second State Court Cases, the state court initially issued a Journal Entry stating that "pursuant to Pltf's 8/9/2022 Notice of Voluntary Dismissal without Prejudice, case is hereby dismissed without prejudice." *See* First and Second State Court Cases (docket sheets; Journal Entries dated Aug. 15, 2022.) The following day, however, the state court issued a Journal Entry stating as follows: "The 8/15/2022 full Dismissal in response to Pltf's 8/9/2022 Notice of Voluntary Dismissal was in error as counterclaims remain pending. This matter is reinstated to the active docket and the claims asserted in Pltf's Complaint only are dismissed without prejudice." *Id.* at docket sheets; Journal Entries dated Aug. 16, 2022. In the Third State Court Case, the state court issued a Journal Entry on August 22, 2022 granting Plaintiff Shnizel's Motion to Dismiss without Prejudice and stating that the "within Case is dismissed without prejudice. Final." *See* Third State Court Case (docket sheet; Journal Entry dated Aug. 22, 2022). The following day, however, the state court issued a Journal Entry stating, in relevant part, as follows: "Order clarifying this Court's 8/22/2022 Order. Defendants' Counterclaims remain pending. Follow Up Phone Call set." *Id.* at docket sheet; Journal Entry dated Aug. 23, 2022. As discussed *supra,* the Third State Court Case was later consolidated with the First and Second State Court Cases in January 2023. All three state court cases are ongoing as of the date of this Opinion.

of the date of this decision.  The state court, therefore, has not entered a "final judgment" in any of the three state court cases (either with respect to Plaintiffs' claims[18] or with respect to the cases as a whole) and Plaintiffs' claims are not precluded.   As such, this Court cannot dismiss the instant action based on the compulsory counterclaim rule set forth in Ohio Civ. R. 13(A).  *See Quality Associates, Inc.*, 949 F.3d at 285 (concluding that "a federal court cannot enforce a *state* compulsory-counterclaim rule against a *federal* litigant while the relevant state litigation is still pending") (emphasis in original).  *See also TowerCo 2013, LLC v. Berlin Township*, 2023 WL 5334633 at * 5 (S.D. Ohio Aug. 18, 2023) (applying *Quality Associates, Inc*. and rejecting defendant's argument that plaintiff's claims should be dismissed as compulsory counterclaims under Ohio Civ. R. 13(A) where federal plaintiff had voluntarily dismissed its state court counterclaims from ongoing parallel state court action).

The Moving Defendants, however, argue that *Quality Associates* is distinguishable from the instant action because, unlike here, the state court denied QAI leave to amend its pending claims to add the § 1981 claim it brought in federal court.  (Doc. No. 73 at p. 4.)  This is significant, the Moving Defendants assert, because QAI "was left with no other forum to assert its discrimination claim but in federal court."  (*Id*.)  The Court finds this argument to be without merit.  As the Sixth Circuit has made clear, the central issue in determining whether a federal court has the authority to enforce a state compulsory counterclaim rule is whether the federal plaintiff's claims are precluded under state

---

[18] Under Ohio law, a dismissal under Ohio Civ. R. 41(A)(1)(a) does not typically operate as an adjudication on the merits and is not generally considered a final, appealable order.  *See, e.g., Thorton v. Montville Plastics & Rubber, Inc*., 902 N.E.2d 482, 487 (Ohio 2009).  *See also Reinbolt v. National Fire Ins. Co. of Hartford*, 816 N.E.2d 1083, 1086 (Ohio App. 6th Dist. 2004) ("It is well settled that 'a voluntary dismissal without prejudice normally is not a final, appealable order because it is not an adjudication on the merits and it leaves the parties as if the action never had been commenced.'") (quoting *Lovins v. Kroger Co*., 782 N.E.2d 1171, 1172 (Ohio App. 2nd Dist. 2002)).

law.  Thus, the fact that a federal plaintiff did or did not successfully attempt to assert its claims in the parallel state court action is not material, so long as the federal plaintiff's claims are not barred by *res judicata* or issue preclusion.  Here, the Court finds that Plaintiffs' claims in the instant action are not precluded because the state court has not issued a final judgment in the First, Second, or Third State Court Cases, all of which remain pending and are currently being actively litigated. Thus, the Moving Defendants' argument that *Quality Associates* is distinguishable because Plaintiffs herein failed to seek leave to reassert their claims in the state court post-voluntary dismissal, is without merit and rejected.

The Court also rejects Defendants' argument that the Sixth Circuit's decision in *Hutchison v. Parent*, 773 Fed. Appx. 288 (6th Cir. 2019) requires a different conclusion.  In that case, plaintiff Scott Hutchison sued defendant John Parent in state court for breach of fiduciary duty and fraud involving the operation of their company.  *Hutchison,* 773 Fed. Appx. at 289.  Parent counterclaimed, alleging that Hutchison had misappropriated company funds and failed to repay certain loans.  *Id.* After three years of litigation in state court and with trial imminent, Hutchison voluntarily dismissed his claims.  *Id.*  Two months later, the parties entered into a consent judgment on Parent's counterclaims against Hutchison, awarding Parent $153,000.  *Id.* at 290.

Meanwhile, the day after voluntarily dismissing his state court claims, Hutchison filed a complaint in federal district court asserting the same claims.  *Id.*  Parent filed a motion for summary judgment, arguing that Ohio Civil Rule 13(A) barred Hutchison from relitigating the claims he voluntarily dismissed in state court because they were compulsory counterclaims to Parent's own counterclaims.  *Id.*  The district court denied Parent's motion, finding that Rule 13(A) did not bar

Hutchison's claims. *Id.* The matter proceeded to trial, and a jury found Parent liable for breach of fiduciary duty and fraud. *Id.*

On appeal, Parent argued that Ohio Civil Rule 13(A) precluded Hutchison's attempt to litigate his claims in federal court following the consent judgment against him in state court. *Id.* The Sixth Circuit agreed, finding that the district court had applied the wrong legal standard in determining whether the relevant claims were part of the same transaction or occurrence under Rule 13(A). *Id.* at 291. Applying the proper test (i.e., the "logical relationship" test), the Sixth Circuit found that Parent had shown a logical relationship between his state court counterclaims for unpaid loans and misappropriation of funds, and Hutchison's federal claims for breach of fiduciary duty and fraud. *Id.* at 292-293. The Sixth Circuit found that "the overlapping factual and legal issues establish such a logical relationship; therefore, *res judicata* precluded Hutchison from litigating his dismissed state court claims in the subsequent federal case." *Id.* at 294.

Here, the Moving Defendants argue that *Hutchison* is directly on point and controls because, just like the plaintiff in *Hutchison*, Plaintiffs herein voluntarily dismissed their state court claims after years of litigation, and then improperly refiled them in federal court. (Doc. No. 62 at p. 12; Doc. No. 73 at p. 3-4.) The Moving Defendants assert that "[j]ust as in *Hutchison*, Plaintiffs had an opportunity to litigate their claims in the State Court but elected to dismiss their claims" and "are proceeding forward with federal court litigation despite the appropriate state court forum." (Doc. No. 73 at p. 3.) The Moving Defendants argue that this Court should dismiss the First Amended Complaint "to prevent the same unnecessary resource expenditures as in *Hutchison*." (*Id.*)

The Court finds that the Moving Defendants' reliance on *Hutchison* is misplaced. Although both the plaintiff in *Hutchison* and Plaintiffs herein voluntarily dismissed their state court claims and

subsequently refiled them in federal court, there is a key distinction between *Hutchison* and the instant case.  In *Hutchison*, after plaintiff Hutchison voluntarily dismissed his claims, the parties entered into a consent judgment on defendant Parent's counterclaims, thus resolving and closing the state court action.  *Hutchison*, 773 Fed. Appx. at 289.  Thus, the Sixth Circuit was able to enforce Ohio's compulsory counterclaim rule because Hutchison's federal claims were precluded by *res judicata*.  *Id.* at 294.  By contrast, here, the parties have not resolved the Moving Defendants' counterclaims in the First, Second, and Third State Court cases, and those state court actions remain pending.  Thus, Plaintiffs' claims herein are not yet precluded by *res judicata*.  This is a critical distinction, as this lack of preclusion strips this Court of the authority to enforce Ohio Civ. R. 13(A).  Accordingly, the Moving Defendants' argument that *Hutchison* requires this Court to dismiss the instant action is without merit and rejected.

Finally, the Court addresses the Moving Defendants' "Supplemental Authority in Support of Motion to Dismiss" (Doc. No. 83), which was filed over four months after the Moving Defendants filed their Reply Brief.   Therein, the Moving Defendants present an entirely new argument in support of dismissal.  (*Id.*)  Citing Ohio Supreme Court cases from 1948, 1977, 1985, and 1995, the Moving Defendants argue, for the first time, that this Court lacks subject matter jurisdiction because "when there are concurrent courts of competent jurisdiction, the court who first obtains jurisdiction over a common nucleus of fact retains that jurisdiction to the exclusion of all other courts."  (*Id.* at p. 1.)  The Moving Defendants assert that, because the state court first obtained jurisdiction over "this same common nucleus of operative facts" in May 2020, this Court may not exercise jurisdiction over the instant action.  (*Id.* at p. 2.)

The Moving Defendants' "Supplemental Authority" is both procedurally improper and incorrect as a matter of law.   First, briefing closed on the Moving Defendants' Motion to Dismiss on June 9, 2023, when Defendants filed their Reply Brief.  (Doc. No. 73.)  While parties may file notices of supplemental authority to direct the Court's attention to recent authority issued after the conclusion of briefing, the Moving Defendants' "Supplemental Authority" in this case does not do so.  Rather, the Moving Defendants' "Supplemental Authority" relies on state court cases from the 1940's through the 1990's, all of which were clearly in existence at the time of the original briefing on Defendants' Motion to Dismiss.  More concerningly, the Moving Defendants do not simply direct this Court's attention to this "supplemental authority" but also attempt to raise an entirely new legal argument that was not raised in either their Motion or Reply Brief.  This is inappropriate.

As Moving Defendants appear to contest this Court's subject matter jurisdiction, however, the Court feels compelled to address Defendants' argument.  Citing Ohio Supreme Court law, the Moving Defendants assert that this Court lacks jurisdiction under Ohio's so-called "jurisdictional priority rule," which holds that, as between courts of concurrent jurisdiction, the first to acquire jurisdiction over the action acquires exclusive jurisdiction.  For the following reasons, the Moving Defendants' argument is without merit.

Although not cited by the Moving Defendants, the Court notes that the Ohio Supreme Court has clearly held that the jurisdictional priority rule invoked by the Moving Defendants "does not apply to proceedings in federal court."  *See State ex rel. McGirr v. Winkler*, 93 N.E.3d 928, 932 (Ohio 2017) ("The jurisdictional-priority rule provides that as between *state* courts of concurrent jurisdiction, the tribunal whose power is first invoked acquires exclusive jurisdiction to adjudicate the whole issue and settle the rights of the parties. The rule does not apply to proceedings in federal

court.") (emphasis added) (internal citations omitted).  Moreover, all the cases cited by the Moving

Defendants in their Supplemental Authority relate to *state* courts of concurrent jurisdiction, i.e., to

claims pending in two different state courts of concurrent jurisdiction.  *See State ex rel. Racing Guild*

*of Ohio, Local 304, SEIU v. Morgan*, 476 N.E.2d 1060 (Ohio 1985) (discussing jurisdictional priority

rule in the context of proceedings filed in Cuyahoga County Court of Common Pleas and Summit

County Court of Common Pleas); *State ex rel. Phillips v. Polcar,* 364 N.E.2d 33 (Ohio 1977)

(discussing rule in the context of proceedings filed in Cuyahoga County Court of Common Pleas and

Parma Municipal Court); *John Weenick & Sons Co. v. Court of Common Pleas of Cuyahoga County*,

82 N.E.2d 730 (Ohio 1948) (discussing rule in the context of proceedings filed in Cuyahoga County

Court of Common Pleas and Municipal Court of Cleveland); *State ex rel. Sellers v. Gerken*, 647

N.E.2d 807 (Ohio 1995) (discussing rule in the context of proceedings filed in Franklin County Court

of Common Pleas and the Hocking County Court of Common Pleas).

Moreover, the Moving Defendants' invocation of the jurisdictional priority rule is directly

contrary to the Sixth Circuit's discussion in *Quality Associates, Inc.*, *supra*, which explains that "in

the state-federal concurrent jurisdiction context, 'the pendency of an action in [a] state court'

generally is considered 'no bar to proceedings concerning the same matter in the Federal court having

jurisdiction.'" *Quality Associates, Inc.,* 949 F.3d at 288 (citations omitted).  Rather, "[w]here the

judgment sought is … for the recovery of money or for an injunction compelling or restraining action

by the defendant, **both a state court and a federal court having concurrent jurisdiction may**

**proceed with the litigation**, at least until judgment is obtained in one court which may be set up as

*res judicata* in the other." *Id.*  at 189 (emphasis added).  Even though *Quality Associates, Inc.* is

discussed extensively in Plaintiffs' Brief in Opposition, the Moving Defendants fail to acknowledge

or address it in their "Supplemental Authority" or otherwise explain how the state law cases cited by Moving Defendants relate to the Sixth Circuit's discussion of concurrent federal and state jurisdiction in *Quality Associates, Inc., supra.*

Therefore, the jurisdictional priority argument set forth for the first time in Moving Defendants' "Supplemental Authority" is without merit as a matter of law. Additionally, the Court finds, for all the reasons set forth above, that the Moving Defendants are not entitled to dismissal of Plaintiffs' First Amended Complaint based on Ohio Civ. R. 13(A).

### B.     RICO Claim

The Moving Defendants next argue that Plaintiffs have failed to sufficiently plead the necessary elements of a RICO claim. (Doc. No. 62 at pp. 16-20.) In Count I, Plaintiffs allege that the Moving Defendants violated the RICO Act, 18 U.S.C. § 1962(c) with respect to the Property Fraud, Loan Fraud, JV Fraud, Nadam Fraud, and Bavaria MF Fraud. (Doc. No. 1 at ¶¶ 289-312.) Specifically, Plaintiffs allege that "[t]he Nakhles and Gutzky systematically converted approximately 218 real properties into cash by acquiring them without adequate consideration, mortgaging them and taking the money, as well as collecting rents and other income from such properties." (*Id.* at ¶ 307.) Plaintiffs allege that "[i]n the process [the Nakhles and Gutzky] borrowed and misappropriated large amounts of cash in order to finance the other frauds being committed." (*Id.*) Plaintiffs further allege that "these overlapping schemes were timed so that the substantial defaults would all occur around the same time, namely, the Fall of 2019." (*Id.*) Plaintiffs allege that these "overlapping schemes" were furthered by multiple instances of bank, wire, and mail fraud, including "dozens if not hundreds of phone calls" and the use of the mail in connection with the execution of "every notarized document" relating to the Property Fraud Properties. (*Id.* at ¶¶ 296, 297, 300, 301, 303, 304.)

43

Section 1964(c) of RICO provides, in relevant part, that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).  As noted above, Plaintiffs herein assert a claim under Section 1962(c).  That Section provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

A substantive RICO claim brought under Section 1962(c) has four elements: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Courser v. Allard*, 969 F.3d 604, 621 (6th Cir. 2020) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).  *See also Bachi-Reffitt v. Reffitt*, 802 Fed. Appx. 913, 918 (6th Cir. 2020).  More specifically, the Sixth Circuit recently explained that "to state a civil RICO claim, a plaintiff must allege (1) two or more predicate racketeering offenses, (2) the existence of an enterprise affecting interstate commerce, (3) a connection between the racketeering offenses and the enterprise, and (4) injury by reason of the above." *Grow Michigan, LLC v. LT Lender, LLC*, 50 F. 4th 587, 594 (6th Cir. 2022) (citing *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) and *Frank v. D'Ambrosi*, 4 F.3d 1378, 1385 (6th Cir. 1993)).

Each of these elements must be satisfied as to each defendant.  *See, e.g., Compound Prop. Mgmt., LLC v. Build Realty, Inc.*, 462 F. Supp.3d 839, 858 (S.D. Ohio 2020); *Kerrigan v. Visalus, Inc.*, 112 F. Supp.3d 580, 602 (E.D. Mich. 2015).  Additionally, a RICO plaintiff must also establish

that he suffered an injury to "business or property" because of the defendant's unlawful conduct. *Jackson v. Sedgwick Claims Man. Servs., Inc.*, 731 F.3d 556, 563-64 (6th Cir. 2013).

In deciding a motion to dismiss a RICO claim, courts are mindful that RICO must be "liberally construed to effectuate its remedial purposes"—giving redress to those victimized by racketeering activity. RICO, Pub. L. No. 91-452 § 904(a), 84 Stat. 947. *See also Sedima, S.P.R.L.*, 473 U.S. at 498. But "the statute was never intended to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007); *see also Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992) ("[I]t is equally evident that RICO has not federalized every state common-law cause of action available to remedy business deals gone sour.").

Here, the Moving Defendants argue that "Plaintiffs merely plead in generalities, which is insufficient to meet the stringent requirements imposed on a RICO Act plaintiff." (Doc. No. 62 at p. 17.) The Moving Defendants maintain that Plaintiffs failed to sufficiently plead a pattern of racketeering activity because they failed to plead two or more predicate acts with particularity, a scheme to defraud, and/or the requisite intent. (*Id.*) The Moving Defendants further assert that Plaintiffs' RICO claim fails because Plaintiffs failed to allege the necessary elements to demonstrate the existence of an association-in-fact enterprise. (*Id.*) Plaintiffs oppose the Moving Defendants' arguments, asserting that the First Amended Complaint sufficiently pleads each element of a RICO claim under Section 1962(c). (Doc. No. 70.)

### 1. Pattern of Racketeering Activity

The Court begins by addressing the Moving Defendants' argument that Plaintiffs failed to sufficiently plead a pattern of racketeering activity. To establish this element, Plaintiffs must show

that the Moving Defendants committed at least two predicate racketeering acts within ten years of each other that demonstrate criminal conduct of a continuing nature. 18 U.S.C. § 1961(5).  The racketeering predicates must be "related" and "amount to or pose a threat of continued criminal activity." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 409 (6th Cir. 2012) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989)).  Racketeering activity consists of acts that are indictable under the federal statutes listed in 18 U.S.C. § 1961(1)(B).

In the instant case, Plaintiffs' RICO claim is premised on the following predicate acts: (1) bank fraud in violation of 18 U.S.C. § 1344; (2) wire fraud in violation of 18 U.S.C. § 1343; and (3) mail fraud in violation of 18 U.S.C. § 1341.  (Doc. No. 10 at ¶¶ 296, 297, 300, 301, 303, 304, 305.)

### a.        Bank Fraud

Plaintiffs allege that "[t]he Nakhles and Gutzky, in violation of 18 U.S.C. § 1344, materially misrepresented the values of the properties acquired by fraud in the Property Fraud, the JV Fraud, the Nadam Fraud and the Bavaria Fraud in order to obtain mortgages that in many cases were far in excess of the purchase price for the same." (Doc. No. 10 at ¶ 303.) Plaintiffs further allege that "Gutzky in particular additionally agreed to act as guarantor for the mortgages."  (*Id*.)  Plaintiffs allege that "[t]he mortgages encumber the properties that were involved in such frauds and in some cases the properties may be deemed 'underwater' (worth less than the mortgage)." (*Id*. at ¶ 304.)  As a result, the Plaintiffs in the Property Fraud, JV Fraud, Nadam Fraud and Bavaria Fraud allege that they "have suffered direct and proximate damages because they cannot simply demand rescission and restitution."  (*Id*.)

The Moving Defendants argue that Plaintiffs lack standing to allege bank fraud as a predicate act.  (Doc. No. 62 at p. 17, fn 7.)  As the Moving Defendants correctly note, several district courts

within this Circuit have held that "[o]nly defrauded financial institutions have standing to assert bank fraud as a RICO predicate." *Herrick v. Liberty League Intern*., 2008 WL 2230702 at *5 (S.D. Ohio 2008) (collecting cases.)  *See also Tunne v. Hendrick*, 2012 WL 3644825 at * 13 (W.D. Ky. Aug. 24, 2012); *Infocision Management Corp. v.  Foundation for Moral Law, Inc.,* 2009 WL 650282 at * 9 (N.D. Ohio Jan. 14, 2009) (collecting cases). Plaintiffs do not acknowledge or address the Moving Defendants' argument at any point in their Brief in Opposition.  (Doc. No. 70.)

The Court deems Plaintiffs to have waived any opposition to the Moving Defendants' argument that Plaintiffs lack standing to assert bank fraud as a predicate act under RICO.  It is well established that, if a plaintiff fails to respond or to otherwise oppose a defendant's motion to dismiss, a district court may deem the plaintiff to have waived opposition.  *See, e.g., Humphrey v. U.S. Attorney Gen.'s Office*, 279 Fed. Appx 328, 331 (6th Cir. 2008) (finding that a plaintiff's failure to oppose arguments raised in the defendants' motion to dismiss is grounds for the district court to assume that opposition to the motion is waived).  *See also Kuhlman v. City of Cleveland,* 2023 WL 2652585 at * 11 (N.D. Ohio March 23, 2023) (finding that, by failing to respond to defendant's motion to dismiss, plaintiff "waived any argument in opposition to the City's argument that plaintiff's state law claims are barred"); *Selou v. Integrity Sol. Servs., Inc*., 2016 WL 612756 at *3 (E.D. Mich. Feb. 16, 2016) ("Plaintiff's failure to address any claim but her TCPA claim in response to LiveVox's motion to dismiss is cause for dismissing those claims.").

Here, despite having every opportunity to respond to the Moving Defendants' argument that Plaintiffs lack standing to allege bank fraud as a predicate act, Plaintiffs failed to do so.  The Court, therefore, deems Plaintiffs to have waived any opposition with respect to this issue.  Accordingly, in

determining whether Plaintiffs have sufficiently plead a pattern of racketeering activity, the Court will not consider Plaintiffs' allegations of bank fraud.

### b.  Mail and Wire Fraud

Plaintiffs also allege that the Moving Defendants engaged in numerous instances of mail and wire fraud.  (Doc. No. 10 at ¶¶ 296, 297, 300-302.)  Specifically, in Count I, Plaintiffs allege that every notarized document relating to the Property Fraud Properties constitutes an act of mail fraud because each document contains material misrepresentations and was "signed by sending the originals through the mails or via courier service."  (*Id*. at ¶¶ 296, 297.)  With respect to wire fraud, Plaintiffs allege that the Nakhles engaged in "dozens if not hundreds of phone calls" with the Plaintiffs and Property Fraud Investors, during which the Nakhles made various misrepresentations relating to the properties and loans at issue.  (*Id*. at ¶¶ 300, 301.)

Mail fraud consists of "(1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme."  *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir.2005).  *See also Heinrich v. Waiting Angels Adoption Services, Inc*., 668 F.3d 393, 404 (6th Cir. 2012).  "The elements of wire fraud are essentially the same except that one must use the wires in furtherance of the scheme to defraud."  *Heinrich*, 668 F.3d at 404 (citing *United States v. Daniel*, 329 F.3d 480, 486 n. 1 (6th Cir.2003)) (noting that the statutes share the same relevant language and the same analysis should be used for each).

"A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money."  *Jamieson*, 427 F.3d at 402.  *See also Heinrich*, 668 F.3d at 404.  "A plaintiff must also demonstrate scienter to establish a scheme to defraud, which is satisfied by showing the defendant acted either

with a specific intent to defraud or with recklessness with respect to potentially misleading information." *Heinrich*, 668 F.3d at 404.

When pleading predicate acts of mail or wire fraud, to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir.2008) (quoting *Gupta v. Terra Nitrogen Corp.,* 10 F.Supp.2d 879, 883 (N.D. Ohio 1998)). *See also Heinrich*, 668 F.3d at 404. A RICO plaintiff is not required to plead or prove first-party reliance on an allegedly false statement. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648 (2008). To allege a valid RICO claim, however, a plaintiff must show not only that the predicate act was a "but for" cause of plaintiff's injuries, but also that it was a proximate cause. *See Heinrich*, 668 F.3d at 404. A plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).

In the instant case, the Moving Defendants argue that Plaintiffs fail to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) because the First Amended Complaint does not identify the specific time, place, or content of any mailing or internet or telephone communication that allegedly constitutes mail or wire fraud. (Doc. No. 62 at p. 17.) The Moving Defendants further assert that Plaintiffs' RICO claims fail because Plaintiffs do not point to specific statements within such communications that they contend are fraudulent, and "instead rely on after-the-fact circumstances to infer a scheme by Movants." (*Id.* at p. 18.)

49

Plaintiffs acknowledge that, to sustain a RICO claim, they must describe the "who, what, when, where, and how" of the alleged predicate acts of mail and wire fraud. (Doc. No. 70 at p. 8.) Plaintiffs maintain, however, that they need only delineate "the specific circumstances constituting the overall fraudulent scheme" with enough detail to put the Moving Defendants on notice as to the nature of the claim. (*Id*. at p. 9.) Plaintiffs argue that they have done so here because the First Amended Complaint makes clear that "Plaintiffs relied on the representations and warranties that were made in the purchase agreements and associated land contracts, as well as the guarantees issued by the Nakhles." (*Id*. at p.10.) Without directing this Court's attention to any specific paragraphs in the First Amended Complaint, Plaintiffs assert that "the Complaint clearly states that these representations, warranties, and guarantees were made and the documents on their face provide information as to the time, place and content of their execution," noting further, that "all documents were communicated via mail (or courier) and email to the Plaintiffs." (*Id*. at p. 10.)

Plaintiffs then argue generally (and, again, without citing to a single paragraph of the First Amended Complaint) that the Complaint is sufficient because it "runs for dozens and dozens of pages and provides a step-by-step explanation of how the various frauds were executed."[19] (*Id*. at p. 11.) Plaintiffs assert that "[t]o provide the 'temporal or geographic particulars' … of each communication would force the Complaint to engage in a level of granular detail that would expand its scope, already over 100 pages, into the thousands of pages and essentially force the Plaintiffs to demonstrate the level of detail expected in trial proceedings rather than at the stage of filing a complaint." (*Id*. at pp. 11-12.) Plaintiffs maintain that "now is not the time" for such detail, indicating that they "intend to

---

[19] As noted *supra*, Plaintiffs also failed to cite a single paragraph of the First Amended Complaint in the "Factual Background" section of its Brief in Opposition to the Moving Defendants' Motion to Dismiss.

present a complete and damning picture of the evidence against Defendants after discovery has been completed." (*Id*. at p. 12.)

The Court will address the parties' arguments with respect to the alleged predicate acts of wire and mail fraud separately, below.

### i.     Wire Fraud

In support of their argument that they have sufficiently plead the predicate act of wire fraud, Plaintiffs cite Paragraph 301 of the First Amended Complaint. (Doc. No. 70 at p. 11.) That Paragraph provides as follows:

> 301.    As with the mail fraud, the number of instances in the period of 2017 through 2021 far exceed two acts, as the Nakhles in particular engaged in dozens if not hundreds of phone calls with the Plaintiffs and Property Fraud Investors, misrepresenting intentions and inducing (1) the Property Fraud Investors to transfer their properties without adequate compensation, (2) the members of Finance and Zuk Marble to invest money that was subsequently embezzled, (3) ABO to invest money in Nadam that was embezzled, (4) Adam, ABO and BAO to extend loans that were never repaid and (5) the seller of the Bavaria Property to transfer it without adequate compensation, in each case with the purpose of defrauding the relevant Plaintiffs. Many of these phone calls were international, as the principals of all of the Plaintiffs are Israeli citizens.

(Doc. No. 10 at ¶ 301.)  Plaintiffs do not direct the Court's attention to any allegations in the First Amended Complaint that identify the specific time and place of any of the alleged "dozens if not hundreds of phone calls with Plaintiffs and Property Fraud Investors," and/or the participants and specific content of any such telephone calls. *See* Doc. No. 70 at pp. 8-12.

The Court finds that Plaintiffs have failed to sufficiently plead a predicate act of wire fraud. As stated above, to state a RICO claim, a complaint "must state with particularity the circumstances constituting [such] fraud" and "at a minimum … allege the time, place, and content of the alleged misrepresentation …, the fraudulent scheme, the fraudulent intent of the defendants, and the injury

resulting from the fraud." *Am. BioCare Inc. v. Howard & Howard Attorneys PLLC*, 702 Fed. Appx. 416, 421 (6th Cir. 2017) (quoting *Heinrich,* 668 F.3d at 403.)  The Court finds that Plaintiffs fall far short of meeting this standard for the following reasons.

Plaintiffs fail to direct this Court's attention to any specific paragraph(s) of the First Amended Complaint that state the time, place, participants, or content of any specific allegedly fraudulent telephone call.  Certainly, Paragraph 301 does not allege any of this information.  To the contrary, Paragraph 301 does nothing more than vaguely reference "dozens if not hundreds of phone calls" over a four-year period and then loosely attribute them to either George and/or Samir Nakhle. Plaintiffs do not specifically identify when any of these allegedly fraudulent communications occurred, who precisely participated in them, or what was said.  The First Amended Complaint, therefore, fails to satisfy the requirements of Rule 9(b) as it does not provide either the Moving Defendants or this Court with sufficient information to understand the basis of Plaintiffs' wire fraud allegations.[20]  *See, e.g., Infocision Management Corp v. Foundation for Moral Law, Inc.*, 2009 WL 650282 at * 8 (N.D. Ohio Jan. 14, 2009) (finding plaintiffs had failed to sufficiently plead predicate act of wire fraud because "[n]ot only does [plaintiff] fail to describe the dates, times, and actors involved in the allegedly fraudulent communications, it also neglects to identify the contents of any (among the thousands of) communications and does not specify what was misrepresented.")

In their Brief in Opposition, Plaintiffs argue generally that they satisfied Rule 9(b) by pleading a specific example of the Moving Defendants' fraudulent conduct.  (Doc. No. 70 at p. 14.)  Plaintiffs

---

[20] Moreover, because Plaintiffs' RICO claim is against each of the 18 Moving Defendants, Plaintiffs were required to allege facts establishing predicate acts of racketeering by each individual defendant.  *See Compound Prop. Mgmt LLC,* 462 F.Supp.3d at 858; *Kerrigan,* 112 F.Supp.3d at 602.  *See also Marinac v. Todd,* 2022 WL 3904049 at * 12 (N.D. Ohio Aug. 30, 2022); *Infocision Management Corp.*, 2009 WL 650282 at * 8.  Plaintiffs' generic wire fraud allegation fails to distinguish between the Moving Defendants and is, therefore, also insufficient for that reason.

direct this Court's attention to Paragraphs 259-272 of the First Amended Complaint, which relate to one specific property identified as the "Willowhurst Property." (*Id.*) It is true that courts have held that "where … a complaint alleges 'a complex and far-reaching scheme,' it is sufficient if the pleading offers examples of specific fraudulent conduct as a representative sample." *Kovach v. Access Midstream Partners, L.P.*, 2016 WL 1162061 at * 11 (N.D. Ohio March 23, 2016) (quoting *U.S. ex rel Marlar v. BXST Y-12, LLC*, 525 F.3d 439, 445 (6th Cir. 2008)). Assuming *arguendo* that pleading facts regarding the Willowhurst Property as a representative sample would be sufficient to satisfy Rule 9(b) in the instant case,[21] the Court finds that Paragraphs 259-272 of the First Amended Complaint nonetheless fail to sufficiently allege a predicate act of wire fraud. None of those Paragraphs even mention a telephone call or email message, much less plead the specific dates, times, participants, or content of any such wire communication, as required by Rule 9(b) and the Sixth Circuit precedent discussed above. (Doc. No. 10 at ¶¶ 259-272.) Accordingly, the Court rejects Plaintiffs' argument that the First Amended Complaint's allegations regarding the Willowhurst Property as a "representative sample" are sufficient to plead a predicate act of wire fraud for purposes of establishing a pattern of racketeering activity.

Plaintiffs also suggest that the Moving Defendants' Motion should be denied because allegations regarding the time, place, and content of the Moving Defendants' allegedly fraudulent phone calls can be found somewhere in the "dozens of pages" of the First Amended Complaint. (Doc. No. 70 at p. 11.) Plaintiffs, however, do not direct this Court's attention to any such allegations and it is not this Court's function to pore through the First Amended Complaint to attempt to find them.

---

[21] Although it need not decide this issue, the Court notes that it is not entirely convinced that the First Amended Complaint's allegations regarding the Willowhurst Property are sufficient to constitute a "representative sample," as the term "sample" implies more than one example of the Moving Defendants' fraudulent scheme.

As the Sixth Circuit has long held, "[a] district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).  *See also Layne Christensen Company v. City of Franklin, Tennessee*, 449 F.Supp.3d 748, 755 (M.D. Tenn. 2020) (same); *Uduko v. Cozzens*, 975 F. Supp. 2d 750, 786 (E.D. Mich. 2013) (same).  Here, Plaintiffs had the opportunity to pinpoint specific allegations in the First Amended Complaint that they believe satisfy Rule 9(b)'s heightened pleading requirements for allegations of wire fraud, and/or at a minimum to include in Paragraphs 259-272 of the First Amended Complaint telephone call(s) and/or email message(s), and the date(s) and time(s) thereof to satisfy Rule9(b) regarding the Willowhurst Property as a representative sample.  Plaintiffs failed to do so and chose, instead, to rely on a sole citation to Paragraph 301 and broad generalities regarding the complexity of the Moving Defendants' allegedly fraudulent scheme and the length of the First Amended Complaint.[22]  The Court finds this to be insufficient for all the reasons set forth above.

In sum, then, the Court finds that Plaintiffs failed to sufficiently plead a predicate act of wire fraud under RICO Section 1962(c).

### ii.    Mail Fraud

The only remaining potential predicate act plead in the First Complaint, therefore, is mail fraud.  In support of their argument that they have sufficiently plead at least two predicate acts of

---

[22] The Court notes that, in a different section of Plaintiffs' Brief in Opposition regarding the issue of whether Plaintiffs sufficiently plead scienter, Plaintiffs cite to several paragraphs of the First Amended Complaint relating to the Lot One properties.  (Doc. No. 70 at pp. 13.)  None of these paragraphs sufficiently plead a predicate act of wire fraud, however, because those paragraphs fail to allege either the date, time, participants, and/or contents of a single telephone call or email message.

mail fraud, Plaintiffs cite Paragraph 297 of the First Amended Complaint. (Doc. No. 70 at p. 11.)

That Paragraph (and the Paragraph directly preceding it) provide as follows:

> 296. Upon information and belief, the Nakhles and Gutzky, acting on their own behalf and through the Controlled Entities, in violation of 18 U.S.C. § 1341, placed in post offices or official depositories of the United States Postal Service matter and things to be delivered by the US Postal Service, caused matter and things to be delivered by commercial overnight courier services, and received matter and things from the US Postal Service or commercial overnight courier services, including, but not limited to, documents containing material misrepresentations that were calculated to defraud the Plaintiffs in the Property Fraud, the JV Fraud, the Loan Fraud, the Nadam Fraud and the Bavaria Fraud. The US mail was used to convey material misrepresentations, willful omissions of material facts, and other acts of fraud.

> 297. The number of instances of this mail fraud are far in excess of 2 instances in the period from 2017 through 2021, as every Land Contract, every Supplemental Agreement, and every other notarized document for 192 properties in the Property Fraud, every property in the JV Fraud, the property in the Nadam Fraud and the property in the Bavaria Fraud, were signed by sending originals through the mails or via courier service.

(*Id*. at ¶¶ 296-297.)  Again, in the section of their Brief in Opposition relating to mail fraud, Plaintiffs do not direct the Court's attention to any other allegations in the First Amended Complaint to support their argument that they sufficiently plead at least two predicate acts of mail fraud.  *See* Doc. No. 70 at pp. 8-12.

For the following reasons, the Court finds that Plaintiffs have failed to sufficiently plead mail fraud.  Plaintiffs' blanket reference in Paragraph 297 to "every Land Contract, every Supplemental Agreement, and every other notarized document" relating to the properties at issue is not sufficient to plead the time, place, and content of the alleged misrepresentations, as required by Rule 9(b).  The First Amended Complaint in this matter contains over 500 paragraphs and attaches over 400 pages of exhibits.  Plaintiffs do not direct this Court's attention to any specific Land Contract, Supplemental Agreement, and/or other "notarized document" that allegedly constitutes mail fraud.  Nor do Plaintiffs

direct this Court's attention to any paragraph(s) in the First Amended Complaint that identify (1) the specific Land Contracts, Supplemental Agreements, and/or other notarized documents that allegedly contain fraudulent misrepresentations; (2) the allegedly fraudulent content of any specific Land Contract, Supplemental Agreement, and/or other notarized document; and/or (3) how any specific Land Contract, Supplemental Agreement, and/or other notarized document furthered the alleged scheme to defraud, as to each Moving Defendant.

Rather, Plaintiffs appear to expect this Court to scour through the First Amended Complaint and its voluminous Exhibits to identify every notarized document that was allegedly sent through the mails and, further, to divine from those documents the times, places, and content of each of the Moving Defendants' allegedly fraudulently misrepresentations. Essentially, Plaintiffs ask this Court to locate the supporting allegations in the First Amended Complaint and construct their argument for them. As discussed above, that is not this Court's function and the Court declines to do so. *See Interroyal Corp*, 889 F.2d at 111; *Layne Christensen Company*, 449 F.Supp.3d at 755; *Uduko,* 975 F. Supp.2d at 786.

To the extent Plaintiffs suggest that the First Amended Complaint's allegations regarding the Willowhurst Property (i.e., Paragraphs 259 through 272) as a "representative sample" are sufficient to plead two or more instances of mail fraud, the Court rejects this argument. As an initial matter, none of the First Amended Complaint's paragraphs regarding the Willowhurst Property allege that a document relating to that Property was sent through the mail or via courier service. (Doc. No. 10 at ¶¶ 259-272.) Indeed, the words "mail" or "mail fraud" do not appear in any of those paragraphs. (*Id*.) It is true that Paragraphs 259 through 272 of the First Amended Complaint reference certain documents, including (1) a Land Contract dated January 26, 2018 (Doc. No. 10-30); (2) a Quitclaim

Deed dated June 3, 2019 (Doc. No. 10-31); (3) a letter dated August 16, 2019 from an individual named Ilam Kedem to "George" (Doc. No. 10-27); (4) a document entitled "Termination of Land Installment Contract" dated November 1, 2019 (Doc. No. 10-32); (5) a General Warranty Deed dated November 26, 2019 (Doc. No. 10-33); and (6) a financial closing statement dated November 20, 2019 (Doc. No. 10-34.)  And it is also true that the First Amended Complaint subsequently alleges that "every Land Contract . . . and every other notarized document for [the properties at issue] . . .were signed by sending originals through the mails or via courier service." (Doc. No. 10 at ¶ 297.) Reviewing these allegations together, one could perhaps argue that Plaintiffs have sufficiently plead that at least some of the Willowhurst Property documents referenced in Paragraphs 259 through 272 were sent via the mail.

However, even assuming that to be the case, the Court would nonetheless find that Plaintiffs have not sufficiently plead a predicate act of mail fraud.  Of the Willowhurst Property documents noted above, only the following four are notarized (and, thus, allegedly sent through the mail): (1) the January 26, 2018 Land Contract (Doc. No. 10-30); (2) the Quitclaim Deed (Doc. No. 10-31); (3) the Termination of Land Installment Contract (Doc. No. 10-32); and (4) the General Warranty Deed (Doc. No. 10-33.)   None of the paragraphs in the First Amended Complaint relating to the Willowhurst Property identify the allegedly fraudulent content of these documents or otherwise explain why or how Plaintiffs believe any of these particular documents were used to further a fraudulent scheme.  This is problematic because the January 26, 2018 Land Contract, for instance, is over twenty pages long and contains multiple terms and conditions.  (Doc. No. 10-30.)  Plaintiffs fail to allege the specific content of this particular Land Contract that is allegedly fraudulent or how that fraudulent content furthered the Moving Defendants' alleged scheme to defraud.

Likewise, none of the allegations in the First Amended Complaint relating to the Willowhurst Property identify the allegedly fraudulent content of either the Quitclaim Deed, the General Warranty Deed, or the Termination of Land Installment Contract. It is altogether unclear to this Court what Plaintiffs believe to be the allegedly fraudulent content of either the Quitclaim Deed or the General Warranty Deed. And, with respect to the Termination of Land Installment Contract, that Contract (like the January 26, 2018 Land Contract) contains multiple terms and conditions, making it unclear what specifically in that Contract Plaintiffs believe to be fraudulent. Thus, the Court rejects Plaintiffs' argument that the First Amended Complaint's allegations regarding the Willowhurst Property are sufficient to plead a predicate act of mail fraud for purposes of establishing a pattern of racketeering activity.

Lastly, the Court is not persuaded by the cases cited by Plaintiffs in support of their argument that they have sufficiently plead mail fraud. Specifically, in their Brief in Opposition, Plaintiffs rely on *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F.Supp.3d 772 (E.D. Mich. 2015), *State Farm Mut. Auto. Ins. v. Universal Health Group*, 2014 WL 5427170 (E.D. Mich. Oct. 24, 2014), and *State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc*., 2014 WL 555199 (E.D. Mich. Feb. 12, 2014). (Doc. No. 70 pp. 9, 13.) None of these district court cases are binding on this Court. Additionally, as discussed below, each of them is distinguishable from the instant action.

In *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F.Supp.3d 772 (E.D. Mich. 2015), State Farm alleged a "multi-faceted scheme involving rehabilitation facilities, prescribing clinics and physicians, and a diagnostic testing facility, all of whom are alleged to have conspired to provide medically unnecessary treatment and to submit false and fraudulent documentation to State Farm for the payment of No–Fault benefits for patients who were involved in

motor vehicle accidents and were thus eligible to obtain Personal Insurance Protection ('PIP') Benefits under Michigan's No–Fault Act." *Id*. at 778. State Farm asserted causes of action for common law fraud, unjust enrichment, and violations of RICO Section 1962(c). *Id*. Defendants moved to dismiss State Farm's Complaint on multiple grounds, including that State Farm had failed to plead mail fraud with sufficient particularity.

The district court denied defendants' motion, finding that State Farm had sufficiently plead mail fraud. The court explained that "[i]n a complex case, involving multiple actors and spanning a significant period of time, where there has been no opportunity for discovery, 'the specificity requirements of Rule 9(b) [should] be applied less stringently.'" *Id*. at 788 (quoting *JAC Holding Enterprises, Inc. v. Atrium Capital Partners, LLC*, 997 F.Supp.2d 710, 726 (E.D. Mich. 2014)). The district court concluded that State Farm's Complaint, read in conjunction with its voluminous Exhibits, "sufficiently put each Defendant on notice of the misrepresentations allegedly made so that each can reasonably know where to begin the task of responding to the allegations." *Id*. at 789. In so finding, the district court recited several detailed paragraphs from State Farm's Complaint that specifically alleged the nature of the allegedly fraudulent misrepresentations contained in the medical bills and supporting documentation that were mailed by defendants to State Farm. *Id*. at 789-790. In addition, the district court noted as follows:

> Paragraphs 85 and 112 of the Complaint allege particular patient testimony in support of the allegation that some services were billed for but never in fact provided. The Charts attached as Exhibits to the Complaint, referenced in these paragraphs of the Complaint, identify the Defendant involved in a particular course of treatment and submission to State Farm and reveal when the false services were rendered with respect to the identified patients. The Charts identify a representative fraudulent mailing by date for each RICO event. These Charts also reveal the dates of service that are alleged to have involved fraudulent conduct, i.e. they identify the first and last dates of service and the total number of visits involved, which State Farm alleges identifies the entire range of services, each one of which they claim to have been a

> part of the fraudulent scheme. Defendants question how Plaintiff intends to establish that each and every visit in the treating time frame involved a fraudulent service provided pursuant to the alleged predetermined protocol. But that is what has been alleged and this is a factual matter of proof that is not appropriately addressed at this pleading stage. What is important here is that the allegations of the Complaint, read in conjunction with the detail provided in the Exhibits, contain sufficient factual content to put Defendants on notice of the fraud that they are alleged to have committed or of which they are alleged to have been a part.

*Id*. at 790.

In the instant case, by contrast, Plaintiffs have failed to direct this Court's attention to any comparable detail either in the First Amended Complaint itself or in any of the Exhibits attached thereto. Instead, Plaintiffs rely on the broad, general allegation that every Land Contract and "every other notarized document" over a nearly two-year period constitutes a fraudulent mailing, without specifying the time, date, participants, or allegedly fraudulent content of any of them. Moreover, and as discussed at length above, the Court rejects Plaintiffs' reliance on their allegations regarding the Willowhurst Property as a "representative sample" because Plaintiffs fail to sufficiently plead mail fraud with respect to that Property either. In sum, the Court finds that, unlike the plaintiff in *State Farm v. Pointe Physical Therapy, supra*, Plaintiffs herein have failed to direct this Court's attention to any allegations in the First Amended Complaint, or Exhibits attached thereto, that sufficiently "put each Defendant on notice of the misrepresentations allegedly made so that each can reasonably know where to begin the task of responding to the allegations." *Id*. at 789.

Plaintiffs' reliance on *State Farm Mut. Auto. Ins. Co. v. Universal Health Group*, 2014 WL 5427170 (E.D. Mich. Oct. 24, 2014) is likewise misplaced. In that case, State Farm similarly alleged that defendants were "part of a racketeering enterprise that has the alleged purpose of fraudulently generating bills for unneeded medical services for individuals who are in automobile accidents and have Personal Injury Protection ("PIP") benefits under plaintiff's auto insurance policies." *Id*. at * 1.

Defendants moved to dismiss, arguing (among other things) that State Farm had failed to plead mail fraud with particularity.  The district court rejected this argument on the grounds that State Farm's complaint was "supported by several lists of what it claims are hundreds of fraudulent evaluations, assessments, treatments, and tests that the [defendants] conducted that led to bills being submitted to Plaintiff for payment," as well as by affidavits from two doctors who performed some work for defendants.  *Id.*  Here, Plaintiffs have failed to support their RICO allegations with the same level of specificity.

Lastly, *State Farm Mut. Auto Ins. Co. v. Physiomatrix, Inc.,* 2013 WL 509284 at * 5 (E.D. Mich. Feb. 12, 2013)[23] also involved allegations that defendants engaged in a scheme to defraud State Farm through the submission of fraudulent claims for medical services that were unnecessary or not actually performed.  *Id.* at *1.  Defendants moved to dismiss, arguing (in part) that State Farm had failed to allege mail fraud with particularity.  The district court denied defendants' motion, noting that (in addition to specifying the "overall fraudulent scheme in the complaint") State Farm provided "attachments to the complaint listing the claims for which it contends Dr. Abu Farha provided a fraudulent diagnosis (and the dates those claims were mailed), examples of his allegedly fraudulent disability certificates, and his initial examination findings." *Id.* at * 5.  Again, Plaintiffs herein have failed to direct this Court's attention to any specific paragraphs in the First Amended Complaint, or Exhibits attached thereto, that provide this level of particularity. [24]

---

[23] In its Brief in Opposition, Plaintiffs cite to a decision in the *Physiomatrix* case dated February 12, 2014.  *See* Doc. No. 70 at pp. 9, 13 (citing *State Farm Mut. Auto Ins. v. Physiomatrix*, 2014 WL 555199 (E.D. Mich. Feb. 12, 2014)).  The decision cited by Plaintiffs, however, does not address the issue of whether State Farm sufficiently plead a predicate act of mail fraud.  Based on its own research, the Court notes that the district court in *Physiomatrix* addressed this pleading issue in the February 2013 decision discussed above.

[24] As noted *supra*, in a different section of their Brief in Opposition regarding the issue of scienter, Plaintiffs cite several paragraphs of the First Amended Complaint relating to the Lot One properties.  (Doc. No. 70 at p. 13.)  While these

Thus, each of the district court cases cited by Plaintiffs are clearly distinguishable from the instant action.  For all the reasons set forth above, the Court therefore finds that Plaintiffs failed to sufficiently plead a predicate act of mail fraud under RICO Section 1962(c).

## 2. Enterprise

The Moving Defendants next argue that Plaintiffs failed to sufficiently plead an association-in-fact enterprise.  (Doc. No. 62 at pp. 19-20.)  A RICO association-in-fact enterprise "includes any . . . union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In *Boyle v. U.S.*, 556 U.S. 938 (2009), the Supreme Court described the characteristics of such an enterprise:

> Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

---

paragraphs do reference the Property LOA and certain Land Contracts and other notarized documents that were allegedly sent through the mail, Plaintiffs nonetheless fail to sufficiently explain in their briefing before this Court which of the many terms, conditions, representations, and warranties in these various documents allegedly constitute fraudulent misrepresentations.  (*Id.*)  Plaintiffs' failure to do so is significant given that Plaintiffs themselves allege that the Moving Defendants did meet at least some of their obligations under some of the various agreements between the parties.  *See, e.g.*, Doc. No. 10 at ¶¶ 133, 147, 152, 157, 160, 190, 200.  Nor do Plaintiffs sufficiently plead (or explain in their briefing) how the documents referenced in these paragraphs furthered the Moving Defendants' alleged fraudulent scheme. Lastly, Plaintiffs' allegations are insufficient because, as discussed above, Plaintiffs were required to allege facts establishing predicate acts of racketeering activity by each of the 18 Moving Defendants.  *See Compound Prop. Mgmt LLC*, 462 F.Supp.3d at 858; *Kerrigan,* 112 F.Supp.3d at 602. *See also Marinac v. Todd*, 2022 WL 3904049 at * 12; *Infocision Management Corp.*, 2009 WL 650282 at * 8. Even considering Plaintiffs' string citation to numerous paragraphs in the First Amended Complaint regarding the Lot One Properties, Plaintiffs fail to sufficiently allege predicate acts of mail fraud by each of the Moving Defendants.

*Id.* at 948. The Supreme Court concluded that an association-in-fact enterprise "has at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. "Put another way, a plaintiff must show 'simply a continuing unit that functions with a common purpose.'" *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 793 (6th Cir. 2012) (quoting *Boyle*, 556 U.S. at 948.)

The Moving Defendants assert that "no continuing unit exists to constitute an enterprise" because "George Nakhle and his entities and Adam and his entities broke away from not only the common entities but also Gutzky and the Investors to create the entities used in the purported JV, Nadam, and Bavaria Frauds." (Doc. No. 62 at pp. 19-20.) The Moving Defendants further assert that "George Nakhle and Adam's side dealings sever the allegations, especially when considering the involvement of Zuk, Zuk Marble, and D. Mody in RSN Finance." (*Id.*)

Plaintiffs' response, in its entirety, is as follows:

> Whether each individual actor can be proven at this stage to have participated in each aspect of every scheme is irrelevant; in all cases the Nakhle Entities acted under the direction of George Nakhle, Samir Nakhle, and Richard Gutzky, acting in concert. Each of the three individuals provided guarantees – George Nakhle and Samir Nakhle to the investors, and Richard Gutzky to CoreVest to obtain the mortgages. Each of the three then pocketed the proceeds rather than paying for the properties they had fraudulently acquired. George acted as the face of the operations, while Samir was his assistant. Gutzky was their "deep pocket" for assistance in obtaining mortgages and other financial matters. While some of the Nakhle Entities were special purpose vehicles, others predated the fraud and clearly demonstrate the existence of a formal ongoing structure.

(Doc. No. 70 at p. 12.) Notably, Plaintiffs fail to cite a single paragraph of the First Amended Complaint in support of any of the above assertions.

The Court finds that Plaintiffs have failed to adequately respond to the Moving Defendants' argument that the First Amended Complaint fails to sufficiently plead the existence of a RICO

63

enterprise and have, therefore, waived any opposition with respect to this issue. Plaintiffs fail entirely (at any point in their Brief in Opposition) to direct this Court's attention to any specific paragraphs in the First Amended Complaint to support the factual assertions in their briefing regarding the existence of a RICO enterprise. Moreover, Plaintiffs also fail to directly address the Moving Defendants' legal argument that Plaintiffs failed to plead the existence of a "continuing unit." Instead, Plaintiffs appear to expect this Court to go through the First Amended Complaint for them, determine which paragraphs support their argument, and then find case law to support the argument that Plaintiffs' factual allegations are sufficient to plead an "association-in-fact" enterprise.

The Court declines to do so. As noted *supra*, this Court "is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp.*, 889 F.2d at 111. *See also Layne Christensen Company*, 449 F.Supp.3d at 755; *Uduko*, 975 F. Supp. 2d at 786. Plaintiffs herein had the opportunity to pinpoint specific allegations in the First Amended Complaint that they believe sufficiently plead the existence of an association-in-fact enterprise, as well as to cite and discuss legal authority in support of their position. Plaintiffs failed to do so.

Accordingly, the Court finds that Plaintiffs have failed to demonstrate that the First Amended Complaint sufficiently alleges the existence of a RICO "association-in-fact" enterprise.

### 3. Conclusion

For all the reasons set forth above, the Court concludes that Plaintiffs have failed to allege a claim under RICO Section 1962(c) because the First Amended Complaint fails to sufficiently plead

either a pattern of racketeering activity or the existence of a RICO enterprise. Accordingly, Plaintiffs'

RICO Claim (Count I) is hereby dismissed.

### C. Remaining State Law Claims

Having dismissed Plaintiffs' sole federal claim, the Court declines to exercise supplemental

jurisdiction over the remaining state law claims.

Pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental

jurisdiction over state law claims once they have dismissed all claims over which they had original

jurisdiction. "In determining whether to retain jurisdiction over state-law claims, a district court

should consider and weigh several factors, including the 'values of judicial economy, convenience,

fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting

*Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988)). "[A] district court has broad discretion

to decide whether to exercise jurisdiction over state law claims." *Smith v. Erie Cty. Sheriff's Dep't*,

603 Fed. Appx 414, 424 (6th Cir. 2015). However, "[w]hen all federal claims are dismissed before

trial, the balance of considerations usually will point to dismissing the state law claims, or remanding

them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Express Corp*., 89

F.3d 1244, 1254-55 (6th Cir. 1996); accord *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th

Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily

reach the plaintiff's state-law claims.").

Here, the Court uses its "broad discretion" in deciding not to exercise supplemental

jurisdiction over Plaintiffs' remaining state law claims. *Smith*, 603 Fed. Appx at 424. The Court

concludes that issues of comity support the Court's decision to decline jurisdiction over Plaintiffs'

state law claims. As other courts have recognized, "[t]he interest in avoiding needless decisions on

state-law issues as a matter of comity weighs heavily against supplemental jurisdiction." *Howell v. Buckeye Ranch, Inc*., 2013 WL 1282518 at *8 (S.D. Ohio Mar. 27, 2013); *see also Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007) (noting "the Supreme Court's general comity-related principle that residual supplemental jurisdiction be exercised with hesitation, to avoid needless decisions of state law"); *White v. City of Cleveland, et al*., 2020 WL 7640932 at *24 (N.D. Ohio Dec. 23, 2020); *Barrio Bros., LLC v. Revolucion, LLC*, 2021 WL 2895509 at *18 (N.D. Ohio July 9, 2021). Were the Court to retain jurisdiction here, it would be required to delve into numerous purely state law claims, as well as the Moving Defendants' likely affirmative defenses, as the Court's rulings on Plaintiffs' federal RICO claim does not fully resolve Plaintiffs' remaining state law claims. Such purely state-law decisions are better reserved for a state court.

Additionally, considerations regarding judicial economy, convenience and fairness do not outweigh the Court's comity concerns. It is not apparent that it would be more convenient or fair to litigate in federal, rather than state, court. Indeed, litigating this matter in state court will be at least as convenient for the parties and witnesses as litigating in this Court, as both courts are located only a few blocks apart in Cleveland, Ohio. *See Fox v. Brown Memorial Home, Inc*., 761 F. Supp. 2d 718, 725 (S.D. Ohio 2011). Moreover, this case has not yet progressed past the pleading stage. No discovery has commenced, no trial date is set, and the matter has only been pending in federal court for a matter of months.

Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. The Moving Defendants' Motion to Dismiss Plaintiffs' state law claims is denied without any prejudice to any right the Moving Defendants may have to refile such motions in any state court proceedings.

**V.**     **Conclusion**

For all the foregoing reasons, the Moving Defendants' Motion to Dismiss (Doc. No. 62) is GRANTED with respect to Plaintiffs' claim for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), as set forth in Count I of the First Amended Complaint.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims set forth in Counts II through XXXVII and, therefore, those Counts are dismissed without prejudice.

**IT IS SO ORDERED.**

  *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  November 17, 2023                         U. S. DISTRICT JUDGE